UNITED STATES FEDERAL DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**MAR 2 6 2002**

| | |
|---|---|
| William E. Shea, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) COMPLAINT |
| v. | ) |
| | ) CASE NUMBER 1:02CV00577 |
| | ) |
| Colin Powell | ) JUDGE: James Robertson |
| (in his official capacity as | ) |
| Secretary of State only) | ) DECK TYPE: Employment Discrimination |
| | ) |
| Defendants | ) DATE STAMP: 03/26/2002 |
| | ) |

--------------------------------------------------------------------------------

COMPLAINT FOR VIOLATION OF CONSTITUTIONAL (FIFTH AMENDMENT
DUE PROCESS) AND CIVIL RIGHTS ACT, TITLE VII RIGHTS

Plaintiff, William E. Shea, alleges on information and belief:

1. This action arises under the United States Constitution and federal statutes. This

Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), 5

U.S.C. § 702, 42 U.S.C. § 2000e-16(e), and 22 U.S.C. § 4140. If the Court lacks

jurisdiction pursuant to these statutory review provisions, it has jurisdiction over this case

as a non-statutory review action. *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C.

Cir. 1996), citing *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94,

23 S.Ct. 33 (1902). Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

2. Administrative procedures have been exhausted, and further attempts at obtaining

relief administratively would be futile.

   2(a). More specifically, I submitted a grievance to the State Department

concerning the matters herein complained of, alleging that certain State Department

actions (and the Executive Orders and statutes that authorize those actions) violated my

due process rights pursuant to the Fifth Amendment of the U.S. Constitution. The State
Department denied the grievance. I appealed to the Foreign Service Grievance Board,
which found that it lacked jurisdiction to decide the matter, since it is without authority to
rule on the constitutionality of the challenged Executive Orders, statutes, policies and
programs. I also alleged in my grievance that my rights pursuant to Title VII (42 U.S.C. §
2000e *et seq.*) were being violated. However, since my Title VII rights are being violated
only if the various programs I challenged are unconstitutional, this complaint too would
have required deciding the constitutional issues first, which the Board has no authority to
do.

2(b). A Foreign Service officer who files a grievance regarding an alleged
violation of civil rights may not also file an EEO complaint regarding the same matter.
Thus, it appears that no further administrative avenues of relief are open.

2(c). I received the decision of the Foreign Service Grievance Board dismissing
for lack of jurisdiction on January 30, 2002, which date is within 90 days of the filing of
this complaint.

3. I am now and have since May 1992 been a Foreign Service officer, an
employee of the Department of State ("Department"). Relevant to the issues in this case,
my race is white, I am of Irish descent  (ethnicity), and I am a citizen of the United States.

4. The defendant Colin Powell is the Secretary of State, and as such is responsible
for the Department's policies and programs. The Department of State is a department of
the executive branch of the United States government, and an employer for purposes of
Title VII.

5. The Department's actions are reviewable pursuant to the standards of the

Administrative Procedure Act. In addition, a federal employee who has filed a complaint

of a Title VII violation with an agency, if aggrieved by the final disposition of the

complaint, may file a civil suit within 90 days of receiving the final decision. 2000e-

16(c).

6. The Department of State has discriminated against me because of my race,

white, and my ethnicity, Irish (or more generally non-minority), in violation of the Fifth

Amendment to the U.S. Constitution and Title VII, 42 U.S.C. § 2000e-16(a), the

Department continues to discriminate against me on the grounds of race and ethnicity,

and unless enjoined from doing so will continue to discriminate against me on the basis

of race and ethnicity in the future, among other ways, by:

6(a) Subjecting me to a higher standard than racial/ethnic minority applicants for

employment when I applied for a job as an FSO in 1982 - 1983. More specifically, I took

and passed the Foreign Service Written Exam in 1982. As a result, I took the Foreign

Service oral exam in early 1983. The State Department held non-minority applicants,

including me, to a higher standard than minority applicants in order to decrease the

percentage of non-minorities and increase the percentage of minority applicants being

made offers of employment. The governmental interest being advanced by this racially

discriminatory policy was achieving diversity (that is, racial/ethnic balancing of the State

Department's workforce with that of American society in general). Although it is

impossible to re-create conditions as they would have existed without discriminatory

treatment, it is reasonably possible that, without racially/ethnically discriminatory

treatment, I would have passed the oral exam and been offered a position as an FSO in

1983. The factual allegations in this sub-paragraph are made pursuant to Fed. R. Civ. P. 11(b)(3), as being likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

