## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM E. SHEA,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Civil Action No. 02cv577 (JR)
                                          )
CONDOLEEZZA RICE, Secretary,              )
        Department of State,              )
                                          )
                    Defendant.            )
_____ )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Condoleezza Rice, Secretary of the Department of State, respectfully moves,

pursuant to Fed. R. Civ. P. 56, for judgment on the grounds that, based upon the undisputed facts

in this matter, including the fact that Plaintiff waited over nine (9) years to file his EEO

complaint, and based upon the Supreme Court's recent decision in Ledbetter v. Goodyear Tire &

Rubber Co., Plaintiff claim is untimely.  In addition, because the State Department's mid-level

minority placement program was implemented in compliance with a specific statutory

requirement that was enacted by Congress after Title VII, that program is not subject to the

provisions of Title VII, at least with respect to reverse-discrimination claims, and Plaintiff cannot

maintain his claim against the Defendant.

In support of this motion, the Court is respectfully referred to the Statement of Material

Facts Not in Genuine Dispute and the accompanying Memorandum of Points and Authorities

attached hereto.  A proposed Order consistent with this motion is also attached.

Plaintiff should take notice that any factual assertions contained in the attached

Memorandum in Support of this Motion and supporting exhibits will be accepted by the Court as true unless the Plaintiff submits his own affidavit or other documentary evidence contradicting the assertions therein.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992).

Furthermore, the Federal Rules of Civil Procedure provide:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); See Fox v. Strickland, 837 F.2d 507 (D.C. Cir. 1988) (*pro se* party may lose if he fails to respond to a dispositive motion); Local Rule 56.1 ("the court may assume that facts identified by the moving party in its statement of facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion").

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILLIAM E. SHEA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02cv577 (JR) |
| | ) | |
| CONDOLEEZZA RICE, Secretary, | ) | |
| Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

1.      Plaintiff is a white male of Irish descent.  Complaint (Dkt. No. 1) at ¶ 3.

2.      In 1985, Congress enacted the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987 ("1986-87 FRAA").  Pub. L. 99-93.

3.      In the 1986-87 FRAA, Congress directed the State Department ("Department") to "develop . . . a plan designed to increase significantly the number of members of minority groups and women in the Foreign Service in that agency."  Pub. L. 99-93, Title I, § 152(a); 22 U.S.C. §3922a(a).  Congress further directed that "each plan developed pursuant to this section shall . . . place particular emphasis on achieving significant increases in the numbers of minority group members and women who are in the mid-levels of the Foreign Service."  Id. at 3922a(b).

4.      To implement that Congressional mandate, the Department instituted a mid-level minority placement program, as one program under its more general Mid-Level Foreign Service Career Candidate Program (sometimes called by slightly different names, e.g., Mid-Level Foreign Service Officer Program).  See Standard Operating Procedure No. 22 (Jan. 8, 1982) (Def. Exh. 1) at 1.  This mid-level minority placement program operated from January 1987

through January 1993.  See Letter from Evelyn Day to Charles Middleton, Sr., Feb. 23, 1994

(Def. Exh. 2), at 2.

5.      The Department's description of the requirements and procedures for the general

mid-level program, including the minority placement program, was revised in November 1990.

See BEX [the Department's Board of Examiners] Assessors Manual, Section on Mid-Level

Foreign Service Officer Career Candidate Program (State), rev. Nov. 90 (Def. Exh. 3).  That

description addresses the version of the mid-level program that was in effect when Plaintiff

applied for and joined the Foreign Service in 1990-92.

6.      The mid-level program was a mechanism for the Department to place new

Foreign Service Officers ("FSOs") at more senior grades than the normal entry-level grades,

specifically at grades FS-03, FS-02, or, in exceptional circumstances, FS-01.  See id. at I-4.1.  (In

the Foreign Service personnel system, employees are promoted to a lower grade number.  Thus,

FS-05 is the entry-level, and FS-01 is the upper level).

