**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILLIAM E. SHEA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02cv577 (RCL) |
| | ) | |
| HILLARY CLINTON, Secretary | ) | |
| U.S. Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

This is a reverse-discrimination claim brought pro se by plaintiff, a licensed attorney and

a tenured Foreign Service Officer with the State Department.  Plaintiff alleges that he is being

discriminated against in paygrade as a result of racial/ethnic discrimination.  Specifically,

Plaintiff claims that, at the time he was hired by the State Department in 1992, he was started at

an entry-level paygrade as compared to some minority mid-level hires, as a result of a

then-existing program called the Mid-Level Affirmative Action Program (MLAAP) aimed at

ending a manifest imbalance in the upper and mid-levels of the Foreign Service within the State

Department.

Plaintiff has moved for summary judgment claiming that the MLAAP was unlawful.

First, Plaintiff argues that the MLAAP was not intended to cure a "manifest imbalance" that

reflected underrepresentation of minorities or women in "traditionally segregated job categories."

In making his argument, Plaintiff was confronted with data, including Congressional findings

and a State Department statistical analysis, that clearly demonstrated an over-representation or

"manifest imbalance" of White males in the mid- and upper-levels of the Foreign Service as compared to women and other minorities.  Instead of retaining and presenting expert testimony to address the statistical analysis that requires specialized knowledge or training, Plaintiff attempts his own lay analysis that manipulates the data by combining the population of White male employees (who were grossly over-represented in the mid-levels of the Foreign Service at the time) with White female employees (who were grossly under-represented in the mid-levels at the time) in order to "smooth out" the differential and hide the over-representation.  In this way, Plaintiff created his own reality by changing the focus of what constituted the "traditionally segregated job categories" in the State Department.

Next, Plaintiff argued that the MLAAP was not properly tailored so as to cure any disparity without unnecessarily trammeling the interests of non-minorities.  Again, he was faced with data that demonstrated that White males continued to be promoted and hired into the mid- and upper-levels of the Foreign Service in large numbers during the short life span of the MLAAP, and that out of 521 appointments and promotions to the mid-levels of the Foreign Service in 1992 (the year in which Plaintiff was hired), only four minorities entered into the mid-levels of the Foreign Service through the MLAAP.  Undeterred, Plaintiff simply narrowed his focus in order to ignore the multiple avenues that remained open for White males to enter into the mid-level and upper-level ranks of the Foreign Service, and further ignored the irrefutable facts that the MLAAP was regularly reviewed by the State Department and Congress, and actually ended in 1993 to argue that the MLAAP was not temporary.

Finally, Plaintiff further alleges that, except for his race, he was qualified for the program and that he was damaged during the period of limitations by the continuing effects of the

MLAAP.  These arguments are speculative, as he never applied for admission into the mid-levels of the Foreign Service, through the MLAAP or any other non-race/gender-based program that existed at the time he applied for a position with the Foreign Service, and has further failed to produce a competent expert or opinion witness, who could testify as to his probable career track.

As is demonstrated below, all of the above analyses attempted by Plaintiff require the testimony of expert witnesses of competent experience and background, which were not retained or identified by Plaintiff, and which qualifications Plaintiff does not have so as to permit him to testify on his own.  Without this expert testimony evidence, Plaintiff cannot meet the burden of proving his case, and Defendant respectfully requests that the Court deny Plaintiff's motion, and enter summary judgment in favor of Defendant.

## I.     FACTUAL BACKGROUND

### A.     The State Department's Mid-Level Minority Placement Program.

In 1985, Congress enacted the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987 ("1986-87 FRAA").  Pub. L. 99-93.  In the 1986-87 FRAA, Congress directed the State Department ("State Department" or "Department") to "develop . . . a plan designed to increase significantly the number of members of minority groups and women in the Foreign Service in that agency." Pub. L. 99-93, Title I, § 152(a); 22 U.S.C. §3922a(a).  Congress further directed that "each plan developed pursuant to this section shall . . . place particular emphasis on achieving significant increases in the numbers of minority group members and women who are in the mid-levels of the Foreign Service." Id. at 3922a(b).

To implement that Congressional directive, the Department instituted the MLAAP under its more general Mid-Level Foreign Service Career Candidate Program (sometimes called by

slightly different names, e.g., Mid-Level Foreign Service Officer Program).  See Def. Exh. 1A

(Standard Operating Procedure No. 22); Def. Exh. 1B (The New Mid-Level Program for 1987).

The Department's description of the requirements and procedures for the general mid-level

program, including the minority placement program, was revised in November 1990.  See Def.

Exh. 2 (Multi-Year Affirmative Action Plan 1990-1992); Def. Exh. 7 (BEX [Board of

Examiners] Assessors Manual, Section on Mid-Level Foreign Service Officer Career Candidate

Program (State), rev. Nov. 90).  That description addresses the version of the mid-level program

that was in effect when Appellant applied for and joined the Foreign Service in 1990-92.

The mid-level program was a mechanism for the Department to place new Foreign

Service Officers ("FSOs") at more senior grades than the normal entry-level grades, specifically

at grades FS-03, FS-02, or, in exceptional circumstances, FS-01.  See id. at 7.[1]  Eligibility for the

more general Mid-Level Foreign Service Career Candidate Program required (a) a "certification

of need," i.e., Department internal documentation that the Foreign Service required an outside

hire at a particular candidate's specialty and level, (b) the applicant pass a screening to determine

whether he or she had extensive professional work experience (above that required for

entry-level FSO applicants) of particular types;[2] and (c) the applicant pass a comprehensive oral

examination.  See id. at I-4.2 to I-4.9 (Shea-3449-3456).  If the applicant passed all of these

requirements, as well as a background investigation, medical review and a Final Review Panel,

---

[1]     In the Foreign Service personnel system, employees are promoted to a lower grade
number.  Thus, FS-05 is the entry-level, and FS-01 is the upper level.

[2]     The screening also determined whether the candidate had demonstrated required abilities
such as writing skill, supervisory responsibility, and adaptability to foreign cultures.  See id. at
I-4.3 to I-4.4.

the candidate would be placed on a register to await possible placement into a Foreign Service position.  See id. at I-4.9 (Shea-3456).

The MLAAP retained many of the same elements as the more general Mid-Level Foreign Service Career Candidate Program, but replaced the "certificate of need" requirement with a self-certification by the applicant that he or she is a member of at least one the following minority groups: American Indians and Alaskan Natives, Asians and Pacific Islanders, Blacks and Hispanics.  See id. at I-4.2 to I-4.3.  On or about February 4, 1993, the State Department ended the mid-level minority placement program.  See Def. Exh.  9 (Memo from A. Peter Burleigh to the Deputy Secretary, March 19, 1993).  It was never resumed.

The race and gender breakdown of mid-level assignments through promotion and through the various mid-level placement programs during the period 1990 to 1993 are as follows:[3]

### 1990

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Native/ Am male | Native/ Am female | Asian/ Am male | Asian/ Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS2 | 134 | 43 | 16 | 8* | 11 | 5 | 1 | 0 | 3 | 2 |
| FS3 | 206 | 85 | 8* | 7* | 15 | 5 | 0 | 0 | 4* | 5 |
| Total | 340 | 128 | 24 | 15 | 26 | 10 | 1 | 0 | 7 | 7 |

### 1991

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Native/ Am male | Native/ Am female | Asian/ Am male | Asian/ Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS2 | 129 | 48 | 11 | 7 | 6* | 2 | 2 | 0 | 4 | 2 |
| FS3 | 221 | 88 | 5 | 8* | 15* | 1 | 0 | 1 | 7 | 3 |
| Total | 350 | 136 | 16 | 15 | 21 | 3 | 2 | 1 | 11 | 5 |

---

[3]    "*" denotes the FS grade that includes mid-level hire(s) through the Mid-Level Foreign Service Career Candidate Programs (MLAAP or certificate of need).

