## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WILLIAM E. SHEA** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil No. 02-577 (RCL)** |
| | ) |
| **JOHN F. KERRY, Secretary** | ) |
| **U.S. Department of State[1]** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

*Pro se* plaintiff William Shea, a white career Foreign Service officer, brought this Title VII reverse discrimination action against the Department of State ("State"). Compl., Mar. 3, 2002, ECF No. 1. When State hired Shea in 1992, State operated an affirmative action program that made qualified minorities eligible for direct placement into mid-level classes of the Foreign Service. Shea claims he would have been eligible for this mid-level placement program but for his race and still feels the effect of his entry at a lower pay grade—each paycheck is less than it would have been if he entered as a mid-level officer.

This case suffered a series of fits and starts, largely attributable to *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618 (2007) and the Lilly Ledbetter Fair Pay Act, Pub. L. No. 111–2 (Jan. 29, 2009). Since Shea based his claim on the continuing effects of a discriminatory decision made in 1992, his claim was time-barred until passage of the Lilly Ledbetter Act. The substantive merits are finally ripe for consideration as the Court considers each party's motion

---

[1] On February 1, 2013, John F. Kerry succeeded Hillary Clinton as the United States Secretary of State. Since this suit is against the Secretary of State in his or her official capacity only, the Court will substitute Secretary Kerry as defendant in this matter, per Federal Rule of Civil Procedure 25(d).

for summary judgment.  Under Title VII, Shea has the ultimate burden of proving that State's affirmative action plan was unlawful.  Shea cannot support an essential element of his claim with admissible evidence.  He tries to prove, via his own amateur statistics, that minorities were not significantly underrepresented in the Foreign Service mid-levels.  Shea needs, and lacks, qualified testimony about the statistical significance of his findings.  Therefore, State is entitled to summary judgment on Shea's remaining claims and this case will be dismissed with prejudice.

I.     **BACKGROUND**

    **A.     Factual Background**

In 1985, Congress enacted the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987 ("1986–87 FRAA").  Pub. L. 99–93.  The 1986–87 FRAA directed State to "develop…a plan designed to increase significantly the number of members of minority groups and women in the Foreign Service."  Pub. L. 99-93, Title I, § 152(a).  Congress further directed that "each plan developed pursuant this section shall…place particular emphasis in achieving significant increases in the numbers of minority group members and women who are in the mid-levels of the Foreign Service."  Pub. L. 99-93, Title I, § 152(b).  Thereafter, State instituted the Mid-Level Affirmative Action Plan ("MLAAP") under its more general Mid-Level Foreign Service Career Candidate Program ("MLCCP").  *See* Def.'s Statement of Facts Not in Genuine Dispute ¶ 3 ("Def.'s SMF"), Aug. 17, 2012, ECF No. 120-1; Pl.'s Response to Def.'s Statement of Material Facts Not in Dispute 7–8 ("Pl.'s SMF Resp."), Aug. 30, 2012, ECF No. 123-4 (only objecting to defendant's statement that MLAAP was "in response" to FRAA).  Although white women were not qualified to participate in the MLAAP, State created the "Federal Women Programs" and the Federal Women's Program manager to develop and monitor programs aimed at greater female representation.  Def.'s SMF ¶ 4; Pl.'s SMF Resp. (admitting Def.'s SMF ¶ 4).

In 1987, Congress enacted the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 ("1988–89 FRAA").  Pub. L. 100–204.  In the 1988–89 FRAA Congress found:

> [T]hat the Department of State and other Foreign Service agencies have not been successful in their efforts – (1) to recruit and retain members of minority groups in order to increase significantly the numbers of minority groups in the Foreign Service; and (2) to provide adequate career advancement for women and members of minority groups in the senior levels of the Foreign Service.

Pub. L. 100–204, Title I, § 183(a).  Congress further required State to "substantially increase their efforts to implement effectively the plans required by" the 1986–87 FRAA and "ensure that those plans effectively address the need to promote increased numbers of qualified women and members of minority groups into the senior levels of the Foreign Service."  Pub. L. 100–204, Title I, § 183(b).  State revised the MLAAP in November 1990 and instituted its FY 1990–92 Mid-Level Affirmative Action Plan, which was in effect when Shea applied to, and was hired by, State.  Def.'s SMF ¶ 9; Pl.'s SMF Resp. 10 (admitting Def.'s SMF ¶ 9).

Mid-level hiring allowed State to hire a Foreign Service candidate directly into a higher grade, rather than into an entry-level grade.  Under the general mid-level hiring program, a candidate with the requisite experience could enter as a mid-level hire if State received a "certification of need" that State required an outside hire at that grade and with those qualifications.  The Mid-Level Affirmative Action Plan dispensed with the "certification of need" requirement in favor of self-identification as American Indian, Alaskan Native, Asian and Pacific Islander, Hispanic, or African American.  State required all candidates for mid-level hiring—both minority and non-minority—to (a) have substantial professional experience, (b) receive a passing grade on an oral examination, and (c) pass a background check.  In February 1993, State ended the mid-level affirmative action program, but kept in place its more general

mid-level hiring program.  Def.'s SMF ¶¶ 10, 12–17; Pl.'s SMF Resp. 10–11 (admitting in all relevant respects Def.'s SMF ¶¶ 10, 12–17).

In September 1990, William Shea—a white male of Irish descent—submitted an application to the Foreign Service.  Shea never applied for mid-level placement through the general Mid-Level Foreign Service Career Candidate Program.  In May 1993, State hired Shea as an entry-level career Foreign Service Officer; he came in at grade FS-05, step 5.[2]  Shea knew at the time he was hired that qualified minorities could start at higher grades, and that two people in his introductory class were starting at mid-level grades due to their participation in a minority mid-level hiring program.  Shea did not file an administrative grievance until July 11, 2001—nine years after he entered the Foreign Service.  Def.'s SMF ¶¶ 20–23, 26, 37; Pl.'s SMF Resp. 13–16 (admitting Def.'s SMF ¶¶ 20–23, 26, 37).

In his Complaint, Shea alleged that he would have passed the screening process of the MLAAP, but was excluded from consideration solely because of his race.  Specifically, Shea alleged harm because his hiring at entry-level rather than mid-level grade has subjected him to lower pay and fewer promotion opportunities than members of minority groups admitted under the MLAAP, in violation of his rights under Title VII.  *See* Compl. ¶¶ 1–2.

### B.      Procedural Background

On July 11, 2001, Shea filed a grievance with the State Department asserting, among other things, racial discrimination in violation of Title VII because of the disparate pay he was receiving.  *See* Def.'s SMF ¶ 37; Pl.'s SMF Resp. 11 (admitting Def.'s SMF ¶ 37); Compl. ¶¶ 1–2.  On January 30, 2002, Shea received the decision of the Foreign Service Grievance Board dismissing Shea's complaint for lack of jurisdiction.  Compl. ¶ 2.  Having exhausted his

---

[2] In the Foreign Service personnel system, FS-05 is the entry-level grade and FS-01 is the senior grade.  *See* Def.'s SMF ¶ 11; Pl.'s SMF Resp. 10 (admitting Def.'s SMF ¶ 11).

administrative remedies, Shea filed suit in this Court on March 26, 2002.  His Complaint raised a

Title VII challenge to the MLAAP, claiming he was injured by continuing to receive a lower

paycheck than he would had he been eligible for mid-level placement though the MLAAP.

The case was initially assigned to Judge James Robertson, who granted State's Motion to

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) because Shea's complaint and

administrative grievance were untimely.  Mem. & Order, Sept. 30, 2003, ECF Nos. 15 & 16.  He

found Shea's "complaint amounted to no more than allegations of discrimination in May 1992,

when he started at a lower pay grade."  Mem. 4, ECF No. 16.  Judge Robertson held that each

allegedly-diminished paycheck did not amount to a new, discrete discriminatory act that reset the

clock for filing an administrative complaint.  *Id.* at 3–4.  Shea tried to rely on *Anderson v.*

*Zubieta*, 180 F.3d 329 (D.C. Cir. 1999) and *Bazemore v. Friday* 478 U.S. 385 (1986) "for the

proposition that, every time he received a paycheck for less than it would have been had he not

been discriminated against, he was 'discriminated against anew.'"  *Id.* at 4.  However, Judge

Robertson found that these cases were "inapposite," because there was not a "'discriminatory

system in place,'" akin to those in *Bazemore* and *Anderson.*  *Id.* (*quoting Neidermeier v. Office of*

*Baucus*, 153 F. Supp. 2d 23, 29 (D.D.C. 2001)).  Furthermore, Judge Robertson dismissed Shea's

constitutional claims and his request for declaratory and injunctive relief.  *Id.* at 4–5.

Shea then appealed the district court's ruling.  *See* Notice of Appeal, Nov. 11, 2003, ECF

No. 17.  "While the district court dismissed all of his allegations on the pleadings—finding none

stated a viable claim—Shea [sought] review of only one:  *i.e.,* that his pay and benefits are

discriminatorily low because the State Department set his pay grade pursuant to a diversity

program that disadvantaged him on account of his race (white) and ethnicity (Irish), in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* and the Equal Protection

component of the Fifth Amendment, U.S. CONST. amend V." *Shea v. Rice*, 409 F.3d 448, 449 (D.C. Cir. 2005). The court of appeals found that "*Bazemore* holds that an employee may recover for discriminatorily low pay received within the limitations period because each paycheck constitutes a discrete discriminatory act," *id.* at 455, reversed the district court's dismissal, and remanded for further proceedings, *id.* at 456.

While the case was on remand, the Supreme Court decided *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) and brought the D.C. Circuit's analysis into doubt. Judge Robertson denied State's subsequent Rule 12(c) motion for judgment on the pleadings, but invited the parties to file for summary judgment after a fuller development of the factual record. *See* Order, Aug. 30, 2007, ECF No. 43. After the parties filed cross-motions for summary judgment, Judge Robertson found that *Ledbetter* effectively overturned the D.C. Circuit's prior analysis. *Shea v. Rice*, 587 F. Supp. 2d 166, 168–69 (D.D.C. 2008). He stated that Shea's argument "cannot be successfully distinguished from the 'paycheck accrual rule' that Ledbetter argued for and that the Supreme Court rejected." *Id.* at 169. *Bazemore* could not save Shea because State did not engage in any "fresh discrimination" or continue a discriminatory system during the limitations period; it was undisputed that State ended its mid-level affirmative action program in 1993. *Id.* at 169–70. Therefore, Judge Robertson granted State summary judgment.

Shea again appealed the dismissal of his case. *See* Notice of Appeal, Nov. 23, 2008, ECF No. 65. While Shea's appeal was pending, Congress passed the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5 (2009), which abrogated the Supreme Court's holding in *Ledbetter*. The D.C. Circuit remanded for reconsideration in light of this intervening change. *Shea v. Clinton,* No. 08–5491, 2009 WL 1153448, at *1 (D.C. Cir. Apr. 2, 2009).

On remand, Judge Robertson reconsidered the parties' summary judgment motions, examining arguments he did not reach earlier because he had disposed of the case on other grounds.  Mem. Order, Aug. 11, 2009, ECF No. 69.  He rejected State's legislative immunity defense and found State did not have enough evidence to support a laches defense.  *Id.* at 3–5. He then considered Shea's Title VII challenge to the MLAAP.  He applied the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and considered Shea's claims under the affirmative action jurisprudence of *United Steelworkers v. Weber*, 443 U.S. 193 (1979), *Johnson v. Transportation Agency, Santa Clara County, Cal.*, 480 U.S. 616 (1987), and *Hammon v. Barry*, 826 F.2d 73 (D.C. Cir. 1987).  *Id.* at 6–7.  Judge Robertson stated that:

> The government will be liable to Shea on account of the affirmative action program that was in operation at State more than fifteen years ago only if Shea can show (a) that the program was unlawful – meaning generally that it was not designed to cure a manifest imbalance in the workforce; (b) that, except for his race, Shea was qualified for the program; and (c) that Shea was damaged during the period of limitations by the continuing effects of the MLAAP.

*Id.* at 5–6.  At that time, the factual record regarding the legality of State's affirmative action plan had not been well developed.  *Id.* at 8.  Therefore, Judge Robertson denied both parties' motions for summary judgment, *id.* at 11, and set a schedule for additional fact and expert discovery, *see* Scheduling Order, Sept. 23, 2009, ECF No. 73.

Several miscellaneous motions followed.  First, State objected to the Court's treatment of the MLAAP as a voluntary affirmative action plan and requested reconsideration.  *See* Def.'s First Mot. Reconsideration, Aug. 19, 2009, ECF No. 70.  The Court denied this motion the next day.  Order, Aug. 20, 2009, ECF No 71.  On January 1, 2010, Shea filed his still-pending Motion for Summary Judgment, ECF No. 74.  Thereafter, the Court allowed State to amend its discovery responses so State will not have been deemed to admit to several of Shea's factual claims.  *See* Order Granting Def.'s Mot. for Leave to File, Feb. 2, 2010, ECF No. 78.

Judge Robertson retired in 2010, and the case was randomly reassigned to Judge Henry H. Kennedy on June 4, 2010.  Reassignment of Civil Case, June 4, 2010, ECF No. 80.  Less than a month later, the case was randomly reassigned to Judge Emmet G. Sullivan.  Reassignment of Civil Case, June 30, 2010, ECF No. 83.  Judge Sullivan extended all discovery until September 30, 2010.  Minute Order, July 6, 2010; Revised Scheduling Order, July 6, 2010, ECF No. 84.

Shea then filed a motion for reconsideration, challenging various aspects of Judge Robertson's prior rulings.  Pl.'s Mot. Reconsideration, July 23, 2010, ECF No. 85.  Shea also moved to hold discovery deadlines in abeyance until resolution of this motion.  ECF No. 86.  In response, Judge Sullivan stayed the entire matter until an April 6, 2011 status conference.  Minute Order, Mar. 9, 2011.  At that conference, he orally extended the stay indefinitely.