6(b)  Subjecting me to a lower paygrade (and inferior terms and conditions of employment that are tied to paygrade, including lower benefits and lower-responsibility assignments) than racial/ethnic minority applicants for employment when I was hired as an FSO in 1992. More specifically, at the time I applied for a position as an FSO in 1991 and started in 1992, the Department was giving higher starting paygrades to minorities with the same qualifications I had, and lower starting paygrades to non-minorities. I was not eligible to start at a higher grade only because of my race/ethnicity. I would have started two paygrades higher than I did, but for my non-minority race/ethnicity status. The governmental interest being advanced by this racially discriminatory program was, again, achieving racial balancing (diversity) in the workforce. The factual allegations in this sub-paragraph are made pursuant to Fed. R. Civ. P. 11(b)(3), as being likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

6(c)  Because of the racial/ethnic discrimination noted in subparagraphs (a) and (b) above, I am today receiving less pay with each paycheck than I would be if I had not been discriminated-against as alleged. This is a recurring violation of Title VII with the receipt of each paycheck. At an absolute minimum, even in the unlikely event that I had never been promoted, if I had started in 1992 at FS-3 I would today be receiving pay at no less than the rate of an FS-3 step 9 ($68,684 per year) rather than my current FS-3 step 5 ($61,025). If I had started at FS-3 and been promoted at about an average rate, I would

4

now be paid at about the grade of FS-2 step 4 ($73,119). If promoted at a faster-than-average rate, I would be receiving higher pay than $73,119.

6(d)  Assignment to DCM/SEP position:  This summer I will apply for positions as a Deputy Chief of Mission (DCM) at any of a number of smaller embassies that are included in the Special Embassy Program (referred to as SEP embassies). I will be discriminated-against because of my race/ethnicity pursuant to an official written policy of the Department. This policy is contained in a cable sent from the Department headquarters to all U.S. diplomatic posts worldwide, and is also included on the Department's Intranet site. A copy is attached (Attachment 1) to this pleading. The policy clearly tells those officers responsible for picking DCMs at SEP posts that they should show favoritism toward minorities, and threatens negative consequences (loss of the privilege of making the final DCM selection) if an insufficient number of minorities are selected for the DCM/SEP positions.

6(e) Application to any position in the Bureau of Western Hemisphere Affairs (WHA). This summer I will apply for positions that fall within the responsibility of the Bureau of Western Hemisphere Affairs. I will be discriminated-against because of my race/ethnicity pursuant to an official written policy of the Bureau intended to advance diversity (that is, racial balancing). This written policy is contained in a statement published and distributed to Foreign Service posts around the world in an official Department publication, "State Magazine." The copy appears verbatim on the Department's official Intranet site. I have downloaded a copy of the policy statement from the official Intranet site and attached it to this pleading (Attachment 2).

6(f). Creating a hostile atmosphere, as far as personnel decisions are concerned,

for non-minorities. The Department has numerous unlawful policies and programs in addition to those listed above that treat otherwise similarly-situated people differently, according to race and ethnicity, in order to achieve racial balancing. The totality of the effect of all of these policies and programs is the creation of an environment in which discrimination in personnel decisions against non-minority officers is considered acceptable, even virtuous, if undertaken to achieve a racially balanced workforce. The factual allegations in this sub-paragraph are made pursuant to Fed. R. Civ. P. 11(b)(3), as being likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

7. I am a supervisor who routinely makes various personnel decisions (including decisions that constitute personnel actions for Title VII purposes) concerning some 20-plus subordinates (both U.S. citizen and non-citizen) as well as occasional applicants for employment. The Department's racial preference policies and programs require that I take race into consideration in personnel decisionmaking concerning these government employees and applicants for employment, treating minorities and non-minorities differently, and will continue to so require in the future, in violation of both my subordinates' rights pursuant to the Fifth Amendment, Title VII, and the Foreign Service Act (22 U.S.C. § 3905[b]), and in violation of my right not to participate in an unlawful scheme of racial discrimination.

8. All conditions precedent to the filing of suit have been performed or have occurred.

## DECLARATORY AND INJUNCTIVE RELIEF CONCERNING UNCONSTITUTIONALITY OF STATUTES, EXECUTIVE ORDERS, AND STATE DEPARTMENT PROGRAMS

8. In a separate "Emergency Motion for Relief in the nature of an Injunction and Declaratory Relief" that I will file separately, I will request that the Court expeditiously declare the two State Department programs complained-of to be violations of the Constitution and Title VII. In addition, I will request that the Court declare those Executive Orders and U.S. Code provisions authorizing the challenged programs for the purpose of diversity (racial/ethnic balancing) to be violative of the Constitution and Title VII. I will not make that request or argument here, as the matter will be fully set out in the Emergency Motion.

## RELIEF

WHEREFORE, I request that this Court grant the following relief:

(a) Order the Department to provide sufficient remedial relief to make me whole for the loss I have suffered as a result of the discrimination against me as alleged in this complaint, including as appropriate retroactive hiring, retroactive promotion, back pay, and a raise in current paygrade to that which I would have today if I had not been discriminated against.