7.      Eligibility for the mid-level program in 1990-1992 required either (a) a

"certification of need," i.e., Department internal documentation that the Foreign Service required

an outside hire at a particular candidate's specialty and level, or (b) for the minority placement

program, membership in one of the following minority groups: American Indians and Alaskan

Natives, Asians and Pacific Islanders, Blacks and Hispanics.  See id. at I-4.2 to I-4.3.

8.      In addition to either a certification of need or minority group membership, a

mid-level applicant had to pass a screening to determine whether he or she had extensive

professional work experience (above that required for entry-level FSO applicants) of particular

types.  See id. at I-4.2, I-4.10 to I-4.16.  The screening also determined whether the candidate had

2

demonstrated required abilities such as writing skill, supervisory responsibility, and adaptability to foreign cultures. See id. at I-4.3 to I-4.4. The applicant had to pass a comprehensive oral examination. See id. at I-4.4 to I-4.9. If he or she passed all of these, and a background investigation, medical review and a Final Review Panel, the candidate would be placed on a register to await possible placement into a Foreign Service position. See id. at I-4.9.

9.     Plaintiff submitted an application for the Foreign Service signed September 1, 1990. See SF-171 (Def. Exh. 4). On May 31, 1992, the Department hired Plaintiff as an entry-level FSO. App. at 13, 15. A new FSO's starting grade and class are set based on his or her education, experience, and salary history. Plaintiff was hired at grade FS-05, step 5. See Agreement to Join the Foreign Service, April 22, 1992 (Def. Exh. 5); SF-50, May 31, 1992 (Def. Exh. 6).

10.    Plaintiff was a member of the Department's introductory class for entering FSOs, known as "A-100," that started on June 1, 1992. See Memo from Perry Shankle to the Director General, June 24, 1992 (Def. Exh. 7). Plaintiff's A-100 class included thirty-one new FSOs. See id.

11.    Two members of the June 1992 introductory class, both minority group members, were accepted under the mid-level program. See id.

12.    Plaintiff stated that he recalls in 1988-90, before he became an FSO, seeing a Department recruiting brochure including a statement "the gist [of which] was that qualified minorities could start at a higher grade." See Plaintiff's Response to Defendant's First Set of Interrogatories and Production Requests (Excerpts at Def. Exh. 8), at 4. Plaintiff stated that "[i]t was well-known in Plaintiff's A-100 class that two people in the class were starting at midlevel

grades due to their participation in a minority midlevel hiring program."  See id.

13.    On or about February 4, 1993, the State Department suspended the mid-level

minority placement program.  See Memo from A. Peter Burleigh to the Deputy Secretary, March

19, 1993 (Def. Exh. 9); Def. Exh 2, at 2.  It was never resumed.

14.    The more general mid-level program continued to exist for some time after early

1993 on the certification of need basis only, i.e., without its minority recruitment component.

See Def. Exh. 9, at 0739; BEX Assessors Manual, Section on Mid-Level Foreign Service Officer

Career Candidate Program (State), revised September 1993 (Def. Exh. 10), at I-4A.2.  This

general mid-level program was open to all applicants, including whites.  Id.

15.    Under 22 U.S.C. § 4134(c), Plaintiff has 180 days from an alleged discriminatory

occurrence to file a grievance with the Foreign Service Grievance Board.

16.    Plaintiff filed a grievance alleging discrimination with the Foreign Service

Grievance Board on July 11, 2001.

17.    Plaintiff has not challenged the pay-grade system of the State Department or the

Federal government as it currently exists or as it is currently applied to Foreign Service

employees.  See generally Complaint.

18.    Plaintiff concedes that the State Department did not extend its alleged 1992

discriminatory policy into the charging period.  Plaintiff's Opposition to Defendant's Motion for

Judgment on the Pleading (Dkt. No. 37) at 2 and 17.

19.    Plaintiff does not claim that the State Department denied him a promotion or a

raise, or that he received a racially-biased performance review, due to a facially discriminatory

policy in place at any time immediately prior to or during the charging period.  See generally

Complaint (Dkt. 1).