1992

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Native/ Am male | Native/ Am female | Asian/ Am male | Asian/ Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS2 | 127* | 45* | 10 | 8 | 5 | 1 | 1 | 0 | 2 | 2 |
| FS3 | 208 | 71 | 5* | 5* | 9 | 5 | 1 | 0 | 13* | 3 |
| Total | 335 | 116 | 15 | 13 | 14 | 6 | 2 | 0 | 15 | 5 |

1993

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Native/ Am male | Native/ Am female | Asian/ Am male | Asian/ Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS2 | 139* | 36* | 6 | 7* | 4 | 5 | 1 | 0 | 5 | 3 |
| FS3 | 193 | 73 | 7* | 4 | 6 | 3 | 1 | 2 | 6 | 5 |
| Total | 332 | 109 | 13 | 11 | 11 | 8 | 2 | 2 | 11 | 8 |

See Def. Exh. 21 (Promotions 1989-1994) and Def. Exh. 16 (Mid-Level Hiring 1990 to 1994).

The more general mid-level placement program continued to exist well after 1993 on the certification of need basis, i.e., without its minority recruitment component. See Def. Exh. 16 (Mid-Level Hiring 1990 to 1994); see also 22 C.F.R. §11.11 (Mid-level Foreign Service Officer Career Candidate Appointments, 2004) .[4/]  This general mid-level program was always open to all applicants, including White males.  Id.

## B.  Appellant's Employment with the State Department

Plaintiff, a White male of Irish descent, submitted an application for the Foreign Service signed September 1, 1990.  See Complaint at ¶ 3, and Def. Exh. 11 (Plaintiff's SF-171).  At no time did Plaintiff apply for mid-level placement into the Foreign Service through any hiring plan within the Mid-Level Foreign Service Career Candidate Program.  See Id.  On May 31, 1992, Appellant was hired as an entry-level Foreign Service Officer ("FSO") grade FS-05, step 5 in the

---

[4/]     The Women's program continued beyond 1993 as well.

State Department's June 1992 introductory class.  Def. Exh. 12 (Agreement to Join the Foreign

Service, April 22, 1992) and Def. Exh. 13 (SF 50-B).

Plaintiff's introductory class included thirty-one new FSOs.  See Def. Exh. 14 (Memo

from Perry Shankle to the Director General, June 24, 1992).  Only two members of that June

1992 introductory class, both minority group members, were accepted under the mid-level

placement program.  See id.  Appellant knew at the time that he was hired that "qualified

minorities could start at a higher grade," and that "two people in the class were starting at

midlevel grades due to their participation in a minority midlevel hiring program."  See Def. Exh.

15 (Status Hearing Tr. 9/22/2009) at 10.  Yet, Plaintiff waited until July 11, 2001 to file an

administrative grievance.

## II.   SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the record shows that no genuine issue exists as

to any material fact and the moving party is entitled to judgment as a matter of law.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27

F.3d 635, 638 (D.C. Cir. 1994).  Thus, the party seeking summary judgment bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All matters submitted to

the Court by the movant, including statements, must be **admissible**, in that the declarant must be

**competent to testify to the matters** stated therein, the statement must be under oath, must be

based upon personal knowledge, **and must set forth fact as would be admissible in evidence**. Fed. R. Civ. P. 56(c)(4) (emphasis added).  See Anderson v. Liberty Lobby, 477 U.S. 242, 253-54 (1986).

Only if the moving party satisfies his burden is the non-moving party "required to provide evidence that would permit a reasonable jury to find" in its favor.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir.1987) (*per curiam* ) (*citing* Celotex, *supra*).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  Matsushita, 475 U.S. at 587.  Moreover, because the Plaintiff, as the moving party, bears the initial burden of persuasion at trial, "that party must support its motion with credible evidence--using any of the materials specified in Rule 56(c) – that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477 U.S. at 331.  Unless and until the Court finds that the moving party has discharged its initial burden of production, the burden does not shift to the non-moving party, and the Court need not decide whether the moving party has satisfied its ultimate burden of persuasion.  Id.  In the present matter, Plaintiff's entire Motion for Summary Judgment is based upon his own "expert" analysis and conclusions that violate the Rules of this Court.  Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").  Because Plaintiff cannot meet his burden with admissible, credible evidence, his Motion should be denied, and Defendant's Cross-Motion should be granted.

8

III.   **PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE UNDISPUTED MATERIAL FACTS ARE IN HIS FAVOR.**

In its simplest form, Plaintiff's argument is that because placement into the Foreign Service through the MLAAP is limited to minorities, it is automatically unlawful. Plaintiff, however, fails to address, or even acknowledge the fact that the MLAAP was just a small part of an even broader mid-level hiring program that continued to hire or advance White male applicants and employees into the mid-levels of the Foreign Service, and, in fact, resulted in Whites being placed in the mid-levels of the Foreign Service in numbers well above that of minorities.

In an earlier Memorandum Opinion denying a prior summary judgment motion filed by Plaintiff, the Court pointed out that an affirmative action plan that uses an employment preference based on race does not necessarily violate Title VII's prohibition against racial discrimination in employment. Memorandum Opinion (ECF No. 69) at 6 (*quoting* United Steelworkers v. Weber, 443 U.S. 193, 200 (1979)). The Supreme Court has noted that taking race into account "was consistent with Title VII's objective of 'break[ing] down old patterns of racial segregation and hierarchy.'" Johnson v. Transportation Agency, Santa Clara County, Cal., 480 U.S. 616, 628 (1987) (*quoting* Weber, at 443 U.S. at 208). Accordingly, affirmative action plans directed at removing past discriminatory imbalances in the workplace or in certain job categories are not only lawful under Title VII, they further the very purpose of the statute. Id. at 630.

To prove that the MLAAP was unlawful and therefore exceeds the purposes of Title VII,[5]

---

[5]   In order to prove his claim, Plaintiff must "show (a) that the program was unlawful --

(continued...)

Plaintiff must demonstrate that the MLAAP (1) was not justified by the existence of a "manifest imbalance" that reflected an underrepresentation of minorities or women in "traditionally segregated job categories" and (2) was not properly tailored so as to cure any disparity without unnecessarily trammeling the interests of non-minorities.  Weber, 443 U.S. at 208.  The burden of proving these two facts remains at all times upon the Plaintiff, and never shifts to the Defendant.  Johnson, 480 U.S. at 626-27.

In this matter, Plaintiff's entire Motion is almost entirely founded upon his own "lay expert" analysis and speculation that violate the Rules of Evidence and Civil Procedure, and is inadmissible.  Accordingly, his Motion is without proper factual support and should be denied.