The parties continued to file motions during the stay.  State filed a second motion for reconsideration, again arguing that Congress mandated the MLAAP and that it was error to subject it to the standards applicable to voluntary affirmative action plans.  Def.'s Second Mot. Reconsideration, Apr. 5, 2011, ECF No. 93.  Shea then filed a motion to apply judicial estoppel to bar State from submitting an opposition to Shea's still-pending motion for summary judgment.  Pl.'s Mot. to Apply Judicial Estoppel, Nov. 7, 2011, ECF No. 106.

On October 11, 2011, the case was reassigned by consent to its fourth (and, perhaps, final) judge, Chief Judge Royce C. Lamberth.  *See* Reassignment of Civil Case, ECF No. 105.  Chief Judge Lamberth denied both parties' motions for reconsideration and Shea's motion for application of judicial estoppel, and lifted the stay on July 30, 2012.  *See Shea v. Clinton*, 850 F. Supp. 2d 153 (D.D.C. 2012); *Shea v. Clinton*, 880 F. Supp. 2d 113 (D.D.C. 2012).  The Court set a schedule for briefing on Shea's still-pending summary judgment motion and any cross-motion offered by State.  *See* Mem. & Order 9, July 30, 2012, ECF No. 118.

On August 17, 2012, State filed a second Motion for Summary Judgment.  ECF No. 120.

This led to several more rounds of procedural motions and requests for extensions.  *See* ECF

Nos. 122, 125, 129, 132.  After the Court settled these issues (*see* ECF Nos. 137–39; *Shea v.*

*Clinton*, 228 F.R.D. 1 (D.D.C. 2012)), the parties' motions for summary judgment were finally

ripe for consideration on December 22, 2012.  With discovery closed and a full briefing on the

merits presented, the Court can finally consider the substantive merits of Shea's claim.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).  The mere

existence of *any* factual dispute will not defeat summary judgment; "the requirement is that there

be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  A

fact is material if, under the applicable law, it could affect the outcome of the case.  *Id*.  A

dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id*.  Because "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the

"evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor."  *Id*. at 255.  A nonmoving party, however, must establish more than "the existence of

a scintilla of evidence" in support of its position.  *Id*. at 252.  The inferences drawn from the

evidence "must be reasonably probable and based on more than mere speculation."  *Rogers*

*Corp. v. E.P.A.*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) (citations omitted).  The nonmoving party

may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d

671, 675 (D.C. Cir. 1999).  The nonmoving party must present specific facts that would enable a

reasonable jury to find in its favor.  *Id.*  If the evidence presented is "merely colorable, or is not

significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50.

In *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986), the Supreme Court held that, after

"adequate time for discovery and upon motion," a court must enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  Elaborating:

> In such a situation, there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the nonmoving
> party's case necessarily renders all other facts immaterial.  The moving party is
> "entitled to a judgment as a matter of law" because the nonmoving party has
> failed to make a sufficient showing on an essential element of her case with
> respect to which she has the burden of proof.

477 U.S. at 322–23 (*quoting* Fed. R. Civ. P. 56(c)).  The Supreme Court meant "to disapprove a

line of cases allowing a party opposing summary judgment to resist a properly made motion by

reference only to its pleadings," *id.* at 325:

> In cases…where the nonmoving party will bear the burden of proof at trial on a
> dispositive issue, a summary judgment motion may properly be made in reliance
> solely on the "pleadings, depositions, answers to interrogatories, and admissions
> on file."  Such a motion, whether or not accompanied by affidavits, will be "made
> and supported as provided in this rule," and Rule 56(e) therefore requires the
> nonmoving party to go beyond the pleadings and by her own affidavits, or by the
> "depositions, answers to interrogatories, and admissions on file," designate
> "specific facts showing that there is a genuine issue for trial."

*Id.* at 324 (*quoting* Fed. R. Civ. P. 56).

Rule 56 allows a party seeking or opposing summary judgment to "object that the

material cited to support or dispute a fact cannot be presented in a form that would be admissible

in evidence."  Fed .R. Civ. P. 56(c)(2).  While at summary judgment the nonmovant "is not

required to produce evidence in a form that would be admissible at trial," the evidence must be

"capable of being converted into admissible evidence." *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987). "Because the objective of summary judgment is to prevent unnecessary trials, and because '[v]erdicts cannot rest on inadmissible evidence,' it follows that the evidence considered at summary judgment must be capable 'of being converted into admissible evidence.'" *Akers v. Liberty Mut. Group*, 744 F. Supp. 2d 92, 96 (D.D.C. 2010) (*quoting Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)). At summary judgment the Court cannot rely on "mere allegations or denials." *Anderson*, 477 U.S. at 256; *see also* 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2727 (3d ed. 2012) ("A judge may not resolve a summary-judgment motion by 'assumptions' about matters that have not been properly presented in the manner prescribed by the rule[.]").

The filing of a cross-motion for summary judgment does not "concede the factual allegations of the opposing motion." *CEI Washington Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006). Cross-motions for summary judgment are treated separately. *See McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("The rule governing cross-motions for summary judgment…is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."). The court may—despite the parties' stipulations that there are no disputed facts—find material facts are in dispute, deny both motions, and proceed to trial. *Id*. at 1147 n.4.

### B.    Affirmative Action Plans Under Title VII

Title VII of the Civil Rights Act of 1964, as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e–2, 2000e–3. Title VII protects all Americans, including white men, from race-based employment discrimination. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976).

11

Nevertheless, the Supreme Court has repeatedly interpreted Title VII to allow "race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." *Weber*, 443 U.S. at 204; *see also Johnson*, 480 U.S. at 626. The Supreme Court has approved of affirmative action plans "designed to 'eliminate manifest imbalances in traditionally segregated job categories.'" *Johnson*, 480 U.S. at 628 (*quoting Weber*, 443 U.S. at 197).

"The standard for determining whether affirmative relief is justified under Title VII is less stringent than under the Constitution." *Stewart v. Rubin*, 948 F. Supp. 1077, 1093 (D.D.C. 1996) (Lamberth, J.) *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997). *See also Johnson*, 480 U.S. at 627 n.6 ("The fact that a public employer must also satisfy the Constitution does not negate the fact that the statutory prohibition with which that employer must contend was not intended to extend as far as that of the Constitution."); *cf. Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986) (applying strict scrutiny to constitutional challenge of affirmative action plan). Courts analyze Title VII challenges to affirmative action plans under the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As the Supreme Court stated:

> Once a plaintiff establishes a *prima facie* case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.

*Johnson*, 480 U.S. at 627. The plaintiff bears the ultimate burden of establishing the invalidity of the affirmative action plan. *Id*. Reliance on an affirmative action plan is not an "affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff." *Id*.

In analyzing affirmative action plans under Title VII, courts consider: (1) whether the plan was justified by a "manifest imbalance" reflecting an underrepresentation of minorities or

women in "traditionally segregated job categories"; and (2) whether the plan was properly tailored to cure the disparity without unnecessarily trammeling the interests of non-minorities. *Weber*, 443 U.S. at 208.  Statistically significant disparities between the percentage of minorities employed and the percentage of qualified minorities in the labor market can be strong evidence of a manifest imbalance.  *See Johnson*, 480 U.S. at 433; *Palmer v. Shultz*, 815 F.2d 84, 91 (D.C. Cir. 1987).  Writing for the Court in *Johnson*, Justice Brennan stated that a "manifest imbalance need not be such that it would support a *prima facie* case against the employer."  480 U.S. at 632; *see also id*. at 633 n.11 ("However, as long as there is a manifest imbalance, an employer may adopt a plan even where the disparity is not so striking, without being required to introduce the nonstatistical evidence of past discrimination that would be demanded by the '*prima facie*' standard."); *Stewart*, 948 F. Supp. at 1094 ("Nor is a finding or admission of prior discrimination required in a Title VII case.  Indeed, to adopt affirmative measures to resolve Title VII employment discrimination claims, the employer need not admit to any prior discrimination, nor point 'to evidence of an 'arguable violation' on its part.'" (*quoting Johnson*, 480 U.S. at 630)).

Shortly after *Johnson*, Judge Kenneth Starr of the D.C. Circuit read *Johnson* as not eviscerating the existing "predicate of discrimination" requirement—an employer may only use affirmative action as a remedy for prior discrimination.  *Hammon*, 826 F.2d at 74–75.  Statistics showing an "egregious underrepresent[ation]" of minorities may give rise to an "inference of discrimination" by the employer.  *Id*. at 75.  Finding that the *Johnson* majority agreed with Justice O'Connor's statement that affirmative action is permissible under *Weber* "only as a remedial device to eliminate actual or apparent discrimination or the lingering effects of this discrimination," *Johnson*, 440 U.S. at 649 (O'Connor, J., concurring), Judge Starr held that "although an employer need not admit or prove that it had acted discriminatorily, evidence of the

effects of its past or current discrimination is a prerequisite to lawful race-conscious employment decisions," 826 F.2d at 75 n.1.

In determining whether the affirmative action plan unnecessarily trammels the interests of non-minorities, courts focus on the nature of the plan—including whether the plan is temporary, whether it was intended to attain or maintain a racial balance, whether it imposes quotas, whether it requires the discharge of white employees, and whether it is over-inclusive. *See*, *e.g.*, *Weber*, 443 U.S. at 208; *Johnson*, 480 U.S. at 636–40; *United States v. Paradise*, 480 U.S. 149, 182 (1987); *Stewart*, 948 F. Supp. at 1095–96.

## III.   DISCUSSION

This case is eleven years old and on its fourth judge.  The district court twice entered final judgment.  Order, Sept. 30, 2003, ECF No. 15; Order, Nov. 21, 2008, ECF No. 64.  The court of appeals twice reversed the district court and remanded for further proceedings. Judgment, Sept. 14, 2005, ECF No. 19; Mandate, Apr. 17, 2009, ECF No. 67.  Given this protracted history, the Court should clarify a few preliminary matters.

The Court will use the *McDonnell Douglas / Johnson* framework—described *supra* Part II.B.—to analyze plaintiff's Title VII claims.  This case only concerns Shea's Title VII claims. Shea voluntarily withdrew a number of his claims in response to State's first Motion to Dismiss. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss 1–2, Feb. 10, 2003, ECF No. 12.  Shea abandoned other constitutional claims when he elected not to appeal their dismissal.  *See Shea*, 409 F.3d at 450–51 (noting that Shea only appealed the district court's dismissal of his pay grade discrimination claim).  To the extent Shea has any remaining constitutional claims, they would be time-barred under the three-year statute of limitations applicable to equal protection claims.[3]

---

[3] Shea's equal protection claims would be "subject to the District's three-year residual limitation period."  *Munoz v. Bd. of Trustees of Univ. of Dist. of Columbia*, 590 F. Supp. 2d 21, 28 (D.D.C. 2008) *aff'd,* 427 F. Appx. 1 (D.C. Cir.

Therefore, the Title VII standard articulated by the Supreme Court in *Johnson v. Transportation Agency*, 480 U.S. 616 (1987) applies—rather than the constitutional standard articulated by the Supreme Court in *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986).  Over Justice Scalia's vigorous dissent, 480 U.S. at 657–77, Justice Brennan's majority opinion in *Johnson* made clear that the statutory test differs from the constitutional test, 480 U.S. at 627 n.6.

*Johnson* and its progeny describe the Title VII standard under which courts analyze voluntary affirmative action programs.  State repeatedly argued that the MLAAP is not a "voluntary" plan—that the Foreign Relations Authorization Act, 22 U.S.C. § 3922a, mandated the creation of an affirmative action plan.  *See*, *e.g.*, Def.'s Mem. ISO its First Mot. Reconsideration 4–6; Def.'s Mem. ISO its Second Mot. Reconsideration.  This Court has rejected these arguments, finding that while the FRAA "clearly requires State to implement a plan to address mid-level positions, it is silent on to the means by which State is to accomplish this goal."  *Shea v. Clinton*, 850 F. Supp. 2d 153, 159 (D.D.C. 2012).  The Court concluded, while also rejecting State's argument for legislative immunity, that "[t]he FRAA clearly does not mandate an exception to Title VII and does not mandate creation of the MLAAP specifically."

---

2011).  "To establish an equal protection claim, plaintiff must show that she was singled out from among others similarly situated on the basis of race and/or national origin."  *Id.*  The plaintiff cannot rely on the "ongoing negative consequences" of the prior discrimination to extend the statute of limitations for his equal protection claim.  *Id.*

The Lilly Ledbetter Fair Pay Act, 123 Stat. 5 (2009), does not address constitutional or 42 U.S.C. § 1983 claims.  The Ledbetter Act *did* explicitly mention that it applies to claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination Act of 1967, the Americans With Disabilities Act of 1990, and the Rehabilitation Act of 1973.  *Id.*  It would be very odd for the Ledbetter Act to specify, with great detail, the types of claims to which it applies and then, *sub silentio*, change the statute of limitations for claims under the equal protection clause or § 1983.  *See*, *e.g.*, ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93–100 (2012) (explaining semantic canon that "[n]othing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*).  That is, a matter not covered is to be treated as not covered."); *id*. at 107–111 (explaining the "negative-implication canon" which suggests that "[t]he expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").

Furthermore, courts typically look to state law to determine the statute of limitations for constitutional claims.  *See Carney v. Am. Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998) (D.C. Code § 12-301(8) provides statute of limitations for § 1983 claims); *Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986) (§ 12-301(8) provides statute of limitations for most *Bivens* actions).

*Id.* at 162.  As this Court has found previously, *see id.* at 158–62, it reiterates that MLAAP is a voluntary affirmative action plan subject to *Johnson* and its progeny.