7

(b) All other relief as appropriate. (In the separate Emergency Motion noted above, I will request declaratory and injunctive relief.)

Respectfully submitted,

William E. Shea
*Pro Se*
*(Please use this address for mail)*
PO Box 1689
Nogales, Arizona 85628

Actual residential address (*should not be used for mail*):
Av. de Anza 114 Esq. con Cabral
CP 83150, Colonia Pitic
Hermosillo, Sonora, Mexico

Telephone (in Mexico, from the US)  011 52 662 217 2375
Email address:  williameshea@yahoo.com

8

# Attachment 1

*Bureau of Human Resources*
*The Best Serving the Best*

**Office of the Director General**

HR Home

# First Person DG Messages

HR Home | DG Home | **Themes** | **Speeches** | **DG Messages**

October 10, 2000

## DCM/SEP Selection Process: Pilot Program

Many of you have raised with me the role of ambassadors in the selection of DCMs under the Special Embassy Program (SEP). We have decided to institute a one-year pilot program to give ambassadors at SEP posts the same role in the selection of their DCMs as currently exists at non-SEP posts. This new initiative will more deeply involve ambassadors in the Department's War for Talent. This will be particularly true at SEP posts where ambassadors will be selecting as their DCMs the FO-1 and FO-2 officers who will be expected to move into more senior management positions in the near future.

We need to put one thing out in the open at the beginning of this pilot program: the main reason that the Department held onto the choice of DCMs at SEP posts was to ensure that appropriate consideration was given to diversity. This is very important to successful talent management. The reason I have chosen to proceed with a one-year pilot program is that, if we review the choices of DCMs at SEP posts a year from now and find that we have not promoted diversity in our choices, I plan to return to the old system. I count on you not only actively to recruit a diverse group of candidates for consideration but, when you get the list from the Department of the candidates proposed to you as your DCM in your SEP post, to keep diversity considerations clearly in mind.

Let me outline some of the specifics of this new initiative. Over the last four years, the DCM/SEP Committee, which is chaired by the Director of HR/CDA, has selected one person from a list of qualified candidates for each DCM/SEP post. The Director General then approved the candidate.

The new, one-year pilot program will begin during the 2001 assignment cycle. The DCM/SEP committee will now prepare a short list of candidates for consideration by ambassadors, who will select the DCM. In cases where there is no sitting ambassador, the Director of CDA and the Principal Deputy Assistant Secretary of the relevant geographic bureau will jointly make recommendations on DCM/SEP assignments from the short list to the DG.

Ambassadors are encouraged to interview in person or by telephone all the candidates who are included on the short lists. They should then communicate their choice of DCM to the Director of CDA. The cable/memo needs to include a review of the steps the ambassador took to evaluate the candidates and a statement giving the reasons for the decision. The Director General will give final approval to all DCM/SEP selections.

This new pilot procedure will take effect in the upcoming 2001 bidding cycle. Ambassadors will receive additional information on the program along with the short list of candidates for their DCM vacancies (SEPTEL).



**FILED**

**MAR 2 6 2002**

02 0577

HR Home | DG Home | Themes | Speeches | DG Messages

Click here to send an e-mail to the Director General

Last Updated on 2/12/2001
Contact Freddie Eatmon at eatmonFP2@state.gov and 202-647-5275 **OR**
Cozetta Johnson at johnsonCD@state.gov and 202-647-9280
with any questions on this site

# Attachment 2

## The 12 leadership tenets of the Bureau of Western Hemisphere Affairs:

- Supervisors will be leaders, managers and mentors.
- Supervisors will delegate authority to the fullest extent practical to empower action officers, issue clear and concise instructions and be available for further clarification.
- Action officers will track aggressively issues requiring bureau action, provide senior managers with policy options and complete assigned tasks in a timely manner.
- First-time supervisors will receive leadership and management training, including instruction in writing evaluation reports, within six months of beginning their tour.
- Leadership potential will be a principal criterion in selecting candidates for supervisory positions.
- Managers will seek assessments from a candidate's peers and subordinates in addition to the candidate's supervisors in making selections for supervisory positions.
- Supervisors will hold a minimum of three counseling sessions a year with rated employees to provide candid and constructive feedback on employee performance. Supervisors shall provide employees with a written summary of counseling sessions.
- Supervisors will reward exceptional performance through special recognition, assignments and other incentives.
- Supervisors will work with employees to seek opportunities for employee professional training, growth and enrichment.
- Supervisors will ensure that there are sufficient personnel and financial resources to achieve bureau objectives and reorder duties and workload to make resources available without placing unreasonable burdens on individual employees.
- Candidates from all cones will have an equal chance to compete for Foreign Service positions in the bureau.
- Bureau employees will recruit high-caliber candidates for bureau vacancies, with particular emphasis on enhancing diversity and range of talent in the bureau workforce.