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM E. SHEA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 02cv577 (JR) |
| | ) |
| CONDOLEEZZA RICE, Secretary, | ) |
| Department of State, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

This is a reverse-discrimination claim brought pro se by plaintiff, a tenured Foreign

Service Officer with the State Department.  Plaintiff alleges that he is being discriminated against

in paygrade as a result of racial/ethnic discrimination.  Specifically, Plaintiff claims that, at the

time he was hired with the State Department in 1992, he was started at a lower paygrade than

some minority new hires, as a result of a then-existing program aimed at achieving racial

diversity in the State Department.  Plaintiff does not challenge the pay-grade system of the State

Department or the Federal government as it exists or as it is applied to Federal employees, nor

does he claim that the minority placement program continued at any time immediately prior to or

during the 180 day charging period for discrimination claims.  See generally Complaint.

I.      **STATEMENT OF FACTS.**

On July 11, 2001, Plaintiff filed an administrative grievance with the Foreign Service

Grievance Board of the Department of State.  After the Grievance Board process resulted in a

decision against Plaintiff, he sought review of the Grievance Board's decision in the District

Court on March 26, 2002.

Defendant moved to dismiss the Plaintiff's Complaint arguing, *inter alia*, that the Appellant's claims are untimely, as he alleges a discriminatory act that occurred in 1992. The District Court agreed, finding that because Plaintiff "did not allege [] a discriminatory system akin to those in <u>Bazemore v. Friday</u>, 478 U.S. 385 (1986)] and <u>Anderson v. Zubieta</u>, 180 F.3d 329 (D.C. Cir. 1999)] . . . [h]is complaint amounted to no more than allegations of discrimination in May, 1992, when he started at a lower pay grade." Accordingly, the District Court dismissed the complaint.

Plaintiff appealed the dismissal to the Court of Appeals for the District of Columbia Circuit, claimed that the Court erred when it "rejected my assertion that . . . the continuing receipt of a discriminatorily lesser paycheck is a new violation of Title VII with the receipt of each such paycheck, starting a new limitations clock for each paycheck, even if the original discriminatory act of placing me in a lower paygrade occurred outside the limitations period." (Appellant's Submission of Initial Information.).

In June 2005, the D.C. Circuit agreed with Plaintiff, reversing the District Court's ruling. The crucial basis for the Circuit Court's decision was its reading of <u>Bazemore v. Friday</u>, 478 U.S. 385 (1986), as holding "that the employer committed a separate unlawful employment practice each time he paid one employee less than another for a discriminatory reason." <u>Shea</u>, 409 F.3d at 452. The Circuit Court found that by alleging a discriminatory low paycheck that originated from the initial hiring, Plaintiff alleged "a persistent discriminatory salary structure" that survived the timeliness limits placed upon Title VII claims by the Supreme Court in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), and <u>United Airlines, Inc. v. Evans</u>, 431 U.S. 553 (1977). <u>Shea</u>, 409 F.3d at 453. In other words, the Circuit Court concluded that a

2

current paycheck reflecting past discrimination could be the basis for a present discrimination complaint.

On May 29, 2007, the Supreme Court issued its decision in <u>Ledbetter v. Goodyear Tire & Rubber Co.</u>, __ U.S. __, 127 S.Ct. 2162  (May 29, 2007).  The decision in <u>Ledbetter</u> rejects the analysis used by the Court of Appeals in the present matter, and found that "a new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is 'facially nondiscriminatory and neutrally applied.'" <u>Id</u>. 127 S.Ct. at 2174 (<i>quoting</i> <u>Lorance v. AT&T Technologies, Inc.</u>, 490 U.S. 900, 911 (1989)). Notably, the Court listed the D.C. Circuit Court's decision in <u>Shea</u> as an example of a case in conflict with the 11th Circuit Court's opinion in <u>Ledbetter</u>.  <u>Id</u>. at 2166.  The Supreme Court resolved this conflict by affirming the 11th Circuit Court's decision requiring that a Title VII plaintiff demonstrate that an employer made an affirmative and discriminatory decision within the charging period in order to timely file an EEO charge.  <u>Id</u>. at 2178 (<i>affirming</i> <u>Ledbetter v. Goodyear Tire and Rubber Co., Inc.</u>, 421 F.3d 1169 (11th Cir. 2005)).   The Supreme Court rejected a petitioner's claim, similar to Plaintiff's here, that each paycheck reflecting past discriminatory acts offered a new opportunity to raise a discrimination claim.  Rather, the Court makes clear that some actual discriminatory act must occur within the statutory period.