A.    **Plaintiff's Statistical Analysis of the Over/Under-Representation of Whites and Minorities in the Mid-levels of the Foreign Service Is Improper and Inadmissible**

When looking for the "manifest imbalance" behind a program, the Court need not look solely to the defendant employer's own "prior discriminatory practices, nor even to evidence of an 'arguable violation' on its part."  Id. at 630 (*quoting* Weber, 443 U.S. at 212).  Rather, the Court need only look to a "conspicuous ... imbalance in traditionally segregated job categories." Id. (*quoting* Weber, 443 U.S. at 209).  To determine if an imbalance exists that would justify taking sex or race into account, a plaintiff must provide a "comparison of the percentage of minorities or women in the employer's work force with the percentage in the . . . labor force who

_____

[5/] (...continued)
meaning generally that it was not designed to cure a manifest imbalance in the workforce; (b) that, except for his race, Shea was qualified for the program; and (c) that Shea was damaged during the period of limitations by the continuing effects of the MLAAP." Memorandum Opinion (ECF 69) at 5-6; Memorandum Opinion (ECF 114) at 13.  Plaintiff bears the burden of production on each of these elements, especially in proving that the MLAAP was an unlawful violation of Title VII.

possess the relevant qualifications."  Id. at 631-632.

When Congress enacted the Foreign Relations Authorization Act for Fiscal Years 1986-87 (FRAA), it specifically directed the State Department to "develop . . . a plan designed to increase significantly the number of members of minority groups and women in the Foreign Service in that agency."  Id. §152(a).  Each plan developed by the State Department was to "place particular emphasis on achieving significant increases in the numbers of minority group members and women who are in the mid-levels of the Foreign Service."  Id. §152(b).  The FRAA was re-authorized in 1987 and 1990 to cover subsequent and relevant years, including 1991-92.  Pub. L. No. 100-204 (1987); Pub. L. No. 101-245 (1990).[6]

In compliance with the Congressional mandate as set forth in the FRAA, the State Department created affirmative action programs aimed toward achieving the goal set by Congress, and placed those programs within the already-existing and broader Mid-Level Foreign Service Career Candidate Program.  See Standard Operating Procedure No. 22 (Jan. 8, 1982) (Def. Exh. 1A) at 1.  First, the State Department created the MLAAP, which began in January 1987 and continued through January 1993, when it ended.  See Def. Exh.  9 (Memo from A. Peter Burleigh to the Deputy Secretary, March 19, 1993).  At the same time, the State Department created the "Federal Women Programs" and the Federal Women's Program Manager, which were directed to "develop[] and monitor[] implementation of action items for the annual EEO Plan."  See Def. Exh. 2 at Shea-00077.

An independent review commissioned by Congress and published in 1989 further showed

---

[6]     It appears that Plaintiff concedes the fact that a "manifest imbalance" existed as of 1986-1987, when the MLAAP was instituted.  Plaintiff's Memorandum of Points and Authorities at 4.

that despite the State Department's prior efforts, underrepresentation still existed at the mid- and

senior levels of the Foreign Service.  Def. Exh. 3 (U.S. General Accounting Office (GAO),

GAO/NSIAD-89-146, Minorities and Women are Underrepresented in the Foreign Service

(1989)) at 2-3.  The report by the GAO found that from 1981 to 1987, minority representation for

the Foreign Service as a whole had barely inched forward; of the total number of employees,

African-American male FSOs increased from 2.79% to only 3.33% and the number of female

African-American FSOs increased from 1.49% to only 2.06%.  Id. at 16.  While progress had

been made in closing the disparities between minorities and non-minorities at the entry level

positions, minorities were still underrepresented in the mid-levels – the very focus of the

MLAAP.  Id. at 18.  For example, in **1987 there were no African-American, Hispanic, or

Indian males in mid-level positions**.  Id. at 20 (emphasis added).[7/]  While there were 180 White

females in the mid-ranks, there were only 5 African-American, 6 Hispanic, and 3 Indian females.

Id.  In addition, minority Foreign Service officers were promoted at significantly a lower rate

(15.6 percent) than White males (18.2 percent) or White females (18.2 percent).  Id. at 33.  The

GAO found that despite the State Department's prior attempts to reduce disparities at the mid-

level, "there were only six mid-level hires" under the program in 1987.  Id. at 39.  Thus, the

report called on the State Department specifically to focus on expanding, not contracting, its mid-

level hiring.  Id. at 42.

        In subsequent hearings between 1987 and 1990, Congress expressed its displeasure with

the continued lack of minorities in the Foreign Service, and particularly in the mid-level ranks,

---

[7/]        Plaintiff hides this imbalance in his statistical analysis of the 1990 data by combining
males and females together in order to create the mis-impression that African-Americans were
well-represented.

and called on the State Department to take additional action.  Hearing before the H. Comm. on

Postal Office and Civil Serv. Subcomm. on the Civil Serv., 101st Cong. 34 (1989) (Def. Exh. 4).

Congress noted that "basic goals haven't even been met."  Id. at 22 (statement of Subcommittee

Chairman Gerry Sikorski).  Congress made clear to the State Department that it would "insist on

changes" and that Congress was "going to be there month after month to keep the pressure on

[the State Department]."  Id. at 25.  Officials from the State Department agreed with Congress

that there was a "great need for affirmative action stressing quality" and "systemic changes and

institutional change" at the Department.  Id. at 26.  In another hearing examining the State

Department's workforce, Congress noted that in addition to the GAO Report, two additional

reviews led to the conclusion that "[t]he Foreign Service is discriminatory."  The Department of

State in the 21st Century: Vol. I, Joint Hearing before the H. Comm. on Foreign Affairs & H.

Comm. on Post Office and Civil Serv., 101st Cong. 6 (1989) (Def. Exh. 5).  Such findings

clearly demonstrate that a manifest imbalance existed within the Foreign Service, necessitating

action by the State Department.

    In support of his Motion, Plaintiff ignores the statistics that existed closer in time to the

creation of the MLAAP, and instead relies upon data from a 1990 MLAAP revision.[8]  In that

revision, the State Department conducted a study, comparing the racial and gender make-up of

the State Department's work force in fiscal years 1989 and 1990, including the mid-levels of the

Foreign Service, with the race and gender make up of the Public Administrator labor force who

possessed relevant and comparable qualifications.  Pl. Exh. 3.  That study found that throughout

---

[8]     In 1990, the State Department modified the MLAAP and required that each component
within the Department monitor and assess its hiring and recruitment needs based upon the
updated Foreign Service population data.  Def. Exh. 2.

fiscal years 1989 and 1990 – two years **after** the implementation of the MLAAP, White males,
including those in the mid-levels of the Foreign Service, were still significantly over-represented
in the State Department, when compared to White males in Public Administration.  Id. at Shea-
00110 (1989); Shea-00111 (1990); and Shea-00117 (comparison with Public Administrators).
Within the general minority group, certain sub-groups, including Black males, Black females,
Hispanic females, Native American males, and Native American females were significantly
under-represented.  Id.  The study further found that this disparity grew progressively larger as
one progresses upward through the ranks of the Foreign Service.  Id.[9]

Undaunted by the facts, Plaintiff manipulated the data in his Memorandum of Points and
Authorities by combining the population of White male employees (who were significantly over-
represented) with White female employees (who were grossly under-represented).  Plaintiff's
Memorandum of Points and Authorities at 14.  In light of the fact that the initial Congressional
mandate was directed at a more specific imbalance (comparing White males with all other

---

[9]     This increased disparity did not escape the attention of Congress.  As early as 1987,
Congress directed that the State Department:

> (1) shall substantially increase their efforts to implement
> effectively the plans required by section 152(a) of the Foreign
> Relations Authorization Act, Fiscal Years 1986 and 1987, so that
> the Foreign Service becomes truly representative of the American
> people throughout all levels of the Foreign Service; and
> (2) shall ensure that those plans effectively address the need to
> promote increased numbers of qualified women and members of
> minority groups into the senior levels of the Foreign Service.