This case is not a "mixed motive" or "direct evidence" case.  Shea's reliance on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) is misplaced.  *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. & Reply ISO Mot. Summ. J. 39 ("Pl's Opp'n & Reply"), Aug. 30, 2012, ECF No. 123. In *Price Waterhouse*, the Supreme Court set the standard for "mixed motive" Title VII cases: Once a plaintiff shows an employer acted with an impermissible motive, the burden of proof shifts to the employer to prove that it would have made the same decision even in the absence of the impermissible motive.  490 U.S. at 242.  In 1991, Congress amended Title VII; section 107 of the 1991 Act codified *Price Waterhouse* "to the extent that it shifts the burden of persuasion to the defendant to prove a nondiscriminatory motive was at work."  2 Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 2544 (4th ed. 2007).  However, this is not a "mixed motive" case, and courts typically do not treat "reverse discrimination" cases as falling under the burden-shifting framework of *Price Waterhouse* and § 107.  *See id.* at 2544–46.  Courts in this Circuit have long held that the mere existence of an affirmative action plan does not provide "direct evidence" of discrimination.  *See, e.g., Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 n.9 (D.C. Cir. 1981).  "In the absence of direct evidence of discrimination,"—of which there is none in this case—"disparate-treatment claims under Title VII are analyzed under the burden-shifting framework set forth in *McDonnell Douglas*[.]"  *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1149 (D.C. Cir. 2004).

Shea may only challenge State's revised FY 1990–92 Multi-Year Affirmative Action Plan.  When the Court refers to the "MLAAP" generally, it refers to the 1990–92 plan in effect at the time of Shea's hiring.  At times, Shea presents arguments based on deficiencies in State's

earlier 1987 Multi-Year Affirmative Action Plan.  *See generally* Pl.'s Opp'n & Reply.  This plan
was not in effect when Shea applied to State.  Shea cannot directly challenge the 1987 MLAAP,
and the details of its alleged shortcomings are of limited probative value.  On the other hand, the
findings of underrepresentation and prior discrimination underpinning the 1987 MLAAP may be
relevant to justifying the later plan.  The 1990–92 plan was a continuation and refinement of an
existing plan.  State did not need to justify the revised plan out of whole cloth;  it may rely in part
on its earlier findings of discrimination and underrepresentation if it found that significant
underrepresentation persisted, and race conscious policies continued to be necessary.

　　　　When considering the numbers, the Court focuses on the mid- and senior-levels of career
Foreign Service generalist officers.   At the time, the Department of State had two personnel
systems—one covering the "Foreign Service," and one covering the "Civil Service system."  *See*
Ex. 2 to Def.'s Cross-Mot. 26 (Shea – 00090).  The "Civil Service system" covered the gamut of
employees responsible for the general administration of the State Department, including clerical,
technical, and legal staff.  Within the Foreign Service, there are Foreign Service Officers (or
"Generalists") and Foreign Service Specialists.   Foreign Service Officers have "general
responsibility for carrying out and conducting the United States' foreign relations throughout the
world."   *Id*.   Within this corps, State assigned its officers to one of four "cones"—
Administrative, Consular, Economic, and Political.  Foreign Service Specialists, on the other
hand, are "professional specialists in communications, security, medicine, office support skills,
and other fields."  *Id*.  State is responsible for meeting EEO goals for both the Civil and Foreign
Service, and for both Foreign Service Generalists and Specialists.  Many of the reports submitted
by State also discuss underrepresentation in the Civil Service and Foreign Service Specialist

ranks.  *See*, *e.g.*, Ex. 2 to Def.'s Cross-Mot. (State FY 1990–92 Multi-Year Affirmative Action

Plan); Ex. 3 to Def.'s Cross-Mot. (GAO report on underrepresentation in Foreign Service).

Shea applied for, and received, a position as an entry-level Foreign Service Officer.  *See*

Ex. 12 to Def.'s Cross-Mot. (Agreement to Join the Foreign Service, April 22, 1992); Ex. 13 to

Def.'s Cross-Mot. (employment form SF 50-B).  Therefore, the rates of underrepresentation of

career Foreign Service generalist officers are relevant to this case.  Underrepresentation in the

mid- and senior-levels is relevant because Congress specifically expressed dissatisfaction of the

minority representation at both levels, and directed State to take action to correct for these

specific imbalances.  *See* 1986–87 FRAA, Pub. L. 100–204, Title I, § 183(b); 1988–89 FRAA,

Pub. L. 100–204, Title I, § 183(b)).

With the correct standard and object of inquiry settled, the Court reiterates that in order

for Shea to prevail, he must prove "(1) that the MLAAP was unlawful, (2) that except for his

race, Shea was qualified for the program, and (3) that Shea was damaged during the period in

question by the continuing effects of the MLAAP."  *Shea*, 850 F. Supp. 2d at 163.  At trial, Shea

would have the burden of proving the unlawfulness of the MLAPP.  *See Johnson*, 489 U.S. at

627.  He cannot do meet this burden with admissible evidence, and thus has "fail[ed] to make a

showing sufficient to establish an element essential" to his case.  *Celotex*, 477 U.S. at 322.

### A.      Shea's *Prima facie* Case of Discrimination

Typically, when an "employer has asserted a legitimate, non-discriminatory reason" for

taking an adverse action against the plaintiff, "the district court need not—*and should not*—

decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*."

*Brady v. Office of Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).

In many instances, determining whether the plaintiff has made out a *prima facie* claim is "a

largely unnecessary sideshow," *id.*—especially considering that in a "typical Title VII suit," the plaintiff only needs to "establish that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the adverse action gives rise to an inference of discrimination[.]" *Checka v. Rite Aid of Washington, D.C., Inc*., 538 F. Supp. 2d 82, 86 (D.D.C. 2008) (*citing George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)).

However, "[w]hen the plaintiff is a white male and alleges reverse discrimination…the requirement for establishing a *prima facie* case changes." *Checka*, 538 F. Supp. 2d at 86 (*citing Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)). Instead of showing that he is a member of a minority group, the plaintiff must show "'background circumstances [that] support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *Harding*, 9 F.3d at 153 (*quoting Parker*, 652 F.2d at 1017). This requirement is "not designed to disadvantage the white plaintiff," but "merely substitutes for the minority plaintiff's burden to show that he is a member of a racial minority; both are criteria for determining when the employer's conduct raises an 'inference of discrimination.'" *Id*. at 153.

A white male plaintiff may show background circumstances in one of two ways. First, he "may produce evidence that his employer has reason or inclination to discriminate against the majority." *Checka*, 538 F. Supp. 2d at 87 (*citing Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 851 (D.C. Cir. 2006)). He may do so by presenting evidence of "political pressure to promote a particular minority because of his race, pressure to promote minorities in general, and proposed affirmative action plans." *Mastro*, 446 F.3d at 851. Second, the plaintiff may offer evidence that there is "'something 'fishy' about the facts of the case at hand that raises an inference of discrimination.'" *Id*. (*quoting Harding*, 9 F.3d at 153). "Evidence that a white plaintiff was given little or no consideration for a position that was given to a minority candidate

or that a minority candidate was promoted over four objectively qualified white candidates has been sufficient to show 'something 'fishy[.]'" *Checka*, 538 F. Supp. 2d at 87.

At least one district court in this jurisdiction has held that the mere "existence of an affirmative action policy," does not "automatically impl[y] discrimination against the majority" for the purposes of establishing a *prima facie* case. *Schmidt v. Chao*, Civ. No. 04–892, 2006 WL 1663389, *3 (D.D.C. June 13, 2006). "Rather, there must be a causal connection between the two, demonstrated by direct or circumstantial evidence." *Id.* As an example of such a "causal connection," the *Schmidt* Court cites *Bishopp v. District of Columbia*, 788 F.3d 781, 786 (D.C. Cir. 1986), where "the connection between the existence of an affirmative action plan and reverse discrimination was made when the D.C. Fire Department promoted an African-American candidate, with obviously-inferior credentials, over four (4) Caucasian candidates who were better qualified." *Schmidt*, 2006 WL 1663389, at *3.

To show the necessary connection, Shea may offer some evidence creating an issue of material fact as to his qualifications for a mid-level position. In denying both parties' motions for summary judgment, the Court found that "State has <u>admitted</u> [Shea's] qualifications by failing to respond to proper requests for admissions." Mem. Order 9, Aug. 11, 2009, ECF No. 69 (emphasis in original). Thereafter, State requested leave to amend its discovery responses. Def.'s Mot. Am./Correct, Jan. 7, 2010, ECF No. 75. Over Shea's objection, this Court held:

> [I]t appears (a) that defendant's asserted "admission" that plaintiff would have been qualified for MLAAP occurs only by operation of the government's failure to respond to a request for admissions; and (b) that the failure to respond was justifiable, given the stops and starts that have occurred in this litigation. It also appears, however, (c) that injecting the rhetorical question of the plaintiff's qualifications for MLAAP at this late stage of this long-running case would not "promote the presentation of the merits of the action," and (d) that it would prejudice the plaintiff in maintaining or defending the action on the merits.

> It is accordingly ORDERED that defendant's motion is granted, but that, *unless the government is prepared to demonstrate that any non-minority person applied for and was denied acceptance to MLAAP because of his or her qualifications*, the plaintiff will be deemed to have been qualified for MLAAP – except for his race (or national origin, or ethnicity).

Order 1–2, Feb. 2, 2010, ECF No. 78 (emphasis in original).  In response, State identified two *minority* applicants who had applied for and were denied acceptance to MLAAP because of their qualifications.  *See* Decl. of Alina Eldred ¶¶ 4–11, Sept. 17, 2012, ECF No. 128-2.  This misread the Court's Order.  The Court required State to offer proof that *non-minority* applicants were denied acceptance to MLAAP because of their qualifications; it said nothing about the status of minority applicants.  Since State's submission was not responsive to this Court's Order, the Court deems Shea to have been qualified for MLAAP, except for his race.

State's admission that Shea would have been qualified but for his race establishes the necessary causal connection between the MLAAP and discrimination against the majority.  The burden of establishing "background circumstances" is "minimal," and not intended to be "an additional hurdle for white plaintiffs."  *Harding*, 9 F.3d at 153–54.  Therefore, this Court finds that Shea has demonstrated "background circumstances that support the suspicion that the defendant is the unusual employer that discriminates against the majority," *id*. at 153, and thus has sufficiently stated his *prima facie* case.

### B.     State's Reliance on its Affirmative Action Program

Shea has established a *prima facie* case of employment discrimination under Title VII.  Therefore, State has the burden of producing "admissible evidence that, if believed, would establish that the employer's action was motivated by a legitimate, nondiscriminatory reason."  *Teneyck*, 365 F.3d at 1151.  Under *Johnson*, the "existence of an affirmative action plan provides such a rationale."  480 U.S. at 627.  "As a practical matter…an employer will generally seek to

avoid a charge of pretext by presenting evidence in support of its plan. That does not mean…that reliance on an affirmative action plan is…an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff." *Id.* at 626–27.

The "employer's burden is one of production, not persuasion." *Teneyck*, 365 F.3d at 1151. "By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons," the employer will have "sustained [its] burden of production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original). Courts should not make credibility assessments regarding the employer's evidence; an employer meets its burden if it "introduce[s] evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (emphasis in original). "The employer 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Antrum v. Washington Metro. Area Transit Auth.*, 710 F. Supp. 2d 112, 118–19 (D.D.C. 2010) (*quoting Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)).

The question then is whether State has offered evidence which, taken as true, permits the conclusion that State acted pursuant to a lawful affirmative action plan. To the extent this Court discusses evidence that goes beyond merely satisfying State's burden of production, this does not suggest that State has—at any time—the burden of persuasion. State's evidence concerning the lawfulness of its plan, however, can make it harder for Shea to prove that State's asserted non-discriminatory reasons are merely pretext and that State employed an unlawful affirmative action plan. *See*, *e.g.*, *Johnson*, 480 U.S. at 626–27.

22

### 1.    *Manifest Imbalance and Discrimination in the Workforce*

There must be a manifest imbalance in the workforce, reflecting discrimination in traditionally segregated job categories, justifying State's adoption of an affirmative action plan. *Weber*, 443 U.S. at 208.  As explained by *Weber* and *Johnson*, statistically significant disparities between minorities in the workplace and qualified minorities in the labor market may establish a manifest imbalance.  For "skilled" positions the relevant comparator group is the number of minorities with the requisite qualifications.  *Johnson*, 480 U.S. at 632–33 ("[I]n determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise….  Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications.").[4]

Since affirmative action plans are justified by their "remedial" purpose, State must offer some evidence of a "predicate of discrimination."  *See Hammon*, 826 F.3d at 80–81.  Stark statistical disparities might, by themselves, infer past discrimination by the employer.  *See Johnson*, 480 U.S. at 636 (manifest imbalance shown when *none* of the 238 skilled positions were occupied by a women).   If the statistical comparisons merely reflect general societal discrimination—for which the employer was not responsible—the numbers alone might not justify remedial action.  *See Hammon*, 826 F.3d at 80–81.  State is not required to "admit" to past

---

[4] While Congress directed State to increase its minority recruitment efforts "so that the Foreign Service becomes truly representation of the American people," 1988–89 FRAA, Pub. L. 100–204, Title I, § 183(b), there is no indication that State ever used the "American people" as its comparator when calculating minority underrepresentation.  *Cf. Johnson*, 480 U.S. at 654 (although stated long-term goal of affirmative action plan was to reach employment levels that "approximat[ed] the distribution of women…in the Santa Clara County workforce," this "long-range goal was never used as a guide for actual hiring decisions" and "was merely a statement of aspiration wholly without operational significance").  State based its short-term goals on the number of *qualified* minorities in the workforce, not the number in the total labor market or general population.  *See generally infra*; Exs. 2 & 3 to Def.'s Cross-Mot.

discrimination.  *Johnson*, 480 U.S. 616, 650 (O'Connor, J., concurring) ("Although the employer need not point to any contemporaneous findings of actual discrimination, …the employer must point to evidence sufficient to establish a firm basis for believing that remedial action is required[.]").  Nevertheless, there must be "evidence of at least the effects of the employer's past or current discrimination."   2 LINDEMANN, GROSSMAN & WEIRICH, EMPLOYMENT DISCRIMINATION LAW at 2526 (*citing Hammon*, 826 F.3d at 74–75 & n.1).  Some combination of statistical imbalance and evidence of the employer's past or current discrimination can provide the necessary factual predicate to justify a remedial affirmative action plan.  *See*, *e.g.*, *id.* at 2525; *Johnson*, 480 U.S. at 632; *Hammon*, 826 F.3d at 74–75, 80–81.