## II.     PLAINTIFF'S COMPLAINT IS UNTIMELY.

### A.     Procedural History of Ledbetter.

Petitioner Lilly Ledbetter filed suit against Goodyear Tire & Rubber Co. ("Goodyear"), alleging that she was unlawfully discriminated against because of her sex when she received poor performance evaluations throughout her tenure with the company which resulted in lower pay

than her male colleagues.  127 S.Ct. at 2165-66.  Citing the Supreme Court's decision in

Bazemore, Ledbetter alleged that because of the past discriminatory treatment, each paycheck

issued during the EEOC charging period (the 180-day period preceding the filing of her EEOC

administrative claim) was a separate act of discrimination that carried forward intentionally

discriminatory treatment from prior years.  Id. at 2167.  A jury found for Ledbetter, awarding

backpay and damages.

On appeal, Goodyear contended that the pay discrimination claim was time barred with

regard to all pay decisions made before the 180 day EEO administrative filing period, and that

Ledbetter failed to provide any evidence of a discriminatory act relating to her pay occurring after

that date.  The Court of Appeals for the Eleventh Circuit reversed the District Court's

enforcement of the jury verdict and award, finding that Ledbetter's claim was untimely.  The

Circuit Court held that under Morgan, Ledbetter could "state a timely cause of action for

disparate pay only to the extent that the 'discrete acts of discrimination' of which she

complain[ed] occurred within the limitations period created by her EEOC questionnaire [180

days from the date of her initial EEOC complaint]."  Ledbetter v. Goodyear Tire & Rubber Co.,

421 F.3d 1169, 1180 (11th Cir. 2005).  The Court further held that "any acts of discrimination

affecting her salary occurring before then are time-barred."  Id.[1]  Accordingly, because Ledbetter

alleged that her salary was made disparately low by actions (discriminatory performance

evaluations) that occurred well-before the 180 day EEOC charging period, and further failed to

---

[1]        As an example of a case whose view is opposite of the Eleventh Circuit's in
Ledbetter, the Court pointed to the D.C. Circuit's decision in Shea v. Rice, 409 F.3d 448 (D.C.
Cir. 2005), for the proposition that paychecks that are discriminatorily low because of an earlier
act that occurred outside of the limitations period create a new cause of action at each issuance.
See 421 F.3d at 1184 n. 19.

demonstrate any discriminatory act, other than the payment of a low paycheck, occurring within

the charging period, her claim was untimely and the Court overturned the jury verdict and

entered judgment for Goodyear as a matter of law.  Id. at 1189-1190.

      **B.**      <u>**The Supreme Court Decision.**</u>

Because the 11th Circuit Court's decision created a split in the circuits, including with the

D.C. Circuit Court's decision in <u>Shea</u>, the Supreme Court granted Ledbetter's Petition for Writ of

Certiorari.  <u>Ledbetter v. Goodyear Tire & Rubber Co.</u>, 126 S.Ct. 2965 (2006); <u>see</u> <u>also</u> <u>Ledbetter</u>,

127 S.Ct. at 2166 (*citing* <u>Shea</u> as being in conflict with the 11th Circuit's decision below).

After reviewing the Supreme Court's case law regarding the triggering of the EEOC

charging period when a "discrete unlawful practice" takes place, the Court stated that "[a] new

violation does not occur, and a new charging period does not commence, upon the occurrence of

subsequent nondiscriminatory acts that entail adverse effects resulting from the past

discrimination."  <u>Ledbetter</u>, 127 S.Ct. at 2169.  "[C]urrent effects alone cannot breathe life into

prior, uncharged discrimination; . . . such effects in themselves have 'no present legal

consequences.'"  <u>Id</u>. (*quoting* <u>United Airlines, Inc. v. Evans</u>, 431 U.S. 553, 558 (1977)).