Pub. L. No. 100-204 § 183.  The Mid-Level Foreign Service Career Candidate Program worked
to achieve this goal by ensuring that only qualified women and members of minority groups enter
through the smaller plans, thereby increasing the number of women and minorities eligible for
those senior positions.

race/gender groups), and the fact that the State Department implemented programs to address the racial/gender disparities, his decision to focus on race alone makes no sense, other than as a deliberate attempt to "smooth out" the difference and thereby "create" an entirely new parameter of facts to support his position.  Plaintiff then conducts his own statistical analysis of the newly created data to argue that Whites, in general, were not significantly over-represented.

Plaintiff cannot ignore the 1981 to 1987 data that reflects the initial manifest imbalance that led to the creation of the MLAAP, nor can he play with the facts so as to create an entirely new focus of the imbalance that was never the basis of Congress's or the State Department's decisions.  More importantly, Plaintiff is unqualified and incompetent to present his own "lay" analysis of statistical evidence, where an expert with relevant training and experience is needed to testify about the reasons underlying the choice of data and the comparator population used, the degree of statistical significance (or lack thereof) within the populations tested, and the methodology used to develop it.

### 1.    The Presentation of Statistical Evidence in a Discrimination Claim Requires Expert Testimony and Analysis

Evidence presented for its statistical significance without an expert to testify about the reasons underlying the choice of data and the comparator population used, the degree of statistical significance (or lack thereof) within the populations tested, and the methodology used to develop it, is without probative value and should be excluded.  This point was made clear by the D.C. Circuit Court in Whitacre v. Davey, 890 F.2d 1168, 1172 (D.C. Cir. 1989), a case that involved the sufficiency of statistical evidence in an age discrimination matter.  The Court of Appeals commented on the complainant's allegations as follows:

15

> Of course this is still circumstantial rather than direct evidence, but in any event, we agree with the district court that the proffered statistics would be inadequate even in a statutory context.  Without evidence of the pool of available and qualified applicants, we could not know whether the "three selections is [sic] disproportionately small to the pool, disproportionately large, or approximately statistically perfect."  Whitacre v. Davey, 727 F. Supp. at 639.  Therefore, Whitacre's allegations of statistical disparity would not meet even Title VII's liberal evidentiary standards.

890 F.2d at 1172 (some citations omitted).

Similarly, in its decision in Thomas v. Chao, the Court of Appeals affirmed the district court's exclusion of a Plaintiff's unsupported and unprofessional statistical analysis.  The Court stated that "[t]he District Court was correct to exclude from evidence the list of employees identified by race and gender, and witness' observations about the race and gender of employees, in the absence of an expert who could testify that the alleged underrepresentation was statistically significant."  See Thomas v. Chao, 65 Fed. Appx. 321, 2003 WL 21186036, at *3 (D.C. Cir. May 19, 2003) (unpublished).  See also Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395 (D.C. Cir.), on rehearing, 852 F.2d 619 (1988) (describing the rigorous standards that must be followed in using statistical evidence in Title VII cases).

What is "statistically significant," however, must include a meaningful comparison of "what is observed" versus "what is expected."  To make this comparison, a determination of the "standard deviation" must be made, which is to be consistent with significance levels typically relied upon by social scientists.  See Berger, 843 F.2d at 1412 (requiring a standard deviation analysis).   Thus, to make this determination, an expert must testify.  Fed. R. Evid. 702 (expert testimony necessary where scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue).

### 2.     Plaintiff's Lay Opinion Analysis is Improper

Initially, Plaintiff's Motion fails to satisfy the summary judgment standards because

Plaintiff cannot present his own lay statistical analysis of the data to make his case.  The Federal

Rules of Evidence specifically prohibit a lay witness from offering any opinion testimony or any

testimony drawing inferences from evidence that is based upon any scientific, technical, or other

specialized knowledge within the scope of expert testimony.  Fed. R. Evid. 701.[10]  Speculative

evidence suffers the same fate, as it lacks probative value and must be disregarded or excluded.

Here, Plaintiff's lay analysis is neither based on his own perception of events, nor upon

any scientific, technical or other specialized knowledge that he possesses to assist the trier of

fact.  Accordingly, all of the statistical analysis that Plaintiff attempts in support of his motion is

inadmissible, improper, and should be disregarded

### 3.     Plaintiff's "Expert" Statistical Analysis is Improper

Even if this Court were to treat Plaintiff's opinion as "expert" testimony, which it should

not, Plaintiff failed to comply with the discovery requirements of Federal Civil Rule 26(a)(2),

and further presented an "expert" analysis that is defective and falls far short of the admissibility

---

[10]     The Federal Rules of Evidence specifically limit any opinion that may be presented by a lay witness to one that is:

> (a) rationally based upon the witness's perception;
>
> (b) helpful to clearly understand the witness's testimony or to determine a fact in issue, **and**
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701 (emphasis added).

requirements of a valid and reliable opinion, as developed through the case law and the scientific community.

      a.      As demonstrated above, the Circuit Court has on more than one occasion held that evidence presented for its statistical significance must be accompanied by an expert to testify about the reasons underlying the choice of data and the comparator population used, the degree of statistical significance (or lack thereof) within the populations tested, and the methodology used to develop it.  Plaintiff even failed to provide appropriate discovery regarding any of his "expert" statistical analysis.  Under the Federal Rules, before a party may present any expert testimony, he must first disclose the identity of the expert witness, a written report prepared and signed by the expert that contains the complete statement of all opinions expressed, the facts or data underlying the opinion, any exhibits that summarize or support the testimony, and the witness's qualifications to testify as an expert.  Fed. R. Civ. P. 26(a)(2).  Only after a party has satisfied these requirements is the other party under a duty to identify its own expert to contradict or rebut the first party's expert.  Fed. R. Civ. P. 26(a)(2)(D).

      Here, Plaintiff failed to satisfy any of the requirements of the Federal Rules.  He failed to provide a report as well as information regarding his experience, education or background that qualifies him to make such an analysis.  Moreover, because Plaintiff has failed to comply with the rules regarding the disclosure of expert testimony, Defendant was not under any obligation to designate a rebuttal expert witness to testify regarding these matters.  Accordingly, Plaintiffs' argument is improper.

      Nor is Plaintiff's failure the result of any ignorance of the duty imposed by the Court and

by the Federal Civil Rules to provide such discovery.[11/]  On September 22, 2009, the District

Court set forth a discovery schedule, which included a deadline for providing expert notices and

discovery.  ECF Minute Entry dated 9/22/2009.  In a subsequent status hearing before the Court,

Mr. Shea set forth his general theory that the statistics did not support the creation of the

MLAAP under a Title VII analysis, and specifically asked for additional time to file his expert

notices – to February 16, 2010, with the government's rebuttal designation to be one month after

that.  See Minute Entry 12/18/2009.  The Court granted Plaintiff's request.  Id.  On June 28,

2010, and again on June 29, 2010, Plaintiff moved for an enlargement of time to complete

discovery.  ECF 81 and 82.  In his request, Plaintiff, again, evidences his knowledge of the

obligation to provide an expert discovery notice, and he asked for additional time to provide that

expert discovery.  Id.