> a.  Statistical imbalance and minority underrepresentation

The defendant offers sufficient evidence to show that a finding of significant minority underrepresentation motivated the State Department's adoption of its affirmative action plan.  As discussed in Part I.A. *supra*, the chronic underrepresentation of minorities in the State Department—and the mid- and senior-levels of the Foreign Service in particular—had long been an issue.  Congress demanded greater minority representation at State, and closely monitored State's efforts to set and meet diversity goals.  *See* 1986–87 FRAA, Pub. L. 99–93; 1988–89 FRAA, Pub. L. 100–204.  Congress held hearings where representatives discussed minority underrepresentation in the Foreign Service, explored the nature and extent of the problem, and asked State what it was doing to fix the problem.  *See Underrepresentation of Women and Minorities in the Foreign Service—State Department: Hearing Before the Subcomm. on the Civil Service of the H. Comm. on Post Office and Civil Service*, 101st Cong. (1989) (Ex. 4 to Def.'s Cross-Mot.); *The Department of State in the 21st Century: Joint Hearing Before the Subcomm.*

*on Int'l Operations of the H. Comm. on Foreign Affairs & the Subcomm. on the Civil Service of the H. Comm. on Post Office and Civil Service*, 101st Cong. (1989) (Ex. 5 to Def.'s Cross-Mot.).

In the late 1980s—directly preceding the drafting and adoption of the 1990–92 MLAAP—two reports studied the Foreign Service personnel and management systems. *Thomas Commission Report; Bremer Study Group Report*.[5]  Congress mandated the "Thomas Report" in the 1988–89 FRAA; the Secretary of State himself commissioned the "Bremer Report." *See The Department of State in the 21st Century* (prepared statement of Rep. Gerry Sikorski, Chairman, Subcomm. on Civil Service).  As interpreted by Rep. Gerry Sikorski, the Chairman of the Civil Service Subcommittee, these reports  "tell [Congress] that management of the U.S. Foreign Service is seriously flawed." *Id*.  The reports "show that officer training has particularly suffered," and address in particular the "issues of recruitment, career development and training, the underrepresentation of women and minorities, [and] the lack of management skills[.]" *Id*.

In June 1989, the General Accounting Office ("GAO") issued a report titled, "State Department:  Minorities and Women Are Underrepresented in the Foreign Service." *See* Ex. 3 to Def.'s Cross-Mot.  This report found that while existing affirmative action programs had made some progress, minorities remained underrepresented:

> The State Department increased minority representation in the Foreign Service from 7 percent in 1981 to 11 percent in 1987.…  In 1987 minorities and white women were still substantially underrepresented when compared to civilian labor force data that the EEOC has issued to measure federal agencies.
>
> Progress has been mixed in the FS officer and specialist categories.  At the entry level, underrepresentation in the FS officer corps has been eliminated, except for Asian-Americans/Pacific Islanders.  In the mid-level ranks of the officer corps, minority male representation has increased, but minority and white women have made less progress.  In State's Senior Foreign Service positions, underrepresentation of minorities and white women is still pervasive.

---

[5]  Both reports were entered into the record during *The Department of State in the 21st Century: Joint Hearing Before the Subcomm. on Int'l Operations of the H. Comm. on Foreign Affairs & the Subcomm. on the Civil Service of the H. Comm. on Post Office and Civil Service*, 101st Cong. (1989)) (Ex. 5 to Def.'s Cross-Mot.).

*Id.* at 15 (Shea – 008689).  An accompanying chart shows that, as of September 1987, females of every race were underrepresented as senior and mid-level Foreign Service Officers, minorities of every race were underrepresented as senior Foreign Service Officers, and Hispanics and Asian/Pacific Islanders were underrepresented in the mid-levels.   *Id.* at 20 (Table 2.3: Underrepresentation of Minorities and White Women in State's Foreign Service by Grade (As of Sept. 1987)) (Shea – 008694).

Shea seizes on this chart—and State's unfortunate misinterpretation of it[6]—as evidence that not all MLAAP-eligible minority groups were underrepresented.  *See* Pl.'s Opp'n & Reply 4–6.  After all, the chart showed that as of 1987 black and Indian/Alaskan males were fully represented in the Foreign Service Officer mid-levels.  However, this chart neither undermines State's evidentiary proffer that the MLAAP was lawful, nor proves that the MLAAP was *un*lawful.  First, the GAO report acknowledged the limitations of its numbers—the agency had to compare 1987 State Department employment data with a 1980 comparator population:

> The criteria established by the EEOC is based on 1980 census data, but considerable change has occurred in the civilian labor force since 1980.  If these changes were considered in analyzing State's representation, the extent to which minorities and women are underrepresented would be worse than depicted in table 2.3.  Bureau of Labor Statistics data shows that blacks, Hispanics, and white women have increased their representation in the civilian labor force in recent years.

---

[6] In a rather serious mistake, State used this chart in its Cross-Motion for Summary Judgment to show that "**in 1987 there were no African-American, Hispanic, or Indian males in mid-level positions**."  Pl.'s Cross-Mot. Summ. J. 12 (emphasis in original).  Worse still, State bolded this language, drawing special attention to its mistake.  Digging the hole deeper, State was repeating a mistake they had made previously—*and had filed an errata to correct.  See* Def.'s Reply ISO its Second Mot. Reconsideration 6, May 18, 2011, ECF No. 98 (stating the same incorrect statement verbatim, minus the bolding); Errata to Def.'s Reply ISO its Second Mot. Reconsideration 1, May 25, 2011, ECF No. 100 (admitting that the chart "actually shows a comparison" of workforce and census data "to demonstrate that, under current EEOC criteria, the underrepresentation of minority males in some levels of the Foreign Service was '0'").

Perhaps State did not take its *pro se* opponent seriously.  The Court warns State that such sloppy lawyering could have cost State dearly if State had the burden of persuasion, rather than simply the burden of production.  If this were a constitutional challenge—and strict scrutiny applied—State may have failed to justify the MLAAP based on the record submitted.

Ex. 3 to Def.'s Cross-Mot. 21 (Shea – 008695). *Hammon* made clear that a court must use the most recent available data when determining whether there is a manifest imbalance. 826 F.3d at 77–78. When State adopted the 1990–92 MLAAP, it had more recent work force data available. *See* Ex. 2 to Def.'s Cross-Mot. 47–47a (Shea – 00116–17) (discussed in more detail *infra*). Second, Shea's criticism takes a narrow view of the MLAAP. The MLAAP may work to increase minority representation not only in the mid-levels, but also in the senior-levels. Table 2.3 shows across-the-board minority underrepresentation in the senior-levels. Ex. 3 to Def.'s Cross-Mot. 20 (Shea – 008694). Mid-level minority placement may not be necessary for all groups, if the only concern was underrepresentation in the mid-levels. However, mid-level placement helps alleviate the significant underrepresentation of minorities in the senior levels by making more minorities eligible for promotion into the Senior Foreign Service. Viewed this way, Table 2.3 does not undermine State's evidentiary proffer.[7]

When State formally adopted the revised 1990–92 MLAAP, it made additional findings about manifest imbalance based on more recent work force and labor pool data. The document describing the 1990–92 MLAAP includes several analyses of the State Department workforce, and which job categories had a "manifest imbalance" for which groups. *See* Ex. 2 to Def.'s Cross-Mot. 45–53a (Multi-Year Affirmative Action Plan FY 1990–92) (Shea – 00108–33). In making these comparisons, officials compared State employment data from FY 1989 and 1990 with the most recent Occupational National Civilian Labor Force Data for Public Administration Administrators and Officials. *See id.* at 47 (Shea – 00116). The analysis of Foreign Service

---

[7] This may be a generous reading of Table 2.3, but that is what is required at this stage. State does not need to convince the Court that its plan was lawful. To meet its burden of production, "[t]he employer 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Antrum*, 710 F. Supp. at 118–19 (*quoting Burdine*, 450 U.S. at 254–55).

Generalists showed a "manifest imbalance" for "White females, Black males, Black females, Hispanic females, American Indian males, [and] American Indian females." Ex. 2 to Def.'s Cross-Mot. 47 (Shea – 00116). The document also showed that within the Senior Foreign Service "minority officers were promoted at a lower rate (3.7 percent) than White males (8.8 percent) or White females (9.0 percent)." *Id*. at 74 (Shea – 00153). Minorities were also promoted from the lower-levels to the mid-levels—and within the mid-levels—at a lower rate than white men or women. *Id*. While the data showed that minorities were promoted from class FS-01[8] to the Senior Foreign Service at a marginally higher rate, *id.*, the plan warned that:

> It is important to note, however, that promotion rates at the senior levels are based on a very small number of eligible minorities and White women. For example, Black females were promoted to the Senior Foreign Service at a 33-percent rate (2 of 6) compared with an 11-percent rate for White males (170 of 1,518).

*Id*. at 75 (Shea – 00154). The fact that there were so few minorities even eligible for promotion into the Senior Foreign Service skewed the statistics regarding promotion rates.

"Over-inclusiveness" charges can also be levied at the 1990 data. The 1990–92 plan document does not show that all minority groups eligible for the MLAAP were in fact underrepresented in the mid-levels. However, this does not necessarily undermine State's evidentiary proffer. First, as detailed *supra*, mid-level minority hiring not only immediately cured imbalances in the mid-levels, but created more opportunities for minorities to ascend to the Senior Foreign Service. As the 1990–92 plan noted, very few minorities were eligible for promotion into the Senior Foreign Service. *Id*. Second, while the MLAAP was "open" to all EEO minority groups, the plan only established representation goals for groups for which it found a "manifest imbalance." *See id*. at 54 (for Foreign Service Generalists, establishing goals to increase the representation of white females, black males, black females, Hispanic females,

---

[8] FS-01 being the highest "mid-level" Foreign Service Officer class. *See* Def.'s SMF ¶ 11; Pl.'s SMF Resp. 10 (admitting Def.'s SMF ¶ 11).

American Indian males, and American Indian females—the same groups the plan identified earlier as being underrepresented) (Shea – 00134).   Or as the defendant puts it, "the 1990–1992 MLAAP corrected for the weakness identified by the GAO…and specifically identified the manifest imbalance in each specific minority group within which Foreign Service 'conal system' (Administrative, Consular, Economic and Political), as compared to the more timely data for a comparator population, and then set goals for only those under-represented groups." Def.'s Reply ISO its Cross-Mot. Summ. J. 12 ("Def.'s Reply"), Oct. 3, 2012, ECF No. 133 (*citing* Ex. 2 to Def.'s Cross-Mot 46–46b, 47–47a, 50–51b, 54, 61–67).

### b.      Showing of a predicate of discrimination

The bare numbers only tell one side of the story.   State does rely solely on a statistical imbalance in the mid- and senior-levels.   It has also provided evidence regarding past discrimination in the Foreign Service and institutional and systemic barriers to minority advancement.   State has provided enough evidence to show a "predicate of discrimination" implying the statistical imbalances are due in part to some past discrimination by State, rather than simply reflecting societal discrimination. *See Hammon*, 826 F.3d at 74–75, 80–81.

State's hiring and promotion practices had been the subject of many employment discrimination lawsuits. *See Underrepresentation of Women and Minorities in the Foreign Service* (statement of Rep. Sikorski) (detailing history of discrimination suits against State, stating: "This is not a new phenomenon.   The department has lost a lot of money in a variety of litigation regarding discrimination.").   State, and the Foreign Service in particular, drew the ire of Congress.   The Thomas and Bremer Reports, discussed *supra*, went beyond calculating rates of minority representation.   With a particular emphasis on the Foreign Service, the reports examined which practices contributed to—and exacerbated—minority underrepresentation.   The

reports identified systemic and procedural barriers to minority hiring and advancement.  *See Thomas Comm. Report*; *Bremer Study Group Report*; *The Department of State in the 21st Century* (prepared statement of Rep. Gerry Sikorski).  These findings were echoed by officials from the GAO, who concluded that "some of State's hiring, promotion, and assignment processes have a disproportionate effect on minorities and women."  *Underrepresentation of Women and Minorities in the Foreign Service*, (statement of Joseph Kelly, Director, Security & Int'l Affairs Div., GAO).  These reports focused on recent issues—not, as in *Hammon*, issues buried deep in the past.  826 F.3d at 77–78 (employer may not rely on findings of discrimination from decades ago, but should justify its plan with evidence of more recent discrimination).

Prior to the adoption of the 1990–92 MLAAP, some officials concluded that the  Foreign Service was "discriminatory."  For example, Rep. Sikorski, Chairman of the House Civil Service Subcommittee, held a hearing on September 22, 1989, titled, "Underrepresentation of Women and Minorities in the Foreign Service."  *See* Ex. 4 to Def.'s Cross-Mot.  In his introductory remarks, Rep. Sikorski called the Foreign Service an "old-boys club," and cited a litany of studies and lawsuits charging the State Department with discrimination.  *Id.*  He noted that "[t]he necessity and extent of legal action [against State] raises serious questions about the department's commitment to creating a workplace free of discrimination."  *Id.*  For example, from 1976 to 1986, over 240 EEO cases were filed against State; and in 1985, 1986, and 1987 the State Department violated a consent decree it voluntarily entered into to settle an earlier discrimination suit.  *Id.*  Rep. Sikorski noted that the minorities and women who *were* hired into the Foreign Service were disproportionally placed into less prestigious jobs, from which advancement to the senior-levels was more difficult.  *Id.*  In a later hearing, Rep. Sikorski stated that, in addition to the findings of the Bremer and Thomas Reports, "[i]nvestigations and

hearings conducted by the Subcommittee of the Civil Service have also documented serious instances of discriminatory treatment by the Foreign Service of women, minorities, and people with handicaps."  *The Department of State in the 21ˢᵗ Century* (prepared statement of Rep. Gerry Sikorski) (going on to list specific findings of discrimination in the Foreign Service).