Accordingly, the Supreme Court held that, in order to raise a disparate pay claim under

<u>Bazemore</u>, a complainant must demonstrate two separate acts by the employer.  First, the

complainant must adduce evidence that the employer initially adopted its pay system in order to

discriminate on an unlawful basis (such as sex or race).  <u>Id</u>. at 2174.  Second, the complainant

must show that the employer later applied this system to the complainant within the charging

period with discriminatory animus.  <u>Id</u>.

The Court further specified that, in order to demonstrate the application of a currently

discriminatory pay system under the second prong, a complainant cannot rely solely upon the disparate pay to evidence a present discriminatory pay structure.  Id.  "The fact that precharging period discrimination adversely affects the calculation of a neutral factor . . . that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period.  Id.  Rather, a reviewing court must look to see if the employer "engaged in fresh discrimination" by focusing "on the present salary structure, which is illegal if it *is a mere continuation of the [pre-charging] discriminatory pay structure*."  Id. at 2173 (*quoting* Bazemore, 478 U.S. at 397, n. 6) (emphasis added in opinion).

In Lilly Ledbetter's case, the Court found that her interpretation of the case law, which is similar to the Plaintiff's and the D.C. Circuit's here, "would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive.  The effect of this shift would be to impose liability in the absence of the requisite intent."  Id. at 2170.  See also id. at 2172 ("We therefore reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period").  Accordingly, because the alleged discriminatory act that created the disparately low paychecks occurred well-outside the charging period, the Court held that Ledbetter's claim was untimely.  Id. at 2172.

In the short time since Supreme Court's Ledbetter decision in May 2007, courts have relied heavily upon it, including in cases such as the present one that turn on whether each subsequent paycheck based on an earlier decision constitutes a separate act for time bar purposes. The Eleventh Circuit, for example, affirmed a District Court's dismissal as time-barred of an

employee's non-promotion claim against the Air Force.  <u>Smithers v. Wynne</u> (11th Cir. 2008), 2008 US App. LEXIS 167 (unpublished) (Def. Exh. 11).  Where the employee "asserted that his pay would be higher but for the past discrete instances of discrimination," i.e., the non-promotion decisions, the Court of Appeals held, based on <u>Ledbetter</u>, "that Smithers's paychecks are not continuing violations of the alleged past acts of discrimination and retaliation." <u>Id</u>. at *6.

       **C.**    <u>**Plaintiff's Claim Is Time-Barred Under the Supreme Court's Decision in Ledbetter.**</u>

      In the present case, the State Department's pay system has been facially nondiscriminatory and neutrally applied during the charging period at issue.  Indeed, Plaintiff does not allege that he suffered any discrimination on the basis of his race except at the time of, or as a result of, his 1992 hiring at a particular grade level.  Nor does Plaintiff allege that the State Department maintained a discriminatory hiring program or a policy of paying minorities more than non-minorities anytime during the charging period.