          Despite Plaintiff's own acknowledgment of his discovery obligation, and the repeated

reminders from Defendant, no expert or other Rule 26(a)(2) report was ever produced by

Plaintiff.  Thus, his failure can only be described as the product of a deliberate discovery

violation.

          b.          Even setting aside Plaintiff's flagrant discovery violations, his "expert"

analysis is improper and inadmissible.  In his Motion for Summary Judgment, Plaintiff relies

exclusively on the notion that the MLAAP was not remedial or narrowly tailored because no

manifest imbalance between minorities and non-minorities existed at the mid-level ranks of the

Foreign Service from 1989-1990, the years after the creation of the program and before

---

[11/]          Throughout this litigation, the Defendant has repeatedly asserted and preserved its right to
the information required by the Federal Civil Rules.  See, e.g., ECF Nos. 77, 93, 98 and 115.

Plaintiff's entry into the Foreign Service.  Plaintiff's Memorandum of Points and Authorities at

12-27.  To "prove" that no manifest imbalance existed, he completely ignores the pre-1987 data

that led Congress to order the State Department to create the program and instead compares

1989-1990 data provided in a State Department yearly progress report to Congress (Multi-Year

Affirmative Action Plan FY 1990-92) with data from the 1980 National Civilian Labor Force

(NCLF).  Plaintiff goes even further and changes the parameters of the State Department's

analysis by combining White males, who are clearly and significantly over-represented in the

mid-levels of the Foreign Service, with White females, who are under-represented, so as to

smooth out the discrepancy and create the mis-impression that no manifest imbalance actually

exists in the Foreign Service.

As a threshold matter, any such analysis is problematic because (1) the NCLF data is

from 1980, 12 years prior to Plaintiff's entry into the Foreign Service; (2) neither Plaintiff nor the

Department's multi-year plan explains, or even discusses, the NCLF data or how a certain

occupational category was chosen for comparison and why others were not chosen, or why any

other comparator population may present a preferable parallel to the occupation of Foreign

Service Generalist; and (3) the multi-year plan cited by Plaintiff does not cover the time period

that led to the creation of the MLAAP's to the time of Plaintiff's entry into the State

Department.[12/]

Additionally, Plaintiff makes no attempt to determine what, if any, standard deviation

must be applied to find statistical significance, nor does he even attempt such an analysis.  See

---

[12/]     For the same reasons, Plaintiff's assumptions are based upon disputed evidence that
prevents an entry of summary judgment in his favor.  See §B, infra.

Hazelwood School District v. United States, 433 U.S. 299 (1977) (the "Hazelwood" analysis); Frazier v. Consolidated Rail Corp., 851 F.2d 1447, 1451-52 (D.C. Cir. 1988) ("Z statistic" calculation). The failings of Plaintiff's statistical analysis are not surprising, however, as Plaintiff is not an expert in the field, nor has he has he ever had any experience or training in the area of statistical analysis to support his theories.

In his Memorandum, Plaintiff claims that he is merely using the same analysis performed by the State Department. In fact, he is not. As demonstrated above, Plaintiff changed the very groups used by the State Department by combining all Whites (grossly over-represented White males with under-represented White females) in order to create the mis-impression that Whites, as a whole, are not over-represented in the State Department. Courts have cautioned against inflating the pool of comparators, as Plaintiff attempts in his analysis, as it can "undermine the validity of a statistical study to determine imbalances." See Johnson, 480 U.S. at 636. See also Smith v. Virginia Commonwealth University, 84 F.3d 672 at 677 (4th Cir. 1996) (citing Johnson). Plaintiff's method highlights the concerns expressed by other courts as it ignores the statistically significant over-representation of White males among Foreign Services Generalists. Importantly, this over-representation of White males was the very impetus for the MLAAP. Plaintiff has presented no case law that requires that the statistical analysis used to justify the need for remedial action be for race only, versus race and gender; nor has he explained whether the industry standard uses one or the other.

Even if Plaintiff's manipulation of the numbers is accepted by the Court, Plaintiff has performed no back-up calculation to determine if the population of Public Administrators is the right comparator for a pure race analysis versus a race plus gender analysis. Especially since

using only the race composition of Public Administrators (as opposed to race and gender) hides

the fact that White males are grossly over-represented in the mid-levels of the Foreign Service.

Plaintiff has not explained why there is not a better comparator group, such as the general

population or the population of attorneys in the United States.  Without some additional

explanation into the reason and validity of the factors and the comparator used, this Court cannot

tell if the results were skewed in one direction or the other.  See Whitacre v. Davey, 890 F.2d at

1172 (without additional information regarding the possible comparator groups, the court cannot

tell if the number of minorities actually hired is "disproportionately small to the pool,

disproportionately large, or approximately statistically perfect"); see also Frazier, 851 F.2d at

1450 ("But as well accepted as statistical analysis has become in these [Title VII] cases, it is not

without important limitations.  A statistical calculation relies upon a number of underlying

assumptions, the validity of which can often be assessed only by those with experience in the

field").

Finally, while Plaintiff faults the MLAAP for not including White females as a qualified

group, he fails to address that other programs were instituted for recruiting and assisting females.

For example, the MLAAP, it specifically references the existence of the Federal Women's

Program and a Federal Women's Program Manager who "advise[] management and operating

officials on obstacles and barriers to equal opportunity experienced by women."  Def. Exh. 2 at

Shea-00077.  It further directs that the Manager "develop[] and monitor[] implementation of

action items for the annual EEO Plan...."  Id.  Thus, from the very documents provided to

Plaintiff, it appears that the Department did implement programs for addressing the under-

representation of women, including White women, in the mid-level ranks of the Foreign Service.

Because Plaintiff has failed to demonstrate that the MLAAP was unlawful, let alone provide expert testimony to meet his burden of demonstrating that the MLAAP was unlawful, his motion for summary judgment should be denied.  Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").

**B.      Plaintiff Cannot Demonstrate That the MLAAP Unnecessarily Trammels the Interests of Non-Minorities**

Plaintiff alleges that the MLAAP "trammels the interests of non-minorities" because it uses race as the sole determining factor as to who may participate in the program, sets quota for the number of minority hires, and reserved no other mid-level positions for competition by non-minorities.  Plaintiff Memorandum in Support of Motion for Summary Judgment at 4-5. Plaintiff's argument is not only wrong on the facts, its is also wrong as to the criteria that the Courts look for to determine if the interests of non-minorities are protected.  Notably, from the evidence available, it also appears that Whites were not barred from the mid-level ranks of the Foreign Service, nor was there a quota of positions that had to be filled by applicants from the MLAAP.  In addition to the normal avenue of promotion to the mid-level ranks, other programs existed that allowed Whites, male and female, to be hired into the mid-levels of the Foreign Service.  See Def. Exh. 16 (in the very year that Plaintiff entered the Foreign Service, two White applicants entered the Foreign Service through some Mid-Level Hiring Program), see also Pl. Exh. 2 at Shea 00774 (same).  Plaintiff cannot demonstrate that the MLAAP trammeled the interests of White males, as at the time Plaintiff applied and was hired into the Foreign Service, White applicants were not barred from placement into the mid-levels of the Foreign Service.

With respect to the legal criteria, the Supreme Court has not expressed any precise formula for determining if an affirmative action plan unnecessarily trammels on the interests of non-minorities.  The Court has, however, looked to several factors in approving plans, such as whether (1) the plan did not require the discharge of White workers and their replacement by black workers; (2) the plan did not create an absolute bar to the promotion or advancement of White workers; and (3) the plan was a temporary measure, either for a specified time or with periodic review, designed to attain a racial balance, not maintain one.  See Weber, 443 U.S. at 208; and Johnson, 480 U.S. at 638–40.