Several of the witnesses who appeared before the congressional subcommittee—those with first-hand knowledge of the workings of State—testified about discrimination in the Foreign Service.   *See*, *e.g.*, *Underrepresentation of Women and Minorities in the Foreign Service* (prepared testimony of Mary Lee Garrison, Co-President, State Dep't Chapter, Women's Action Org.) ("Instances of blatant sexism and discrimination have declined, although some still take place, but a simple glance at the statistics contained in the recent GAO report…will confirm the continued existence of a problem."); *Underrepresentation of Women and Minorities in the Foreign Service* (prepared statement of Clarence E. Hodges, Member, Management Council of the Dep't of State) (Calling some of State's positions on its equal opportunity promotion "indefensible," citing "too little progress and unacceptable behavior in this regard."  All around the world, Mr. Hodges "encountered complaints of discrimination from our employees and criticisms from foreigners for that same discrimination as exhibited by our predominately white male diplomatic corps."); *Underrepresentation of Women and Minorities in the Foreign Service* (prepared testimony of Charles Hughes Jr., Vice President for the State Dep't Thursday Luncheon Group) ("I entered on duty in State in late 1965 and had my first experience with discrimination, aside from what I had experienced while stationed in the South.  …[W]hile there are some very good, progressive minded people at State, there are also those who find it much easier to deny fair treatment to some, and thus keep faith with their peers."  ***  "Minorities

have been underrepresented purposely, and the rationale of improperly applied statistics, have provided the relief for the consciences of the establishment.").

When the Court looks at the whole picture—statistical findings of minority underrepresentation and lower promotion rates, history of discrimination lawsuits, reports finding systemic flaws at State, repeated congressional oversight and criticism, testimony from knowledgeable witnesses that the Foreign Service was discriminatory—it finds that State has met its evidentiary proffer of showing a proper factual predicate for its affirmative action plan.   It has provided enough evidence for a reasonable jury to conclude that the MLAAP was justified by correcting a manifest imbalance in the mid- and senior-levels of the Foreign Service, and it served to remedy the lingering effects of State's past discrimination.

### 2.    *Avoiding Unnecessarily Trammeling the Interests of Non-Minorities*

Even if there is a manifest imbalance in the workplace, State must still design and implement its affirmative action plan in a way that does not unnecessarily trammel the interests of non-minorities or create an absolute bar to the advancement of non-minorities.  *Weber*, 443 U.S. at 208; *Hammon*, 826 F.3d at 81.  The plan must consider race-neutral alternatives and be carefully tailored to remedy the problem at hand.  *Hammon*, 826 F.3d at 81. It must be a temporary measure designed to "eliminate a manifest racial imbalance" rather than "maintain a racial balance."  *Weber*, 443 U.S. at 208.  The plan should pay special attention to *how* it accomplishes its goals, and the extent to which its methods burden non-minorities. *Johnson*, 480 U.S. at 616, 637–38.  Courts prefer flexible, case-by-case approaches over rigid quota systems. *See*, *e.g.*, *id.* at 631–32; *Paradise*, 480 U.S. at 177–78 (plurality opinion), 188 (Powell, J., concurring); *Local 28, Sheet Metal Workers v. EEOC*, 478 U.S. 421, 447 (1986).

a.    Considering alternatives to explicit racial preferences
and narrow tailoring of the program

An important factor is the extent to which the employer considered other ways to increase

diversity in the workplace.  *Cf. Hammon*, 826 F.3d at 81 ("[B]ecause available race-neutral

alternatives were not considered, the District's race-based hiring methods were not properly

tailored to its remedial purposes.").  An employer should strive to achieve its EEO goals through

less restrictive means such as minority recruitment, educational programs, and training.  *See*

*Duffy v. Wolfe*, 123 F.3d 1026, 1039 (8th Cir. 1997) (readily approving of efforts to increase the

pool of female and minority applicants through outreach and recruiting programs).   If the

employer believes these programs, alone, cannot yield acceptable results, it may consider race-

conscious hiring and promotion policies.  The employer should not give the race of the applicant

more "weight" than is necessary to meet the goals.  *Hammon*, 826 F.3d at 81 ("*Johnson* does

nothing to disturb the longstanding requirement that the remedy crafted to cure a violation must

be tailored to fit the violation." (*citing Sheet Metal Workers*, 478 U.S. 421)).

State's evidence shows it had implemented its affirmative action plan after its past

recruitment and outreach plans were found lacking.  Studies found that State's efforts throughout

the 1980s to increase minority representation were not satisfactory and were progressing too

slowly.  *See*, *e.g.*, *Underrepresentation of Minorities and Women in the Foreign Service*

(prepared statement of Joseph Kelly, Director of Security & Int'l Rel. Issues, Nat'l Security &

Int'l Affairs Div., GAO).  "[T]he EEOC repeatedly pointed out that the State Department has not

had an effective affirmative action plan or program for overcoming the underrepresentation in

the Foreign Service."  *Id*. at 1 (Shea – 008662).  The State Department adopted minority mid-

level hiring after repeated prodding by Congress, the EEOC, and other government entities.  *See*

*generally Underrepresentation of Women and Minorities in the Foreign Service; The Department of State in the 21st Century.*

As discussed *supra*, there may be some initial concerns over whether the program was properly tailored. Courts have expressed concern over affirmative action plans that provide preferences to all minorities, whether or not all of those groups were underrepresented in the employer's workforce. *See, e.g., Alexander v. Estepp*, 95 F.3d 312, 316 (4th Cir. 1996) (invalidating, under constitutional standard, affirmative action plan because it benefited all minority groups rather than merely discriminated-against African Americans). The 1990–92 MLAAP waived the "certificate of need" requirement for some minority groups that were not found to be underrepresented in the mid-levels. As explained in greater detail *supra*, this "over-inclusiveness" is not fatal when the 1990–92 MLAAP only set minority hiring goals where State *had* found a manifest imbalance, and State had found across-the-board minority underrepresentation in the Senior Foreign Service. The MLAAP involved case-by-case, targeted recruitment of exceptional minority candidates, and considered the enhanced need for candidates from particular minority groups and backgrounds. *See, e.g.*, Ex. 1b to Def.'s Cross-Mot.

b.      Whether the plan is "temporary" in design and fact

Whether or not the affirmative action plan is "temporary" is another important factor to consider. Courts favor temporary plans to *attain* racial balance and disfavor indefinite plans to *maintain* such a balance. Plans that remain in effect long after the employer achieves the desired balance seem less about remedying the lingering effects of past discrimination, and more about permanently providing special protections to certain groups. *See, e.g., Taxman v. Board of Educ. of Tp. of Piscataway*, 91 F.3d 1547, 1564 (3d Cir. 1996). Shea claims the MLAAP was not temporary because it did not have a definite end date. Pl.'s Mot. Summ. J. 10–11. Shea makes

this argument despite the fact that State ended the MLAAP in February 1993 and did not replace it with a similar affirmative action plan. Def.'s SMF ¶ 17; Pl.'s SMF Resp. 12 (admitting Def.'s SMF ¶ 17). *Cf. Hannon v. Chater*, 887 F. Supp. 1303, 1318 (N.D. Cal. 1995) (plaintiff cannot meet burden of showing plan was not temporary when program, in fact, ended). While courts may require definite end dates for plans that impose quotas or other rigid formulae, they typically do not require such end dates for more flexible plans. *See Johnson*, 480 U.S. at 639–40 ("Express assurance that a program is only temporary may be necessary if the program actually sets aside positions according to specific numbers.").

State introduced sufficient evidence to show the MLAAP was temporary in fact and by design. When State originally adopted the MLAAP, it stated that its "new Mid-Level program will be a temporary supplement to, and adjunct of, the Junior Officer Program," and "will be appraised annually to determine whether it needs to be continued[.]" Ex. 1b to Def.'s Cross-Mot. 3 (Shea – 008649). In fact, the MLAAP underwent continuous monitoring to determine whether the plan was meeting its goals, and whether race-based preferences continued to be necessary to meet those goals. *See* 1986–87 FRAA, Pub L. 99–33, Title I, § 152(c) (Congress required annual reports on the "progress being made increasing, through advancement and promotion, the numbers of members of minority groups and women in the mid-levels of the Foreign Service."); Ex. 2 to Pl.'s Mot. (March 19, 1993 State review of the effectiveness and continuing need for the MLAAP); Ex. 2 to Def.'s Cross-Mot. (indicating annual EEO audits and quarterly tracking of progress and problem areas through EEO Quarterly Reporting System). Close and periodic monitoring may show that the plan was temporary. *See McNamara v. City of Chicago*, 867 F. Supp. 739, 752 (N.D. Ill. 1994) (where affirmative action plan reevaluated on annual basis in order "to insure flexibility and to guarantee that the rations are used only so long

as they are necessary and appropriate" it satisfies second element of *Weber* and *Johnson*); *See also Grutter v. Bollinger*, 539 U.S. 306, 342 (2003) ("durational requirement can be met by sunset provisions in race-conscious admissions policies and period reviews" to determine ongoing need for plan).  State has met its burden of production to show that the MLAAP was a temporary measure designed to attain—not maintain—full minority representation.

          c.      Whether the plan forecloses opportunities for
                  non-minority hiring and advancement

Another factor to consider is whether the MLAAP forecloses opportunities for non-minority hiring and advancement.  *See, e.g.*, *Johnson*, 480 U.S. at 637–38.  The MLAAP did not impose an "absolute bar" on non-minority "advancement."  *Id*.  At all relevant times, State had a general mid-level hiring program open to white males—the Mid-Level Foreign Service Career Candidate Program.  *See, e.g.*, Exs. 1A & 1B to Def.'s Cross-Mot. (1982 and 1987 Mid-Level Foreign Service Career Candidate Programs).  The eligibility requirements for this program were the same as the MLAAP, except an applicant under the MLCCP needed an individual certification of a "need for an outside hire at the grade and in the functional field…in which the person is applying."  Ex. 2 to Pl.'s Mot. Summ. J. 5 (March 19, 1993 *Foreign Service Mid-Level Hiring Program Highlights*); *see also* Def.'s SMF ¶¶ 10, 12–17; Pl.'s SMF Resp. 10–11 (admitting in all relevant respects Def.'s SMF ¶¶ 10, 12–17).  While the challenged affirmative action plan was in effect, several non-minority candidates were placed into mid-level positions through the MLCCP.  *See* Ex. 16 to Def.'s Cross-Mot.;  Def's SMF ¶¶ 27–36; Pl.'s SMF Resp. 14–16 (admitting in all relevant respects Def.'s SMF ¶¶ 27–36).

Moreover, Shea could progress to the mid-levels through the ordinary course of promotions.  The MLAAP did not bar Shea from reaching the mid-levels but—by Shea's own admission—served to delay his ascension into the mid-levels.  *See* Pl.'s Mot. Summ. J. 27–36.

Shea has, in fact, been promoted to the mid-levels of the Foreign Service; at the time of his

Complaint, Shea was at grade FS-03, step 5.  *See* Compl. ¶ 6(c).  Several courts have approved

of plans that delay, but do not bar, promotion opportunities.  *See, e.g., Paradise*, 480 U.S. at 183

("'Denial of a future employment opportunity is not as intrusive as loss of an existing job,' and

plainly postponement [of a promotion] imposes a lesser burden still." (*quoting Wygant*, 476 U.S.

at 283)) (plurality opinion); *Johnson*, 480 U.S. at 638 ("[P]etitioner had no absolute entitlement

to the" higher-level job.  "Thus, denial of the promotion unsettled no legitimate, firmly rooted

expectation on part of the petitioner.  Furthermore, while petitioner in this case was denied a

promotion, he retained his employment with the Agency…and remained eligible for other

promotions."); *McNamara*, 867 F. Supp. at 751–52 (plan avoided unnecessarily trammeling

interests of non-minorities as it delayed, not barred, promotion of non-minorities).

> d.  The nature of the plan and the extent to
>     which it burdened non-minorities

The Court also considers the nature of the program, and the extent to which it burdened

non-minorities.  The MLAAP does "not require the discharge of white workers and their

replacement with new black hires." *Weber*, 443 U.S. at 208.  *See also Wygant*, 476 U.S. at 282–

83 (expressing concern about burden layoffs place on non-minorities); *Firefighters v. Stotts*, 467

U.S. 561, 574–76 (1984) (same).  The MLAAP involved hiring goals, and in such cases:

> [T]he burden to be borne by innocent individuals is diffused to a considerable
> extent among society generally.  Though hiring goals may burden some innocent
> individuals, they simply do not impose the same kind of injury that layoffs
> impose.  Denial of a future employment opportunity is not as intrusive as loss of
> an existing job.

*Wygant*, 476 U.S. at 283–83.  State's minority-hiring goals were not accompanied by any

minority-hiring quotas—State was not required to hire a particular number of minorities.  *See* Ex.

2 to Pl.'s Mot. Summ. J. 5, (March 19, 1993 *Foreign Service Mid-Level Hiring Program*

*Highlights*: "Our hiring goal each year for the affirmative action mid-level program has been about twenty.  As you will observe by the hiring statistics…we have not come close to our target.").  At no time did State bind itself to hire a certain number of minorities each year; State noted that it was focused the quality of its minority candidates, not the quantity it could hire.  *See* Ex. 1b to Def.'s Cross-Mot. ("Success will be measured by the quality of the future mid-level candidates hired, and their subsequent performance in the Foreign Service, rather than by whether or not specific numerical hiring goals are met each year[.]").