      Thus, the Supreme Court's opinion in <u>Ledbetter</u> confirms that Plaintiff's claim is not akin to that in <u>Bazemore</u>, where previously institutionalized racial pay disparities among extension service workers in North Carolina continued on into the charging period as a discriminatory pay structure (it did not matter if someone was hired 10 years ago, or 10 days ago, if that person was a racial minority they were paid less than white workers because the *system* presently maintained two different pay levels that were discriminatory).  <u>Bazemore</u>, 478 U.S. at 391.  <u>See</u> <u>also</u> <u>Ledbetter</u>, 127 S.Ct. at 2172 (noting that the employees in <u>Bazemore</u> "brought suit claiming that pay disparities attributable to the old dual pay scale persisted").  Rather, Plaintiff's claim is more analogous to that in <u>Evans</u>, where a past discriminatory policy that affected the current calculation of pay received by the Plaintiff was ended long before the Plaintiff filed an

administrative claim.  See Evans, 431 U.S. at 558.  Thus, the employer "was entitled to treat the [prior act made pursuant to a past discriminatory policy that was no longer in effect] as lawful after respondent failed to file a charge of discrimination within the [charging period]."  Ledbetter, 127 S.Ct. at 2168 (quoting Evans, 431 U.S. at 558).   Here, the minority placement program was ended years before Plaintiff filed his EEO charge, and the pay system in use by the State Department at the time of Plaintiff's administrative complaint was neutral, and did not create a pattern of discrimination.

### 1.    Ledbetter and Evans Control This Case.

Plaintiff's claim that a past discriminatory pay structure imputes current discriminatory intent to the employer with the issuance of each paycheck is not only contradictory to the clear language in Ledbetter, but it is further undermined by the Supreme Court's prior decision in Evans.  In Evans, the employer had a facially discriminatory policy of requiring married flight attendants to resign.  Evans, 431 U.S. at 554.  Nevertheless, after the policy was stuck down and Evans was returned to her position as a flight attendant, Evans pay was set at a level lower than those flight attendants who were not forced to resign due to marriage.  Id. at 555.  The Supreme Court held that even though "the airline's 'seniority system [did] indeed have a continuing impact on her pay and fringe benefits . . . the critical question [was] whether any present violation exist[ed].' " Id. at 558 (quoted in Ledbetter,127 S.Ct. at 2167-2168) (emphasis in original).  The Court found that because the employer implemented its "current" policy in a neutral manner, the continuing effects from a pre-charging period discriminatory policy does not constitute a present violation, even where her salary was lower because of that "past" policy.  Id.  The existence of a past facially discriminatory policy "may constitute relevant background evidence in a proceeding

in which the status of a *current* practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." Id. (emphasis added). See also Ledbetter, 127 S.Ct. at 2168 ("It would be difficult to speak to the point more directly [than the quote from Evans]").

Here, Plaintiff acknowledges that the alleged discriminatory program did not exist at the time of his administrative grievance. See Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings (Dkt. No. 37) at 2 ("I am not saying that these factual assertions [stating the minority recruitment program at the center of this case ended at least seven years before filing this claim] are false"). Further, Plaintiff does not claim that Defendant denied him a promotion or a raise, or that he received a racially-biased performance review, due to a facially discriminatory policy in place at any time immediately prior to or during the charging period. See generally Complaint (Dkt. 1). Consequently, even if this Court agrees with Plaintiff that Defendant's 1992 placement program continues to impact upon his paycheck, Plaintiff fails to demonstrate a "present" actionable violation.

Accordingly, Plaintiff's claim is untimely under the Supreme Court's analysis in Ledbetter v. Goodyear Tire & Rubber Co., No. 05-1074 (May 29, 2007), and United Airlines, Inc. v. Evans, 431 U.S. 553 (1977), and this Court should grant judgment in favor of Defendant.

**D.     Plaintiff's Claim is Barred By the Doctrine of Laches.**

Furthermore, because Plaintiff has acknowledged that he was aware of the events giving rise to his 2001 complaint as far back as 1992, his claim is barred under the equitable doctrine of laches. In National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court recognized that, in addition to the procedural protections of Title VII, an employer may raise a

laches defense, "which bars a plaintiff from maintaining a suit if he unreasonably delays in filing

a suit and as a result harms the defendant."  536 U.S. at 121.  As noted by the Supreme Court, the

defense of laches " 'requires proof of (1) lack of diligence by the party against whom the defense

is asserted, and (2) prejudice to the party asserting the defense.' "  Id. at 122 (*quoting* Kansas v.