Here, the MLAAP did not require the discharge or displacement of any White males already in the mid-levels of the Foreign Service.  Nor did the MLAAP close out all other avenues for advancement or promotion of White males or females into the mid-levels of the Foreign Service.[13]  To create the mis-impression that the only way to be placed in the mid-levels of the Foreign Service was through the MLAAP, Plaintiff, in his motion, focuses solely upon the MLAAP and argues that because no White applicants could be hired through the MLAAP, it completely shut out Whites from mid-level placement.  This is plainly wrong.  Throughout the life of the MLAAP, non-minorities – and White males in particular – were continually moved into the mid-levels of the Foreign Service, such as through the normal course of promotion into

---

[13]      Nor did the MLAAP use race as the sole criteria for placement, but additionally required that the applicant (a) have substantial professional experience and skills to satisfy the standards otherwise needed to be promoted into the mid-level grade, (b) receive a passing grade on an oral examination that is conducted blindly as to whether the interviewee was an MLAAP applicant, and (c) pass a background check.  See Def. Exh. 1A and 1B.  See also Memorandum Opinion (ECF No. 114) at 2.  These additional criteria made placement through the MLAAP just as rigorous and difficult as the general (open to all) mid-level placement programs, and resulted in only a small percentage of minority mid-level placements.  Thus, the MLAAP did not result in the placement of unqualified minorities over qualified non-minorities.

the mid-level ranks, as well as through the general mid-level placement program, which

remained untouched by the MLAAP and remained dominated by non-minorities.[14]   Under that

program, any applicant (non-minority included) could check to see if a certificate of need had

been issued for a particular employment cone, or could directly request that one be issued for the

grade and cone for which he/she believed they were qualified.  Def. Exh. 1A at 22 (Shea-3480).

This option was available to Plaintiff (or any White male) at the time Plaintiff applied for and

entered the Foreign Service.  Def. Exhs. 10 and 16.  Indeed, White applicants came in under this

certificate of need program in the very same year that Plaintiff entered the Foreign Service.  Def.

Exh. 16.

For example, in 1992 (the year that Plaintiff was hired), 335 White males (64%) and116

White females (22%) were placed or promoted into the mid-levels (FS2 and FS3) of the Foreign

Service, as compared to 70 total minorities total for that year (13%).  The breakdown of the

promotions and placements in 12992 are as follows:

Mid-Level Promotions

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Nat/Am male | Nat/Am female | Asia/Am male | Asia/Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS3 to FS2 | 126 | 44 | 10 | 8 | 5 | 1 | 1 | 0 | 2 | 2 |
| FS4 to FS3 | 208 | 71 | 5 | 2 | 9 | 5 | 1 | 0 | 12 | 3 |
| Total | 334 | 115 | 15 | 10 | 14 | 6 | 2 | 0 | 14 | 5 |

See Def. Exh. 21 (Promotions 1989-1994).

---

[14]      See Plaintiff's Memorandum of Points and Authorities at 6-7 ("Non-minorities did not
compete with minorities, or anybody else, for the available mid-level hiring opportunities") and
id. ("all were reserved for minorities").

Mid-Level Foreign Service Career Candidate Program[15]

|  | White male | White female | African/ Am male | African/ Am female | Hispanic male | Hispanic female | Native/ Am male | Native/ Am female | Asian/ Am male | Asian/ Am female |
|---|---|---|---|---|---|---|---|---|---|---|
| FS3 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 |
| FS2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 |

Def. Exh. 16 (Mid-Level Hiring 1990 to 1994).  It is also interesting to note that through the

Mid-Level Foreign Service Career Candidate Program, White candidates were placed in the

highest mid-level grade of the Foreign Service (FS2) as compared to the MLAAP placements,

who were placed in the lowest grade of the mid-levels (FS3).[16]  Accordingly, contrary to

Plaintiff's argument, advancements to the mid-levels of the Foreign Service were not limited

solely to minorities, but rather continued to be dominated by non-minorities.

Finally, the factual record demonstrates that the MLAAP was a temporary measure

designed to attain a racial balance, not maintain one.  First, the fact that the MLAAP did, in fact,

end in early 1993, is conclusive proof of its temporary nature.  See Hannon v. Chater, 887 F.

---

[15]    One White male and one White female were hired directly into the mid-levels (FS2) through the "certificate of need" program of the general Mid-Level Foreign Service Career Candidate Program.  Def. Exh. 16.  One Asian/American male, two African/American female and one African/American males were hired (FS3) through the MLAAP.

[16]    Due to the passage of time caused by Plaintiff's nine-year delay in bringing this action and the resulting loss of records, Defendant is unable to tell if any certificates of need were issued by the State Department in the fiscal years 1990 and 1991.  Nevertheless, the evidence clearly demonstrates that the MLAAP did not prevent the advancement of non-minorities into the mid-level ranks of the Foreign Service, as they continued to be promoted into the mid-levels at numbers that far exceeded that of minorities, even including those who were placed through the MLAAP.  See Def. Exh. 21 (Promotions 1989-1994) and Def. Exh. 16 (Mid-Level Hiring 1990 to 1994).  In 1991 White males constituted 62.5% (350 out of 560 placements) of those promoted in the mid-levels, compared to 12% minority (68 out of 560 placements); and in 1990 White males constituted 61% (340 out of 558 placements) while minorities made up only 15% (84 out of 558 placements).  Id.

Supp. 1303, 1318 (N.D. Cal. 1995) (plaintiff cannot meet his burden of showing that the program was not temporary in nature, when the program, in fact, ended).  Second, documents in the record clearly reference the MLAAP as a temporary program.  <u>See</u> Def. Exh. 1B at 3 (Shea-008649) ("The new Mid-Level program will be a temporary supplement to, and adjunct of, the Junior Officer Program...."); and Def. Exh. 3 at 10 (Shea-008671) (by 1989 it was determined to be a five-year program).  Third, as is demonstrated through the factual record and the FRAA, the MLAAP was monitored regularly by the State Department and by Congress to ensure that it was used to achieve a racial balance.  Pub. L. 99-93, 99 Stat 405 (Congress required yearly reports by the State Department as to the "progress being made in increasing, through advancement and promotion, the numbers of members of minority groups and women in the mid-levels of the Foreign Service").  <u>See also</u> <u>McNamara v. City of Chicago</u>, 867 F. Supp. 739, 752 (N.D. Ill. 1994) (where the affirmative action goals were reevaluated on an annual basis in order "to insure flexibility and to guarantee that the ratios are used only so long as they are necessary and appropriate" it satisfies the second element of <u>Weber</u> and <u>Johnson</u>).  And fourth, the MLAAP did not set "quotas" as Plaintiff alleged, but rather set desired goals as to how many minority placements the State Department wanted to achieve each year through the MLAAP; and as is well-documented in the records, they constantly fell far short of those goals.  Def. Exh. 9 at 5-6 and Plaintiff's Exh. 1.  Thus, like the plans that were approved in <u>Weber</u> and in <u>Johnson</u>, the MLAAP did not "create an absolute bar to the advancement of White employees" but was "a temporary measure; . . . intended to . . . . eliminate a manifest racial imbalance."  <u>Weber</u>, 443 U.S. at 208.