State thoroughly vetted minority candidates, taking far more than thier race into account. The MLAAP required "pre-certification based on a file review, an oral assessment conducted by the staff of the Board of Examiners and the normal background investigation, medical examination and Final Review to determine suitability for appointment to the Foreign Service." Ex. 2 to Pl.'s Mot. Summ. J. 5.  The MLAAP candidate must have had a "bachelor's degree from an accredited college or university;" "six additional years of professional level education and/or professional work experience of which three years must have been in an area related to the prospective Foreign Service functional field;" and "supervisory/managerial skills."  *Id.*  The MLAAP did not assign a set "point" value to minority status.

The MLAAP was "identical" to the more general mid-level hiring program, except that membership in a minority group substituted for an individual certificate of need.  *Id.*  Once those qualified minority candidates applied, they were subject to the same rigorous process as non-minority applicants.  *See* Ex. 7 to Def.'s Cross-Mot. (Nov. 1990 State document describing the requirements and application process for both the MLCCP and MLAAP).  *Cf. Johnson*, 480 U.S. at 638 (approving of plans that "consider[] race along with other criteria"); *Hammon*, 826 F.3d at 79–80 (agreeing with *Johnson*'s approval of a "'moderate, flexible, case-by-case approach'" and

stressing need for sufficient "screening considerations" to avoid "'mere bling hiring by the numbers'" (*quoting Johnson*, 480 U.S. at 636–37)).[9]

While State was interested in increasing the number of minority Foreign Service officers, it strongly emphasized the quality and accomplishments of its minority recruits.  The 1990–92 MLAAP plan document says that "State is committed to forging a workforce that fully represents the American diversity without sacrificing excellence."  Ex. 2 to Def.'s Cross-Mot. 61 (Shea – 00140).  The 1990–92 MLAAP aimed to "emphasize selective recruiting of potential candidates on a one-by-one basis[.]"  *Id*.  The refined plan concentrated "on quality candidates who are unquestionably successful in their current careers and who have been individually recommended by people who know both the candidate and the requirements of the Foreign Service."  *Id*.  This was done despite State's knowledge that it was "dramatically reduc[ing]" the "number of [minority] applications processed."  *Id*.

State proffers evidence that it screened out many interested minority candidates who did not meet the requirements.  *Id*.  State submits evidence that it did not place at least two eligible minority applicants in mid-level positions after those candidates applied.  Decl. of Alina Eldred ¶¶ 4–11.  This happened despite the fact that State did not meet its minority hiring goals at any time during the MLAAP.  *See* Def.'s SMF ¶ 19 ("Despite the expressed goal of hiring 20 mid-

---

[9] Shea argues that the MLAAP is not flexible—"race acted as an absolute bar to participation in the MLAAP."  Pl.'s Mot. Summ. J. 5.  Shea is technically correct that he was ineligible to apply through the MLAAP because of his race.  *See id*. at 4–7.  Shea, however, had an opportunity to apply for direct mid-level placement through the MLCCP, which was substantially identical to the MLAAP.  *See* Ex. 7 to Def.'s Cross-Mot. (describing, in detail, requirements of both programs).  At times, State has spoken of them as if they were two parts of the same program:

> The Mid-Level Foreign Service Career Candidate Program is designed to hire office candidates at the ranks of FP–3, 2 and 1 to supplement the number of Career Foreign Service Officers already in those grades, in accordance with the needs of the Foreign Service.  **The need is either specific—** for an offer at the grade and in the cone which an applicant is seeking to enter**; or general—for minority group members under the Department's Affirmative Action Program** to achieve greater representativeness un the Foreign Service.

*Id*. at Shea – 3448 (emphasis added).  Shea's argument trades heavily on semantic differences—*i.e.*, it doesn't matter that I was eligible for the MLCCP, because I was ineligible for the MLAAP—rather than focusing on the true nature of the program, and considering whether it unfairly shut out or burdened non-minorities.

level minorities per year…, less than 6 minorities per year were placed in the mid-levels of the Foreign Service, totaling approximately 29 minorities (male and female) during the five-year period of the MLAAP's existence."); Pl.'s SMF Resp. 13 (admitting Def.'s SMF ¶ 19).

State has met its burden of production that it properly tailored its affirmative action plan so that it would not unnecessarily trammel the interests of non-minorities.

## C.     Shea's Attempt to Prove that the Affirmative Action Plan is Invalid

With State meeting its burden of production, Shea must offer sufficient, potentially admissible [10] evidence that the MLAAP was unlawful—that State's proffered evidence is not worthy of credence and State illegally discriminated against white males.  If Shea fails to raise a genuine issue of material fact with admissible evidence, State will prevail.  If there is a failure of proof by Shea, State does not have to affirmatively and ultimately prove that the MLAAP is lawful.  *See Johnson*, 480 U.S. at 627 (employer's burden is one of production, not of ultimate proof); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990) ("Rule 56 does not require the moving party to negate the elements of the nonmoving party's case.").

### 1.     *Shea's Calculations of the Rate of Minority Representation*

Shea's primary evidence is that State's numbers show that "minorities overall were actually <u>overrepresented</u> in the mid-level grades…by September 30, 1989."  Pl.'s Mot. Summ. J. 3 (emphasis in original).  Shea states, "It is self-evident that when minorities are overrepresented, the job category is not one that is 'traditionally segregated.'  …[A] program is not remedial when

---

[10] A "party opposing summary judgment may only rely on evidence 'capable of being converted into admissible evidence at trial' to 'survive summary judgment.'" *A.N.S.W.E.R. Coal. v. District of Columbia*, __ F. Supp. 2d __, 2012 WL 5974030, *14 n.5 (D.D.C. Nov. 29, 2012) (*quoting Greer*, 505 F.3d at 1315).  Evidence that may not be admissible at trial, but is capable of being converted into admissible evidence, includes (for example) sworn affidavits that themselves could run afoul of the Sixth Amendment's Confrontation Clause, but could be "converted" into admissible evidence by having the affiant testify at trial or in a deposition.  *See id*. (*citing Gleklen v. Dem. Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).

With this in mind, when the Court speaks of "admissible evidence," it is really using that phrase as a shorthand for "evidence that is admissible or capable of being converted into admissible evidence."

there is no underrepresentation to be remedied, and [] it is impossible to properly tailor a remedial program when there is no underrepresentation to remedy." *Id*. To support his position, Shea "use[d] lots of numbers and g[ave] the results of lots of calculations[.]" *Id*. at 12. Shea describes his method thusly: First, he took the "numbers of FSOs at each grade, broken down by race and sex, as of September 30, 1989" from State's FY 1990–92 FY MLAAP document. *Id*. at 12–13. *See also* Ex. 2 to Pl.'s Mot. Summ. J. (Shea's edited copy of the plan, with additional charts created by Shea). Second, he added "the numbers for male and female officers of each race…to determine totals for any given race at any given grade." *Id*. at 13. He then used the NCLF Public Administrator figures, available at page 47a of the plan, as his comparator group. *Id*. (*citing* Ex. 2 to Pl.'s Mot. Summ. J. at 47a (Shea – 00177)). Shea again combined the gender-specific NCLF data to provide one total number for each racial group. *Id*. at 14.

Shea then performed a series of calculations comparing white representation with minority representation. He concludes that "whites were underrepresented in the Foreign Service mid-level grades," as "[w]hites comprised 85.58 of the Foreign Service mid-level officers" but "comprised 86.1 percent of the Public Administrator" comparator pool. *Id*. at 15. Shea then performed a series of calculations of white versus minority group representation at various mid-level grades, concluding that his numbers show a vast majority of minority groups were not underrepresented at the mid-level grades. *Id*. at 15–27. He did not use a commonly-accepted method, such as the standard deviation or the "Z statistic" method, to explain the statistical significance of his findings. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n.14 (1977) (standard deviation method); *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1451–52 (D.C. Cir. 1988) (Z statistic method).

### 2.    *How Shea's Analysis Differs From State's*

Congress, the GAO, and State had long railed against the overrepresentation of white males in the Foreign Service, especially at its mid- and senior-levels.  *See supra* Parts I.A., III.B. But Shea shows—using State's own numbers—that whites were actually *under*represented in the Foreign Service mid-levels.  *See* Pl.'s Mot. Summ. J. 3.  What explains this difference?  Shea has widened the comparator pool.  Shea concedes that white males were overrepresented, but dismisses this fact as "irrelevant."  Pl.'s Opp'n & Reply. 7.  To Shea, the relevant question isn't whether white *males* are overrepresented, but whether whites as a whole are overrepresented. State provided numbers broken down by both race and gender, *see generally* Ex. 2 to Def.'s Cross-Mot., but Shea combined the gender figures for each race to determine the rates of representation by race only, rather than by race and gender, *see* Pl.'s Mot. Summ. J. 12–27. Instead of comparing white males to white women, black males, *et cetera*, Shea simply compares whites to blacks, Asians, Hispanics, *et cetera*.  When the numbers are looked at this way, Shea argues, one finds that whites are actually *under*represented in the mid-levels, and thus the MLAAP cannot have any legitimate remedial purpose.  Pl.'s Mot. Summ. J. 3, 12–27.

State raises questions about Shea's analysis, claiming Shea "manipulated the data in his Memorandum of Points and Authorities by combining the population of White male employees (who were significantly over-represented) with White female employees (who were grossly under-represented)."  Def.'s Cross-Mot. 14.  State argues that since "the initial Congressional mandate (comparing White males with all other race/gender groups)" and State had "implemented programs to address the racial/gender disparities," Shea's "decision to focus on race alone makes no sense, other than as an attempt to 'smooth out' the difference and thereby 'create' an entirely new parameter of facts to support his position."  *Id*. at 14–15.

42

State's position has some support.  First, the evidence suggests that Congress was concerned specifically with white *male* overrepresentation, rather than the overrepresentation of whites generally.  *See*, *e.g.*, 1986–87 FRAA, Pub. L. 99–33; 1988–89 FRAA, Pub. L. 100–204; *Underrepresentation of Women and Minorities in the Foreign Service—State Department: Hearing Before the Subcomm. on the Civil Service of the H. Comm. on Post Office and Civil Service,* 101st Cong. (1989).  Second, State had separate programs aimed at increasing female representation.  *See* Def.'s SMF ¶ 4; Pl.'s SMF Resp. (admitting Def.'s SMF ¶ 4).  Third, courts have been suspicious of efforts to distort the data by inflating or artificially restricting the comparator groups.  *See Johnson*, 480 U.S. at 636 ("[H]ad the Plan simply calculated imbalances in all categories according to the proportion of women in the area labor pool, and then directed that hiring be governed solely by those figures, its validity fairly could be called into question."); *Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 677 (4th Cir. 1996) ("An inflated pool can undermine the validity of a statistical study to determine imbalances."); *Reynolds v. Sheet Metal Workers Local 102*, 498 F. Supp. 952, 967–69 (D.D.C. 1980) (questioning relevance and significance of statistical analyses that inflate number of minorities in comparator pools).

It is not readily apparent from Shea's summary judgment motion why he combines males and females to create the relevant comparator groups.  This is the Court's best guess, based on scattered comments from Shea's briefs:  Since the MLAAP is not open to white women, the underrepresentation of white women is not relevant to justifying the MLAAP.  Since the MLAAP excluded Shea because of his race, rather than his gender, the pertinent question is whether whites—rather than white males—were overrepresented in the mid-levels of the Foreign Service.  In his opposition brief, Shea does not fully address State's challenges to using whites as the comparator pool.  He seems to misunderstand State's argument, stating:  "The defense

43

emphasis on how 'grossly' overrepresented white males were in 1987 seems part of an effort to convince the court to add an element to a Title VII claim asserting a lawful [affirmative action plan]: that the plaintiff was part of a group that was under-represented in the workforce."  Pl.'s Opp'n & Reply 8.  State responds that it "has never alleged that the Plaintiff 'lacks standing' to raise a claim merely because he is a member of an over-represented group in the workplace," and finds no explanation as to why Shea combined white males and females in his analysis.  Def.'s Reply 5.  The Court agrees that it is not entirely clear why Shea chooses this comparator pool.

What should be clear, however, is that Shea is engaging in a new statistical analysis.  He is changing the comparator group that State used to justify its affirmative action plan, and recalculating rates of representation based on Shea's preferred comparator groups.  State raises serious concerns about Shea's methods and use of comparator pools.  Without deciding whether State's criticisms are valid, the Court notes that the questions they raise are serious and have not been adequately addressed by Shea, as the following analysis will show.

### 3.      *Shea Conducts a Statistical Analysis He is Not Competent to Perform*

Essentially, Shea performs a statistical analysis of State's data to show that there was, in fact, no "manifest imbalance" in the Foreign Service.  Whether or not Shea needs an expert to perform this analysis, it is clear that Shea has not adequately explained his methods or demonstrated the statistical significance of his results.  His analysis of State's racial over- and underrepresentation is not, and is not capable of being transformed into, admissible evidence.

   a.      Courts demand some evidence of the statistical significance
           of statistics, often presented via an expert witness

The case law in this circuit overwhelmingly finds that this kind of analysis requires proof as to its statistical significance.  In *Frazier v. Consolidated Rail Corporation*, 851 F.2d 1447, 1450 (D.C. Cir. 1988), the D.C. Circuit made the fundamental statement that while the use of

statistical analysis has "become routine" and "well accepted" in discrimination cases, "[a] statistical calculation relies on a number of underlying assumptions, the validity of which can often be assessed only by those with experience in the field."  In *Frazier*, the plaintiffs did not use "an expert to explain the statistical calculations to the district court," but submitted raw data about disparate treatment and "several results of numerical calculation performed by counsel." *Id*.  "These calculations were all done according to widely known methods previously reported in other discrimination cases, regulations and commentaries" and included a "Z statistic" calculation to explain the statistical significance of the results.  *Id*.  While not deciding whether expert witnesses are required for this kind of analysis, the D.C. Circuit stressed the importance of verifying the significance of the statistics, and upheld the district court's evidentiary findings:

> We are not prepared to say that the Z statistic calculation is so simple and straight forward that an expert is never required to explain it to a finder of fact.  Nor do we wish to be understood as holding that an expert is always required.  We leave both possibilities open because it would be impossible to anticipate the impact of this theory upon every conceivable factual situation.  We believe that in the factual context of this case, the district court made a valid finding that the plaintiffs' proffered statistics were not sufficiently presented to make out a *prima facie* case of adverse impact.