Colorado, 514 U.S. 673, 687 (1995).  Thus, even if the Court were to view Plaintiff's claim as

timely filed, Plaintiff's unexplained nine-year delay in filing his administrative claim has

severely prejudiced Defendant from being able to defend against the claim of unlawful

discrimination, and is, accordingly, barred by the doctrine of laches.

III.  **PLAINTIFF CANNOT DEMONSTRATE A VIOLATION OF TITLE VII WHEN THE MID-LEVEL MINORITY HIRING PROGRAM WAS ENACTED PURSUANT TO A STATUTORY REQUIREMENT.**

    A.  **There Is No Violation of a Generally Drafted Statute Where Congress Has Mandated Contrary Action in a Subsequent and Specifically Drafted Statutory Directive.**

It is an accepted rule of statutory construction that a specific provision or statute controls

over general provisions or statutes which might be viewed as in conflict.  Fourco Glass Co. v.

Transmirra Corp., 353 U.S. 222, 228-29 (1957) ("However inclusive may be the general

language of a statute, it 'will not be held to apply to a matter specifically dealt with in . . . the

same or another statute which otherwise might be controlling").  See also Edmond v. United

States, 520 U.S. 651, 657 (1997) ( "where a specific provision conflicts with a general one, the

specific governs" ); MacEvoy Co. v. United States, 322 U.S. 102, 107 (1944) (a salutary policy

in a general statute does not justify ignoring plain words of limitation in a narrowly drawn

statute); Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932) ("Specific terms prevail over the

general in the same or another statute which otherwise might be controlling").  In the present

matter, well-after Congress enacted the general prohibition against racial discrimination in Title VII, it passed a narrowly tailored provision that carved out an exception to reverse-discrimination claims and mandated the Department's Mid-Level Placement Program.

**B.      There Is No Violation of Title VII Where Congress Directed Defendant to Create the Mid-Level Minority Placement Program.**

In 1972, Congress applied the provisions of Title VII of the Civil Rights Act as a general prohibition against discriminatory employment practices in Federal employment.  42 U.S.C. §2000e(16).  In August 1985, well-after the passage of Title VII of the Civil Rights Act and its application to Executive agencies, Congress enacted the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987  ("1986-87 FRAA"), which specifically directed the State Department to develop placement programs that would increase the number of minority groups and women in the Foreign Service.  Pub. L. 99-93, Title I, § 152; 22 U.S.C. §3922a. Specifically, Congress directed the State Department to "develop . . . a plan designed to increase significantly the number of members of minority group and women in the Foreign Service in that agency." 22 U.S.C. §3922a(a).  Congress further directed that "each plan developed pursuant to this section shall . . . place particular emphasis on achieving significant increases in the numbers of minority group members and women who are in the mid-levels of the Foreign Service." Id. at 3922a(b).  To comply with that Congressional mandate, the State Department implemented  its mid-level minority placement program, about which Plaintiff now complains.[2]

Under long-accepted rules of statutory construction, the Court must read the 1986-87

---

[2]      "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).

FRAA to carve out an exception to the prohibitions of Title VII, at least with respect to

reverse-discrimination claims.  Indeed, Congress specifically found, in 1987, that minorities were

under-represented in the senior levels of the Foreign Service.  Pub. L. 100-204 §183 (Dec. 22,

1987).  Congress later determined, in 1990, that "intensive recruitment efforts are mandated[,]

particularly for Native Americans, African Americans, and Hispanic Americans, where other

affirmative action and equal opportunity efforts have not been successful in attracting the ablest

applicants for entry into the Foreign Service."  Pub. L. 101-246 § 149 (Feb. 16, 1990), 22 U.S.C.

§ 4141.  To address this problem, Congress specifically directed the State Department to

implement its mid-level minority placement program.  Accordingly, that program may not serve

as the basis for a reverse-discrimination claim, and judgment should be entered in favor of

Defendant.

<div style="margin-left: 40%;">

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

</div>