In his Memorandum of Points and Authorities, Plaintiff compares the MLAAP to the

affirmative action program struck down in the Circuit Court's opinion in <u>Hammon v. Barry</u>, 826 F.2d 73 (D.C. Cir. 1987), and argues that the MLAAP suffers from the same shortcomings.  In his analysis of <u>Hammon</u>, Plaintiff sets out "relevant factors" that he claims were considered by the Supreme Court in <u>Johnson</u> and quoted with approval by the Circuit Court.  Those factors included the fact that the plan approved in <u>Johnson</u> had a moderate flexible, case-by-case approach, with no particular quota, and had short-term goals that would be adjusted annually based upon the refined data regarding under-representation.  Plaintiff's Memorandum of Points and Authorities at 9.  However, as pointed out *supra*, there is no set factors that limit the Court's consideration.  Nevertheless, looking beyond Plaintiff's mischaracterization of the MLAAP and applying the **facts** in this case to the factors identified the Court in <u>Hammon</u>, it is evident that the MLAAP shared almost no common attributed with the program struck down in <u>Hammon</u>.[17]

### C.       Plaintiff's Self-Serving Analysis as to His Possible Promotion Track Is Speculative, Unreliable and Requires Expert Testimony

Plaintiff's claim for damages should also be denied because his damages analysis also requires expert testimony.  Plaintiff attempts to estimate where he would be now in terms of pay grade and step if he had been able to enter the Foreign Service at the FS-03/Step 1 level through the MLAAP and concludes that his estimate demonstrates that he would have earned more

---

[17]       For the same reasons, Plaintiff's self-made factor – that "an AAP that sets aside positions according to specific numbers needs express assurance of its temporary nature to be lawful" must fail.  <u>See</u> Plaintiff's Memorandum of Points and Authorities at 11-12.  The Supreme Court has never set forth that condition as a requirement.  <u>See</u> <u>generally</u>, <u>Weber</u> and <u>Johnson</u>.  But even if it did, the MLAAP never "set aside" any number of positions for minorities only.  Nor did the MLAAP insulated the minority applicant from comparison with all other candidates for mid-level advancement, but rather required the minority applicant to demonstrate that they had the qualifications required for any person (minority or not) to hold that mid-level position.  All this is academic, however, because the MLAAP was temporary, and did in fact end.  Accordingly, even under Plaintiff's self-made factor, the MLAAP was lawful.

money during the limitations period than he has earned, up to and including his salary for 2009.

See Plaintiff's Memorandum at 32.  Plaintiff concedes, however, that each scenario put forth in

his Memorandum is a "hypothetical" and that "opinions may vary concerning exactly what my

history would have been if I had started under the MLAAP in 1992."  Id. at 34-36.  As was

demonstrated, *supra*, any opinion evidence must be based upon either a lay witness's actual

perception, Fed. R. Evid. 701, which is not satisfied here, or upon the knowledge, skill, training,

experience or education of an expert, Fed. R. Evid. 702, who has not been identified nor

presented in this matter.

Moreover, as is demonstrated below, the Foreign Service is not like the Civil Service

where one can expect a promotion after a requisite time in grade.  Rather, promotions in the

Foreign Service are granted only after careful consideration by a Selection Board that determines

promotions by applying certain precepts to each officer's performance and background, and the

failure of any officer to move "up" in grade could result in their removal (voluntarily or

involuntarily) from the Foreign Service.

### 1.    Plaintiff's Analysis is Speculative

There are a number of significant factors that are considered in the promotion decisions

for each Foreign Service Officer.  Selection Boards comprised of six individuals – five from each

of the Department's cones and one public member from outside the Department – review each

Foreign Service Officer's performance and make promotion decisions.  The review and decision-

making processes are complex.  Selection Boards work from a set of precepts that include

leadership and management effectiveness, and creditable service in hardship post assignments

among others.  The evaluation process has its own set of precepts that are used to evaluate each

Officer in areas such as interpersonal skills, intellectual skills, communication (to include foreign language ability), and substantive knowledge.  Def. Exh. 22 (Declaration of Susan E. Alexander (Alexander Declaration)) at ¶¶ 6-7.

In addition, the Department generally has an "up or out" policy with regard to Foreign Service Officers.  Those Officers who are not performing well and do not have potential for promotion into the Senior Foreign Service typically reach their time in class/time in service limits, leave, or are selected out of the Foreign Service prior to retirement (for which they become eligible at age 50).  Id. at ¶ 10.  It is very difficult for Officers entering at the mid-level to come up to speed quickly and become comfortable in supervisory roles when they themselves did not come up through the entry-level Foreign Service ranks.  Consequently, it is even harder to attempt to re-create a hypothetical promotion track from a mid-level, rather than an entry-level, starting point.  In fact, out of the group of Foreign Service Officers entering through the MLAAP in the early 1990s, some are no longer in the Foreign Service.  Id. at ¶ 12.  Based on the difficulty associated with entering the Foreign Service at a mid-level starting point, it is possible that Plaintiff would have performed unsuccessfully and/or become frustrated as a new mid-level Officer and left the Foreign Service before today.

Finally, any prediction about Plaintiff's possible promotions, if he had entered at a higher pay grade level, is made even more difficult by the lengthy time period at issue, nearly 20 years. Reviewing and evaluating the performance of a Foreign Service Officer over a 20-year period is complex and involves a number of factors and multiple six-person Selection Boards.  Id. at ¶¶ 13-14.

Here, Plaintiff's estimate as to his possible promotion track is highly speculative,

unreliable, and lacking in substantive content.  In addition to his unfounded assumption that he

would have qualified for participation in the MLAAP other than for his non-minority status, he

has not attempted to address the many factors involved in making a promotion determination for

a Foreign Service Officer in projecting his alternate career and salary path.  Nor has he addressed

the Department's "up or out" policy for Foreign Service Officers and the possibility that he

already would have left the Foreign Service – by his own choice or at the Department's choice –

had he started at a more demanding and more difficult mid-level pay grade level.  Plaintiff

declares that the "worst-case-scenario salary history" he presents in his Motion for Summary

Judgment "would be extremely unlikely actually to have occurred if [he] had started pursuant to

the MLAAP," and generously provides that "if the Court eventually concludes that my promotion

history would have been about the same as the average promotion history of the people who

started with DoS under the MLAAP around 1992 *and who are still serving*," then damages

would be more.  Plaintiff's Memorandum at 33 n. 18 (emphasis added).  Hence, Plaintiff is

attempting to exclude as comparators all potentially relevant MLAAP participants that are no

longer with the Foreign Service -- a convenient way to ignore the probability that Plaintiff

himself might no longer be in the Foreign Service if he had entered through the MLAAP, but that

this needs to be part of any damages analysis.

## 2. The Determination of Plaintiff's Possible Career Path Requires Opinion Testimony that Can Only Be Provided By an Expert Witness With the Requisite Training and Experience

Plaintiff has not presented rigorous analysis based on all of the above factors, and he

cannot do so without an expert witness of competent experience and background.  As with his lay

statistical analysis, Plaintiff has not provided any information regarding his experience, education

or background that qualifies him to perform this promotion analysis, nor can he.  Notably,

Plaintiff has not engaged in the same analysis used by the Department for Foreign Service for

promotions, nor has he had any experience in that process as he never served on any Selection

Boards or otherwise been involved in the promotion process on behalf of the Department.

In addition, Plaintiff has not performed any back-up calculations or provided any

information on the underlying factors, assumptions, and probabilities used in determining his

proposed alternate career path, leaving the Defendant with no way to evaluate the path.  Plaintiff

cannot just pick the most successful entrant, and compare himself to that one person without

considering all other career paths possible.

Because Plaintiff's self-serving promotion analysis lacks probative value, and involves

calculations and determinations that may only be made by a witness with the requisite experience

and expertise in the area of promotions in the Foreign Service, Plaintiff cannot prove his

damages claim.