*Id*. at 1453.

Courts in this Circuit have continued to require evidence of statistical significance—often provided by experts—before giving any weight to proffered statistics.  In *Kline v. Springer*, 602 F. Supp. 2d 234, 238–39 (D.D.C. 2009), the district court succinctly disregarded plaintiff's assertions about the underrepresentation of white female underrepresentation.  The Court noted that even if the plaintiff's "numbers were properly supported by record evidence they would not be enough.  Without additional context, such as correctly defined pools, no reasonable juror could infer a background of reverse discrimination…from the bare numbers."  *Id*. at 239.  In *Horvath v. Thompson*, 329 F. Supp. 2d 1 (D.D.C. 2004), a *pro se* plaintiff in a reverse gender

discrimination suit tried to introduce self-prepared statistics showing a manifest imbalance of white men in the workplace.   The Court found that plaintiff's numbers regarding the underrepresentation of males were "simply irrelevant," "absent a showing of their significance[.]"   *Id.* at 11.   In that case, the plaintiff failed to introduce sufficient evidence about "the pool of available and qualified applicants," and "any measure of 'the probability that the outcome of a statistical analysis would have occurred by chance.'"   *Id.* (*quoting Segar v. Smith*, 738 F.2d 1249, 1282 (D.C. Cir. 1984)).   In *Thomas v. Chao*, 65 Fed. Appx. 321, 324 (D.C. Cir. 2003), the D.C. Circuit found that the "District Court was correct to exclude from evidence the list of employers identified by race and sex, and witness' observations about the race and sex of employees, in the absence of an expert who could testify that the alleged underrepresentation was statistically insignificant."

> b.   Shea's calculations cannot withstand the rigorous scrutiny
> courts in this circuit apply to statistics in Title VII cases

The infirmity of Shea's lay statistics is further emphasized by the rigorous, exacting analysis courts in this circuit have applied to this kind of statistical evidence.   *See, e.g.*, *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1411–23 (D.C. Cir. 1988), *on rehearing* 852 F.2d 619; *McReynolds*, 349 F. Supp. 2d at 8–28.[11]   Looking at Shea's analysis, this Court has several fundamental, threshold questions.   Why does Shea continue to use the 1980 numbers for the relevant comparator pool, *see* Pl.'s Mot. Summ. J. 3, 12–14, even though the GAO report containing those numbers explicitly disclaimed their reliability, and more recent numbers were available?   *See* Ex. 3 to Def.'s Cross-Mot. 21 (Shea – 008695).   Why is it appropriate for Shea to combine while males and while females, and recalculate the underrepresentation figures by race only?   Isn't Shea simply inflating the comparator group to

---

[11] This presents another way to look at this issue:  In comparison with the detailed, searching analysis used in *Berger* and *McReynolds*, it is clear that Shea's statistical analysis—expert or not—cannot pass muster.

diminish the rate of white male overrepresentation?  How, and why, has Shea recalculated the rates of underrepresentation?  Has he done so pursuant to standard, generally accepted procedures?  Are his results statistically significant?  What is the error rate?  How does Shea measure statistical significance and error rates?

The Court needs to answer these questions before it can determine the relevance, reliability, and probative value of Shea's calculations—and thus their admissibility.  *See Frazier*, 851 F.2d at 1452 ("Statistical comparisons performed on data in discrimination cases are not probative of anything without support from an underlying statistical theory.").  Shea does not adequately answer these questions.  "[T]he statistics must be made meaningful to the finder of fact in order to permit the plaintiff[] to carry [his] burden of showing that [his] statistics are significant."  *Id.* at 1453.  Even if Shea did not necessarily need an expert to conduct his analysis—as left open by *Frazier*, 851 F.2d at 1453—this Court finds that plaintiff's proffered statistics were not sufficiently presented to withstand the scrutiny this Court must apply in determining their relevance and reliability, *cf. id.*

> c.  Shea's analysis is not as simple and modest as he claims

Shea claims that his analysis simply relies on numbers provided in State's own documents.  *See* Pl.'s Opp'n & Reply 9–10, 13, 25.  A simple examination of plaintiff's Exhibit 2 shows that he is not merely pointing to State's analysis and why it cannot support State's position.  Instead he combines different sets of State's numbers—merging the figures for males and females—and recalculating overrepresentation rates based on what Shea thinks should be the relevant comparator.  *See* Ex. 2 to Pl.'s Mot. Summ. J. (plaintiff-created charts at pages 11, 12, 13, 15, 16, 17).  He, in essence, changes the comparator groups without a sufficient explanation for the change, and without a background in the kinds of "pools" analysis frequently done by

47

statisticians in Title VII cases.  *See*, *e.g.*, *Whitacre v. Davey*, 890 F.2d 1168, 1172 (D.C. Cir. 1989) (requiring "evidence of the pool of available and qualified applicants" before proffered statistics may be considered adequate); *Palmer*, 815 F. 2d at 91 (discussing "pools" analysis in Title VII cases); *Segar*, 738 F.2d at 1278 (same); *McReynolds*, 349 F. Supp. 2d at 9 (same).

Shea claims that, in so recalculating the overrepresentation numbers, he is doing simple math—that he does not need any advanced degrees or specialized knowledge to add, subtract, multiply, and divide.  *See* Pl.'s Opp'n & Reply 16–17, 25–31.  Certainly, a big part of what most statisticians do boils down to simple math.  But statisticians are not experts because they are particularly adept at math—the Court suspects that many use performance-enhancing calculators. Statisticians are experts because they know which numbers to use, and what functions to apply to each set of numbers.  In this case, the relevant expertise is not simply applying elementary school-level math to sets of numbers found within the defendant's documents.  It is knowing, out of the different sets of numbers spread throughout State's reports, which sets of numbers to compare and how to compare them.  It is being able to explain whether a disparity between whites and minorities is statistically significant, and whether the results have accounted for "noise" that may skew the numbers.  *See*, *e.g.*, *Berger*, 843 F.2d at 1411–23; *Frazier*, 851 F.2d at 1452; *McReynolds*, 349 F. Supp. 2d at 8–28.

d.      Shea is not qualified to offer expert or lay opinion testimony

Shea's numbers are irrelevant without some explanation of their significance.  Shea might need an expert to opine on the statistical significance of the recalculated underrepresentation figures.  *See Chao*, 65 Fed. Appx. at 324.  Without even considering Shea's qualifications, Shea could not provide expert testimony because he did not disclose his testimony—per Federal Rule of Civil Procedure 26—by the deadlines imposed by the Court.

*See* Revised Scheduling Order 2, July 6, 2010, ECF No. 84 (setting expert deadline as September 30, 2010).   Shea had ample opportunity to designate an expert, and was aware of the relevant deadlines when he asked for—and received—extensions of the expert disclosure and discovery deadlines.   *See, e.g.*, Minute Entry, Sept. 22, 2009; Minute Entry, Dec. 18, 2009; Pl.'s Mot. for Discovery Extension, June 28, 2010, ECF No. 81.   Shea's unexcused and inexcusable failure to timely designate an expert per the Court's deadlines disqualifies him as an "expert," and makes his calculations and conclusions inadmissible to the extent they require expert testimony.

Shea cannot present "lay" opinion testimony as to the statistical significance of his findings.   Such testimony typically involves disclosed experts and is thus not amenable to lay expert analysis.   *See* Fed. R. Evid. 701(c) (forbidding lay opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702").   Lay opinion testimony "'is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'"   *United States v. Williams*, 212 F.3d 1305, 1390 n.6 (D.C. Cir. 2000) (quoting pre-2011 amendment wording of Fed. R. Evid. 701 [12] ).   Shea's opinions on the rates of overrepresentation are not based on his own perceptions and feelings, or his personal knowledge and experience.   He has not attained "specialized knowledge…through experience rather than scientific or technical training," and is not testifying "based solely on personal experience with the case at issue."   *Armenian Assembly of Am. v. Cafesijan*, 746 F. Supp. 2d 55, 65 (D.D.C. 2010).   Therefore, his testimony therefore would not be admissible as "lay opinion" or "lay expert" testimony under Rule 701.   *Cf. Barnes v. District of Columbia*, __ F. Supp. 2d __, 2013 WL 541148, *6–*9 (D.D.C. Feb. 14, 2013) (discussing admissibility of lay opinion testimony).

---

[12] The 2011 changes made to Rule 701 were "intended to be stylistic only" and were not intended "to change any result in any ruling on evidence admissibility."   Fed. R. Evid. 701 advisory committee's note.

e.      Even if no expert is needed, Shea has failed to adequately explain
his methods and the statistical significance of his results

Even if this kind analysis would not require an expert, *per se*, Shea has failed to properly

defend his analysis.  "Statistical comparisons performed on data in discrimination cases are not

probative of anything without support from an underlying statistical theory." *Frazier*, 851 F.2d

at 1452.  Simply presenting numbers and comparisons to the Court is not sufficient.  *See*

*Saunders v. White*, 191 F. Supp. 2d 96, 133 (D.D.C. 2002); *Hatcher–Capers v. Haley*, 786 F.

Supp. 1054, 1063–64 (D.D.C. 1992).  The party offering the statistics must articulate how the

data should be interpreted and why it supports the party's position. *Saunders*, 191 F. Supp. 2d at

133.  The party must "demonstrate that the data []he offers is statistically significant," *Haley*, 786

F. Supp. at 1063, and explain how the numbers reflect discrimination (or a lack thereof) rather

than, for example, "incomprehensive statistical treatment, varying levels of qualifications among

applicants, errors in definition or groups, inappropriate sampling methods, errors in

measurement, or even clerical and computational errors," *Frazier*, 851 F.2d at 1452.

As in *Frazier*, *id.* at 1453, Shea's statistics are not "sufficiently presented;" Shea cannot

explain his methods and assumptions such that his statistics are "meaningful to the trier of fact in

order to permit" him to carry his burden of "showing that [his] statistics are significant."[13]  He

inflates the comparator pool without an adequate justification for using this larger pool.  He

provides no explanation of whether his recalculated rates of overrepresentation are statistically

significant, per any generally accepted measure.  He does not even attempt a standard deviation

or "Z statistic" calculation.  He does not even reference—let alone explain how he relied on—

"widely known methods previously reported in other discrimination cases, regulations, and

---

[13] From the D.C. Circuit's description, the non-expert statistics *Frazier* found to be insufficiently presented appear to be *much more* detailed than the analysis offered by Shea.  851 F.2d at 1450–54.

commentaries." *Id.* at 1450.  He gives the Court none of the information it would need to make a threshold determination of the relevance, reliability, and admissibility of his amateur statistics.

Courts often give *pro se* litigants more slack than represented parties—for example, Courts may be more generous in construing *pro se* complaints when considering a motion to dismiss.  *See generally Pettaway v. United States*, 390 A.2d 981, 984 (D.C. 1978) ("We have a duty to be indulgent of *pro se* pleadings.").  This generosity does not extend, however, to allowing Shea to provide his own opinions where expert testimony is needed, or subjecting Shea's statistical methods to *far less* scrutiny than any other litigant would face.

> f.      State is not required to offer expert testimony to meet its burden

Shea argues that it is unfair to ask him to use experts to show that a manifest imbalance did *not* justify the MLAAP, but not require State to use experts to show that there *was* such a manifest imbalance.  Pl.'s Opp'n & Reply 7–8, 31–35.  Requiring State—as a condition of meeting its burden of *production*—to retain outside experts to verify that State designed the MLAAP to correct for a manifest imbalance would severely undermine the allocation of burdens established in *McDonnell Douglas* and *Johnson*.  *Johnson*, read liberally, might suggest that the mere production of an affirmative action plan could meet the employer's burden under *McDonnell Douglas*.  *See* 480 U.S. at 627 ("Once a plaintiff establishes a *prima facie* case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision.  The existence of an affirmative action plan provides such a rationale.  If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.").  State has done more than simply point to its affirmative action plan—it has provided evidence indicating its plan is lawful, justified by a need to remedy

a manifest imbalance, and properly tailored to those ends.   However, by submitting this evidence, State does not admit that it "carr[ies] the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff." *Id*. at 627–28.

The Court admits that the law is not precise on exactly how much evidence an employer must offer to defend its affirmative action plan.   *Cf.* 2 LINDEMANN, GROSSMAN & WEIRICH, EMPLOYMENT DISCRIMINATION LAW 2506–07 ("On the fact-specific issue as to what evidence is needed to prove discrimination sufficient to undertake affirmative action, however, the lower courts have not taken a consistent approach.").   Nevertheless, wherever the exact location of the "line" is, the Court is confident (as discussed *supra* in Part III.A.) that State's proffered evidence goes far beyond that line.   Under current precedent—*Johnson* and its progeny—an employer is not necessarily required to provide expert testimony to meet its burden of production.