**IV.    BECAUSE PLAINTIFF CANNOT OFFER ANY EXPERT TESTIMONY OR
OTHER ADMISSIBLE EVIDENCE THAT THE MLAAP WAS UNLAWFUL, OR
THAT HE SUFFERED DAMAGES, HE CANNOT MEET HIS BURDEN OF
PROOF AND SUMMARY JUDGEMENT SHOULD BE ENTERED IN FAVOR
OF DEFENDANT**

For the same reasons that Plaintiff's Motion for Summary Judgment fails – that he has

failed to set forth any admissible evidence regarding the statistical analysis of the MLAAP –

judgment should be entered in favor of Defendant.  As the party that bears the burden of proof

and the initial burden of persuasion at trial, Plaintiff must present "credible evidence--using any

of the materials specified in Rule 56(c) – that would entitle [him] to a directed verdict if not

controverted at trial."  Celotex, 477 U.S. at 331.

Nor is it enough that Plaintiff claims that there is a dispute of fact.  The Federal Rules of Civil Procedure provide that summary judgment may be granted where a party "cannot produce admissible evidence to support an alleged fact.  Fed. R. Civ. P. 56(c)(B).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" Celotex Corp., 477 U.S. 323 (citations omitted).  Moreover, mere conclusory allegations are not enough to survive a motion for summary judgment.  Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Rowland v. Riley, 5 F. Supp. 2d 1, 3 (D.D.C 1998); Been v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997).

Here, Plaintiff has neither identified nor offered an expert witness to testify as to the statistical evidence regarding the lawfulness of the MLAAP, or about his probable promotional trajectory.  His failure of proof is sufficient for the Court to enter summary judgment in favor of the Defendant.  See Sharkey v. Dixie Elec. Membership Corp., 262 Fed. Appx. 598, 608 (5th Cir. 2008) (Granting summary judgment for the defendant employer where the plaintiff failed to prove that an affirmative action plan was unlawful); Hannon v. Chater, 887 F. Supp. 1303, 1317-18 (N.D. Cal. 1995) ("Without the comparative statistics [using the percentage of White males versus the percentage of women and minorities qualified for the position], Hannon cannot carry his burden of showing, on the basis of the undisputed facts, that OHA's Affirmative Action Plan is invalid"), and at 1318 (Where the plaintiff has not made a showing sufficient to establish the existence of any elements essential to his reverse discrimination claim, on which he would bear the burden of proof at trial, the defendant is entitled to summary adjudication).

**V.     BECAUSE PLAINTIFF FAILED TO MITIGATE HIS DAMAGES, SUMMARY JUDGEMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANT**

Even if Plaintiff were to prove with some requisite specificity that he was damaged as a result of an "unlawful" MLAAP, Plaintiff failed to mitigate his damages.  Mitigation of damages remains an affirmative defense to an award of damages in a Title VII claim.  Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231 (1982); Fleming v. County of Kane, State of Ill., 898 F.2d 553, 560 (7th Cir. 1990) (*cited with approval in* Barbour v. Merrill, 48 F.3d 1270, 1279-80 (D.C. Cir. 1995).  "[T]he principle of mitigation of damages requires an injured party, at the risk of having his damage award reduced, to take reasonable steps to minimize the harm done.  Fleming, 898 F.2d at 561.  In other words, a plaintiff cannot merely sit back after being injured by an employment decision "in the hope of someday being made whole by a judgment at law."  Id. (*quoting* Hunter v. Allis–Chalmers Corp., Engine Div., 797 F.2d 1417, 1428 (7th Cir.1986). Instead, a plaintiff has a duty to minimize damages by using reasonable diligence in finding another comparable or equivalent position.  Ford Motor Co., 458 U.S. at 231-232.

The undisputed evidence here shows that in 1992 – the year Plaintiff was hired – the State Department issued 14 certificates of need for mid-level hiring in the broader (and race/gender-neutral) Mid-Level Foreign Service Career Candidate Program.  Def. Exh. 10 (Shea-07372).  The certificates were issued for almost every cone in the Foreign Service, including Plaintiff's, and covered the hiring years 1992 and 1993.  Id.  Nevertheless, Plaintiff never applied for mid-level appointment in any of these positions, nor did he make any request that his prospective/pending application for employment be considered under the Mid-Level Foreign Service Career Candidate Program.  Indeed, a White female, Patricia Haslach, wrote as early as January 10,

34

1991, asking about the admission through the Mid-Level Foreign Service Career Candidate

Program.  Def. Exh. 17 (Letter dated January 10, 1991, from Patricia Haslach to James Reid).

Ms. Haslach was allowed to begin the application and interview process for admission through

the Mid-Level Foreign Service Career Candidate Program, in anticipation of the issuance of a

certificate of need in the economics cone.  Def. Exh. 18 (Letter dated October 24, 1991, from

Patricia Haslach to Rose Green).  When a certificate of need was ultimately issued for the

economics cone, see Def. Exh. 10, Ms. Haslach received the appointment and entered the

Foreign Service on October 19, 1992, as an FS2.  Def. Exh. 16 (Mid-Level Hiring 1990 to 1992).

Even after Mr. Shea applied for a position with the Foreign Service, he could have

requested that his application be re-directed to the Mid-Level Foreign Service Career Candidate

Program.  For example, a White female applicant, Carol Kalin Kalin Bevan, was in the midst of

completing her application interviews and oral assessments for a Junior Officer position when

she inquired into the mid-level placement program.  Def. Exh. 20.  A thorough review of her

education and experience revealed an economics expertise that was the subject of a certificate of

need, and her application packet was directed to the Mid-Level Foreign Service Career Candidate

Program.  Id.  Ms. Bevan entered the mid-level of the Foreign Service as an FS2 on August 9,

1993.  Def. Exh. 16 (Mid-Level Hiring 1990 to 1994) at 2.

Even after his appointment as a Junior Officer of the Foreign Service, Plaintiff was able

to seek re-appointment to a mid-level position through a certificate of need.  A White male FSO

was allowed to re-apply to the Mid-Level Foreign Service Career Candidate Program after he

was accepted into the Junior Officer level of the Foreign Service.  Kenneth Thomas had been

accepted as an entry-level FS5, when he sought re-appointment as a result of a recently

announced certificate of need.  Def. Exh. 19.  Mr. Thomas went through the mid-level review process, and was re-appointed as an FS2 in the Science and Technology cone in the State Department.  Def. Exh. 16 (Mid-Level Hiring 1990 to 1994).

The undisputed evidence further demonstrates that Plaintiff had multiple opportunities to apply for a mid-level FSO position and mitigate any allege damages that he may have suffered as a result of any alleged limitations imposed by the MLAAP.  Plaintiff even admits that, at the time he applied for and was accepted into the Foreign Service, he knew about the MLAAP and its focus on mid-level minority placement.  See Def. Exh. 15 at 10.  Yet, he never inquired nor sought mid-level placement into the Foreign Service **at any time**, even with his own self-acclaimed qualification for such a placement.  Because Plaintiff merely chose to sit back "in the hope of someday being made whole by a judgment at law," Fleming, 898 F.2d at 561 (*quoting* Hunter v. Allis–Chalmers Corp., Engine Div., 797 F.2d 1417, 1428 (7th Cir.1986), rather than actually do something to mitigate his alleged damages, his claim must fail.

## VI.    CONCLUSION

For all of the foregoing reasons, the Defendant respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment, and grant the Defendant's Cross-Motion for Summary Judgment.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. BAR # 447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Acting Chief, Civil Division


 /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843