The reports from the State Department, congressional subcommittees, and the GAO—created during the normal course of business—could be sufficient to establish the required "manifest imbalance" and "predicate of discrimination."   *See supra* Part.III.B. (detailing evidence introduced by State).   To authenticate and discuss the content of these reports, the defendant would not necessarily need expert witnesses, or treat its party witnesses as such.   *See Barnes*, __ F. Supp. 2d __, 2013 WL 541148 at *7 (defendant's contemporaneously-created reports on the rates of prisoner overdetentions "are not expert reports," but "business records—created not in anticipation of litigation, but in the normal course of business—that do not require a Rule 26(a)(2) designated expert to authenticate them"); *cf. National R.R. Passenger Corp. v. Railway Express, LLC*, 268 F.R.D. 211, 214–15 (D. Md. 2010) (party employees may be required to provide expert disclosures if employee witness renders opinions on matters outside the normal scope of their employment or the employer retains or specially employs them to

testify).  As properly authenticated business records, these reports and documents could justify the MLAAP without the need for experts.

### 4. *Shea's Evidence that the MLAAP Forecloses Advancement Opportunities for Non-Minorities*

Shea argues that the MLAAP, in effect, forecloses advancement opportunities for non-minorities.  Shea claims he "was not aware of any mid-level hiring program that non-minorities were eligible for when [he] applied for a job with the Foreign Service in 1990[.]"  Pl.'s Opp'n to Def.'s Second Mot. Reconsideration 41, Apr. 12, 2011, ECF No. 95.  While Shea's subjective knowledge of the MLCCP may be relevant to mitigation of damages, it is not relevant in considering the legality of the MLAAP, as it is undisputed that such a general mid-level hiring program existed.  Def.'s SMF ¶¶ 9–12, 22; Pl.'s SMF Resp. 10–13 (admitting Def.'s SMF ¶¶ 9–12, 22).  Nevertheless, Shea claims that the MLCCP would have done him no good, as State was not issuing certificates of need for his particular area of expertise.  Shea says that no certificates of need were issued between January 1990 and the date he began with State, May 31, 1992.  Pl.'s Opp'n & Reply 35.  Shea continues, "The first mid-level white hiring comes on October 19, 1992 – after I had started my employment with State."  *Id.*  In support of this position, Shea cites defense exhibit 16 (ECF No. 128-18), a chart entitled "Mid-Level Hiring 1990 to 1994."  This chart shows that State first hired Caucasian as a mid-level on October 19, 1992.[14]

---

[14] This, of course, does not mean there were no white mid-level hires prior to October 1992.  Construing this chart, the Court draws all reasonable inferences in favor of Shea, and does feel the need to address whether there were non-minority mid-level hires prior to this date.

Elsewhere State argues, "Due to the passage of time cause by Plaintiff's nine-year delay in bringing this action and the resulting loss of records, Defendant is unable to tell if any certificates of need were issued by the State Department in the fiscal years 1990 and 1991."  Def.'s Cross-Mot. 26 n.16.  Since this is merely the *ipse dixit* of counsel, unsupported by a sworn affidavit or admissible evidence, the Court ignores this argument entirely and focuses on what can actually be shown by the evidence.  *See A.N.S.W.E.R. Coal. v. District of Columbia*, __ F. Supp. 2d. __, 2012 WL 5974030, *14 (D.D.C. Nov. 29, 2012) (unsworn statements of counsel, unsupported by the evidence, is evidence of nothing at the summary judgment stage) (*citing Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *Int'l Distrb. Corp. v. Am. Dist. Tel. Co.*, 569 F.2d 136, 139 (D.C. Cir. 1977)).

This chart does not show that no certificates of need were being issued—or that it was impossible to receive such a certificate—when Shea applied.   Certificates of need, as prerequisites to applying for a mid-level position, must be issued some time *before* an applicant is hired.  Exs. 1A & 1B to Def.'s Cross-Mot. (1982 and 1987 Mid-Level Foreign Service Career Candidate Programs).   Consider the case of Patricia Haslach, whom Shea cites as the non-minority candidate hired on October 19, 1992.  Pl.'s Opp'n & Reply 35.  According to a letter from Haslach to State, Haslach inquired about the MLCCP as early as December 12, 1990.  Ex. 17 to Def.'s Cross-Mot. (Shea – 07538).  On January 10, 1991, Haslach applied for a mid-level position, *id.*; apparently it took approximately 22 months for her to be hired at State, *see* Def.'s SMF ¶¶ 28, 30–32; Pl.'s SMF Resp. 14–15 (admitting Def.'s SMF ¶¶ 28, 30–32).  This shows that simply because no white mid-levels were *hired* until a few months after Shea entered State, this does not mean no certificates of need were *issued* until after Shea entered State.

Shea next cites a November 30, 1992, memorandum sent to the State Department Director General titled, "Minority Recruitment and Hiring."  Ex. 1 to Pl.'s Opp'n & Reply, ECF No. 123-1.  The memo states that "at present," State was then "able to certify mid-level need for admin, econ, and science officers at the 02 and 03 levels, and consular officers at the 02 levels." Ex. 1 to Pl.'s Opp'n & Reply (Shea – 03765).   To Shea this means State was not issuing certificates for consular officers at grade FS-3—the position he would have been interested in and qualified for—and therefore he was effectively shut out of the MLCCP.  *See* Pl.'s Opp'n & Reply 37.  However, this conclusion does not follow from the memorandum.  First, the memo only concerns certificates of need as of November 1992, and says absolutely nothing about the availability of consular certificates prior to that date.  In fact, prior to November 1992, State did approve of certificates of need for FS-03 consular officers.  *See* Ex. 10 to Def.'s Cross-Mot.  (on

May 14, 1992, approving of FS-03 consular certificates of need) (Shea – 07372).  This May 1992 State document undermines Shea's interpretation of the November 1992 memorandum—simply because FS-03 consular certificates were not available in November 1992 does *not* mean they were not available earlier, while Shea was applying for a position.

Overall, Shea does not present sufficient evidence to infer that was completely shut out of the MLCCP or did not have an opportunity to reach the mid-levels.  By his own admission, Shea never inquired about the MLCCP, requested a certificate of need, or applied to the program.  Def.'s SMF ¶ 22; Pl.'s SMF Resp. 13 (admitting Def.'s SMF ¶ 22); Pl.'s Opp'n to Def.'s Second Mot. Reconsideration 41.  Applying for, and being rejected from, mid-level placement would be the clearest evidence that he was not eligible for mid-level placement.  At this point, Shea's evidence is speculative at best and not sufficient to overcome State's evidentiary proffer.

## IV.    CONCLUSION

The role of a district court is to ascertain and apply the law as it is, not as the Court thinks it should be.  This Court finds that the Supreme Court's majority opinion in *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616 (1987)—as it has been interpreted and applied in this Circuit—provides the controlling standard for analyzing Title VII challenges of affirmative action plans.  Under *Johnson*, after the plaintiff has made a *prima facie* claim of racial discrimination, the defendant must only meet a burden of production—not persuasion— that it acted pursuant to a legal affirmative action plan.  The ultimate persuasive burden is, at all times, on the plaintiff to prove that the affirmative action plan was unlawful.  Under this standard, Shea has failed to provide sufficient, admissible evidence that State's affirmative action plan was not justified by a manifest imbalance in the workforce or properly tailored to achieve remedial goals.  In particular, Shea's amateur statistics regarding the rates of minority

representation in the Foreign Service would be inadmissible, as Shea provides no evidence as to the statistical significance of his results.  Since Shea cannot prove an essential element of his claim, and has had a full and fair opportunity obtain relevant discovery, the State Department is entitled to summary judgment on Shea's remaining claim.

For Shea, this may be a less than satisfying end to this long-running case.  This Court is, in some ways, sympathetic.  The Court wonders why it is harder to challenge an affirmative action plan under Title VII than under the Constitution.  When challenging affirmative action under the Equal Protection Clause, strict scrutiny applies and the defendant has the ultimate burden of explaining why it was necessary to treat people differently based on their race.  But when the challenge is under Title VII, we make the plaintiff ultimately prove that race-based discrimination is illegal.[15]  The Court questions the wisdom of looking to legislative history to *create* a textual ambiguity, rather than *resolve* one—carving out exceptions from a clear mandate not to discriminate because we imagine what legislators *would* have done, rather than focus on what they actually did. [16]  Our affirmative action jurisprudence—both statutory and constitutional—operates under the assumption that unambiguous mandates not to discriminate based on race somehow apply with less force to members of the "majority."

---

[15] *See Johnson*, 480 U.S. at 626–27 (providing Title VII *McDonnell Douglas* burden shifting standard for analyzing affirmative action plans); *Wygant*, 476 U.S. at 273 (providing constitutional strict scrutiny standard for analyzing affirmative action plans; *Johnson*, 480 U.S. at 480 U.S. at 627 n.6 (majority opinion clarifying that statutory procedure for analyzing affirmative action plans is indeed different from the constitutional test); *Stewart*, 948 F. Supp. at 1093 ("The standard for determining whether affirmative relief is justified under Title VII is less stringent than under the Constitution.").

[16]  Our affirmative action jurisprudence has its origins in the backwards idea that the "spirit" of a law somehow trumps its plain and unambiguous letter.  In *Weber* and *Johnson*, the Supreme Court somehow found—in plain language barring racial discrimination—an out to give racial preferences to minority groups.  Certainly, the Court thought, it would be absurd for a law *barring* racial discrimination not to allow some.  *See generally Johnson*, 480 U.S. at 657–77 (Scalia, J., dissenting).  The Court is reminded of Chief Justice Roberts' incisive statement:  "**The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.**"  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 748 (2007) (Roberts, C.J., concurring) (emphasis added).

While the tide may be turning against this approach to affirmative action, it has yet to directly reach *Johnson*'s Title VII standard.[17]  Much of the doubt about our present affirmative action jurisprudence has been consigned to dissents, non-controlling concurrences, dictum, and scholarly critiques.[18]  Absent a clear statement from the Supreme Court or the Court of Appeals that *Johnson* no longer governs, this Court must apply its principles.  Therefore, Shea's Title VII challenge to State's affirmative action plan must fail, and State is entitled to summary judgment. This constitutes final judgment in this action, and the Court dismiss this case with prejudice.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 10, 2013.

---

[17] Many—including Judge Robertson in this case, Mem. Order 8 n.3, Aug. 11, 2009, ECF No. 69—have questioned the continuing viability of *Johnson* and other affirmative action precedent in light of *Ricci v. DeStefano*, 557 U.S. 557 (2009).  *See*, *e.g.*, Marcia L. McCormick, *Disparate Impact and Equal Protection After* Ricci v. DeStefano, 27 WIS. J.L. GENDER & SOC'Y 100 (2012); Roberto L. Corrada, Ricci's *Dicta: Signaling a New Standard for Affirmative Action Under Title VII?*, 46 WAKE FOREST L. REV. 241 (2011); Sachin S. Pandya, *Detecting the Stealth Erosion of Precedent:  Affirmative Action After* Ricci, 31 BERKELEY J. EMP. & LAB. L. 285 (2010).  However, as these articles indicate, nothing in *Ricci* directly overturns or modifies *Johnson*, at least as it applies to this case.  The arguments are that *Ricci* has dicta signaling that the Supreme Court will change course on affirmative action in the future.  This Court cannot depart from long-standing, clear precedent based on such speculation.

Many also thought—including this Judge in *Stewart*, 948 F. Supp. at 1094–95—there would be a significant change to affirmative action jurisprudence after *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).  *See*, *e.g.*, Margaret A. Sewell, Adarand Constructors, Inc. v. Pena: *The Armageddon of Affirmative Action*, 46 DEPAUL L. REV. 611 (1997); Lara Hudgins, *Rethinking Affirmative Action in the 1990s: Tailoring the Cure to Remedy the Disease*, 47 BAYLOR L. REV. 815 (1995); John Payton, *The Meaning and Significance of the* Croson *Case*, 1 GEO. MASON U. CIV. RTS. L.J. 59 (1990).  This has yet to pass, as in the years since *Croson* and *Adarand*, the Supreme Court has yet to overrule *Johnson* and *Weber*.  *Cf.* Neal Devins, Adarand Constructors, Inc. v. Pena *and the Continuing Irrelevance of Supreme Court Affirmative Action Decisions*, 37 WM. & MARY L. REV. 673 (1996) (arguing neither *Croson* or *Adarand* had effect many expected).

Others still thought that *Parents Involved*, 551 U.S. 701 (2007), sounded the death knell for affirmative action.  *See* Katherine M. Planer, *The Death of Diversity? Affirmative Action in the Workplace After* Parents Involved, 39 SETON HALL L. REV.  1333 (2009).  While not much may be clear about affirmative action, the reports of its demise have been greatly exaggerated.  *Cf.* Frank Marshall White, *Mark Twain Amused / Humorist Says He Even Heard on Good Authority That He Was Dead*, N.Y. JOURNAL, June 2, 1897, at 1, *reprinted in* MARK TWAIN: THE COMPLETE INTERVIEWS 317–18 (Gary Scharnhorst ed., 2006).

[18] *See*, *e.g.*, *Ricci*, 557 U.S. at 594–97 (Scalia, J., concurring); *Johnson*, 480 U.S. at 657–77 (Scalia, J., dissenting); *Hill v. Ross*, 183 F.3d 586, 588 (7th Cir. 1999); *Stewart*, 948 F. Supp. at 1094–95 (Lamberth, J.); *Finch v. City of Indianapolis*, 886 F. Supp. 2d 945, 961 & n.15 (S.D. Ind. 2012); THOMAS SOWELL, BLACK EDUCATION: MYTHS AND TRAGEDIES 292 (1972); Ryan M. Peck, *Title VII is Color Blind: The Law of Reverse Discrimination*, 75  J. KAN. B.A. 20 (June 2006); Kathryn A. Sampson, *Negotiating a Slippery Slope: Voluntary Affirmative Action After* Johnson, 14 J. CORP. L. 201  (1988); Charles Murray, *Affirmative Racism*, THE NEW REPUBLIC, Dec. 31, 1984, at 18.